STATE OF MICHIGAN

IN THE WAYNE COUNTY CIRCUIT COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff,

v.

JAMES ANDREW POWELL,

      Defendant.

_____/

Case No: 08-6961

HON. TIMOTHY M. KENNY

Wayne County Prosecutor
Frank Murphy Hall of Justice
1441 St. Antoine
Detroit, MI 48226

James Andrew Powell
DEFENDANT IN PRO PER
Prisoner ID No. 537041
Bellamy Creek Corr. Facility
1727 W. Bluewater Highway
Ionia, MI 48846

_____

MOTION TO SUPPLEMENT
POST-CONVICTION PLEADINGS

SUPPLEMENTAL
MEMORANDUM OF LAW

ATTACHMENTS

CERTIFICATE OF SERVICE

STATE OF MICHIGAN

IN THE WAYNE COUNTY CIRCUIT COURT

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff,

v.

JAMES ANDREW POWELL,

       Defendant.

_____/

Case No: 08-6961

HON. TIMOTHY M. KENNY

## MOTION TO SUPPLEMENT
## POST-CONVICTION PLEADINGS

NOW COMES Defendant James Andrew Powell, in pro per, and moves this Court to permit him to file supplemental pleadings in the above-captioned case pursuant to MCR 6.502(F). The Defendant states as follows in support of this motion:

1. On 07/14/2011 the United States District Court for the Eastern District of Michigan granted Petitioner James Powell's motion to hold his petition for for writ of habeas corpus in abeyance and issued an ORDER GRANTING PETITIONER'S MOTION FOR A STAY AND ADMINISTRATIVELY CLOSING THIS CASE; this afforded Defendant Powell an opportunity to file a post-conviction motion in the state trial court raising unexhausted claims. (James Powell v Ken McKee, U.S. District Ct. No. 11-12841)

2. In accordance with the above order, Defendant James Andrew Powell filed a motion for relief from judgment in this Court raising the following claims for relief:

    I. MR. POWELL WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS WHERE THE PLEA BARGAIN WAS ILLUSORY AND THE PLEA WAS NEITHER INTELLIGENT OR NOR VOLUNTARY, WHERE, (1) MR. POWELL PLED GUILTY TO SECOND DEGREE MURDER IN EXCHANGE FOR DISMISSAL OF EXCESSIVE CHARGES AND A SENTENCE OF 27-40 YEARS WHEN PROPERLY SCORED GUIDELINES CALLED FOR A

1

SUBSTANTIALLY LOWER SENTENCE, AND (2) WHERE THE ADMISSION IS INSUFFICIENT TO ESTABLISH MALICE FOR 2ND DEGREE MURDER OR TO ESTABLISH ASSAULT WITH A DANGEROUS WEAPON.

II. THE FELONY MURDER STATUTE IS UNCONSTITUTIONAL AS APPLIED: LARCENY UNDER $1,000 IS A MISDEMEANOR AND CANNOT SUPPORT A FELONY MURDER CHARGE.

III. MR. POWELL WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO RAISE SPECIFIC SENTENCE-SCORING ERRORS BASED ON CONSTITUTIONALLY INACCURATE INFORMATION NOT ADMITTED TO BY MR. POWELL.

IV. PRIOR RECORD VARIABLE (PRV) 7, WHICH ENHANCES THE SENTENCE BASED ON SUBSEQUENT OR CONCURRENT FELONY CONVICTIONS, IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED, IN THAT IT VIOLATES THE DOUBLE JEOPARDY AND TITLE-OBJECT CLAUSES OF THE FEDERAL AND MICHIGAN CONSTITUTIONS.

3. Defendant now seeks to file a memorandum of law supplementing the arguments he raised in his motion for relief from judgment, and supplementing his claims as follows:

I. WHERE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE FROM HIS APPELLATE ATTORNEYS THIS CONSTITUTES "CAUSE FOR DEFENDANT'S FAILURE TO RAISE SIGNIFICANT CONSTITUTIONAL CLAIMS DURING HIS FIRST APPEAL.

II. A PERSON CANNOT LAWFULLY BE CHARGED WITH, OR CONVICTED OF, FIRST DEGREE OR FELONY MURDER WHERE THE PREDICATE OFFENSE IS MISDEMEANOR LARCENY BECAUSE (A) INTERPRETATIONS OF MCL 750.316(1)(b) THAT ALLOW MISDEMEANOR LARCENY AS A PREDICATE OFFENSE FOR FELONY-MURDER ARE BASED ON A FAILURE TO RECOGNIZE AN AMBIGUITY IN THE STATUTORY LANGUAGE; AND (B) ACCORDING TO CASE LAW AND APPLICABLE PRINCIPLES OF STATUTORY CONSTRUCTION, THE PHRASE "LARCENY OF ANY KIND," AS USED IN MCL 750.316, SHOULD NOT BE INTERPRETED AS INCLUDING MISDEMEANOR LARCENY.

III. DEFENDANT SHOULD BE PERMITTED TO WITHDRAW HIS GUILTY PLEA BECAUSE THE PLEA WAS ILLUSORY AND, BUT FOR TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE, DEFENDANT WOULD NOT HAVE PLEADED GUILTY.

4. Since filing his initial motion for relief from judgment, Defendant has been transferred from Level 4 (close custody) to Level 2 (medium security) and therefore has increased time out of his cell and access to the legal materials necessary to perfect his pleadings.

2

5. Defendant's memorandum of law clarifies Defendant's claims for relief and does not prejudice the plaintiff's attorneys where no order has been issued from this Court regarding Defendant's motion for relief from judgment.

6. Under MCR 6.502(F) this Court may permit Defendant to supplement or amend his motion for relief from judgment, and it is in the interests of fundamental fairness where this is Defendant's only opportunity to raise these claims and he is acting in pro per.

WHEREFORE, Defendant respectfully requests that this Court grant his motion and permit him to supplement his pleadings with the attached memorandum of law.

Dated: January 31, 2012

/s/ _____

JAMES ANDREW POWELL
PRISON NO: 537041
BELLAMY CREEK CORR. FACILITY
1717 W. BLUEWATER HIGHWAY
IONIA, MI 48846

3

STATE OF MICHIGAN

IN THE WAYNE COUNTY CIRCUIT COURT

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff,

v.

JAMES ANDREW POWELL,

        Defendant.

_____/

Case No: 08-6961

HON. TIMOTHY M. KENNY

SUPPLEMENTAL
MEMORANDUM OF LAW

TABLE OF CONTENTS

Index of Authorities . . . . . . . . . . . . . . . ii

Statement of Questions Presented . . . . . . . . . . . . . . . vi

Arguments

   I. WHERE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE FROM HIS
     APPELLATE ATTORNEYS THIS CONSTITUTES ''CAUSE'' FOR DEFENDANT'S
     FAILURE TO RAISE SIGNIFICANT CONSTITUTIONAL CLAIMS DURING HIS
     FIRST APPEAL. . . . . . 1

  II. A PERSON CANNOT LAWFULLY BE CHARGED WITH, OR CONVICTED OF,
     FIRST DEGREE OR FELONY MURDER WHERE THE PREDICATE OFFENSE IS
     MISDEMEANOR LARCENY BECAUSE (A) INTERPRETATIONS OF MCL
     750.316(1)(b) THAT ALLOW MISDEMEANOR LARCENY AS A PREDICATE
     OFFENSE FOR FELONY-MURDER ARE BASED ON A FAILURE TO RECOGNIZE
     AN AMBIGUITY IN THE STATUTORY LANGUAGE; AND (B) ACCORDING TO
     CASE LAW AND APPLICABLE PRINCIPLES OF STATUTORY CONSTRUCTION,
     THE PHRASE ''LARCENY OF ANY KIND,'' AS USED IN MCL 750.316,
     SHOULD NOT BE INTERPRETED AS INCLUDING MISDEMEANOR LARCENY. . . . . . 7

 III. DEFENDANT SHOULD BE PERMITTED TO WITHDRAW HIS GUILTY PLEA
     BECAUSE THE PLEA WAS ILLUSORY AND, BUT FOR TRIAL COUNSEL'S
     INEFFECTIVE ASSISTANCE, DEFENDANT WOULD NOT HAVE PLEADED
     GUILTY. . . . . 16

Relief Requested . . . . . . . . . . . . . . 26

Attachments

A - Supplemental Affidavit

B - Summary of Relevant Testimony

C - Summary of Witness Statements

D - Certificate of Service

INDEX OF AUTHORITIES

Michigan Cases

Drennan v People, 10 Mich 169 (1862) . . . . . . . . . . . . . 9

G.C. Timmis & Co. v
Guardian Alarm Co., 468 Mich 416 (2003) . . . . . . . . . . . 12

Griffith ex rel. Griffith
v State Farm Auto Ins. Co. . . . . . . . . . . . . 14

Mayor of City of Lansing v Michigan PSC,
470 Mich 154 (2004) . . . . . . . . . . . . 11, 12

People v Amos, 163 Mich App 50 (1987) . . . . . . . . . . . . 20

People v Brannon, 194 Mich App 121 (1992) . . . . . . . . . . 9, 17

People v Bush, 187 Mich App 316 (1991) . . . . . . . . . . . 9

People v Cain, 238 Mich App 95 (1999) . . . . . . . . . . . 18

People v Carbin, 463 Mich 590 (2001) . . . . . . . . . . . 16, 17

People v Covelevsky, 217 Mich 90 (1921) . . . . . . . . . . . 9

People v Davidovich, 238 Mich App 422 (1999) . . . . . . . . . 17, 22

People v Dyer, 79 Mich 480 (1890) . . . . . . . . . . . 9

People v Feezle, 486 Mich 184 (2010) . . . . . . . . . . . 7

People v Flick, 487 Mich 1 (2010) . . . . . . . . . . . 9

People v Fonville, 291 Mich App 363 (2011) . . . . . . . . . 17

People v Gimotty, 216 Mich App 254 (1996) . . . . . . . . . 10

People v Goodchild, 68 Mich App 226 (1976) . . . . . . . . . 18

People v Henry, 202 Mich 450 (1918) . . . . . . . . . . . 19

People v Hill, 486 Mich 658 (2010) . . . . . . . . . . . 7

People v Holcomb, 395 Mich 326 (1975) . . . . . . . . . . . 19

People v Karasek, 63 Mich App 706 (1975) . . . . . . . . . . 19

People v Kelly, 231 Mich App 627 (1998) . . . . . . . . . . . 9

People v Leblanc, 485 Mich 575 (2002) . . . . . . . . . . . 1, 16

People v Oliver 111 Mich App 734 (1981) . . . . . . . . . . . 8

People v Pohl, 202 Mich App 203 (1993) . . . . . . . . . . . . 18

People v Reed, 449 Mich 375 (1995) . . . . . . . . . . . . 1, 2, 3

People v Smith 478 Mich 292 (2007) . . . . . . . . . . . 9

People v Springer, 100 Mich App 418 (1980) . . . . . . . . . . 20

People v Sunday, 183 Mich App 504 (1990) . . . . . . . . . . 24

People v Thew, 201 Mich App 78 (1993) . . . . . . . 5-A, 9, 11, 17, 18, 22, 23

People v Vasquez, 465 Mich 83 (2001) . . . . . . . . . . 13

People v Waterstone, 287 Mich App 368 (2010) . . . . . . . . . . 24

People v Williams, 129 Mich App 362 (1983) . . . . . . . . . . 8, 11, 12

Federal Cases

Ali v Bureau of Prisons, 552 US 214 (2008) . . . . . . . . . . 13

American Civil Liberties
Union v Dept. of Defense, 543 F3d 59 (CA 2, 2008) . . . . . . . . . 12

Brady v United States, 397 US 742 (1970) . . . . . . . . . . 5-A, 6, 17
. . . . . . . . . . . 12
Byrd v Trombley, 580 F Supp 542 (ED Mich 2008) . . . . . . . . . . 20

Coddington v Langley, 202 F Supp 2d 687 (ED Mich 2002). . . . . . . . . 2, 5

Doyle v Scutt, 347 F Supp 2d 474 (ED Mich 2004) . . . . . . . . . 17

Edwards v Carpenter, 529 US 446 (2000) . . . . . . . . . . 2

Gutierrez v Alabama, 528 US 250 (2000) . . . . . . . . . . 14

Grey v Greer, 800 F2d 644 (CA 7 1985) . . . . . . . . . . 3, 5

Hill v Lockhart, 474 US 52 (1985) . . . . . . . . . . 16, 17

Hill v Lockhart, 894 F2d 1009 (CA 8, 1990) . . . . . . . . . 22, 24

Holtgrieve v Curtis, 174 F Supp 2d 542 (ED Mich.2001). . . . . . . 6, 17, 21

Howard v Bouchard, 405 F3d 495 (CA 6, 2005) . . . . . . . . . . 5

Lockhart v Fretwell, 506 US 364 (1993) . . . . . . . . . . 24

Magana v Hofbauer, 263 F3d 542 (CA 6, 2001) . . . . . . . . . 16, 22

Page v United States, 844 F.2d 300 (CA 7, 1989) . . . . . . . . . . 5

Riley v Berghuis, 338 F Supp 2d 789 (ED Mich 2005) . . . . . . . . . 9, 11

Rinehart v Brewer, 561 F2d 126 (CA 8, 1997) . . . . . . . . . . . 23

Simpson v Warren, 662 F Supp 2d 835 (ED Mich 1009) . . . . . . . . . . 24

Smith v Murray, 477 US 527 (1986) . . . . . . . . . . 2

Smith v Robbins, 528 US 259 (2000) . . . . . . . . . . 2

Strickland v Washington, 466 US 668 (1984) . . . . . . . . . . passim

United States v Armstrong, 517 US 464 (1996) . . . . . . . . . . 24

United States v Cook, 45 F3d 388 (CA 10, 1995) . . . . . . . . . . 5

United States v Douglas, 634 F3d 852 (2011) . . . . . . . . . . 13

United States ex rel.
Franklin v Gilmore, 993 F Supp 1162 (ND Ill 1998) . . . . . . . . . . 2

United States v Gonzales, 520 US 1 (1997) . . . . . . . . . . 12, 13

United States v McGee, 494 F3d 551 (CA 6, 2007) . . . . . . . . . . 11

United States v Morris, 470 F3d 596 (CA 6, 2006) . . . . . . . . . . 21

Wash. State Dept. of Soc. & Health Servs.
Guardianship estate of Keffeler, 537 US 371 (2003) . . . . . . . . . . 13

Williams v Booker, 715 F2d 756 (ED Mich 2010) . . . . . . . . . . 6

Wood v Allen, 130 S Ct 841  (2010) . . . . . . . . . . 2

Zimmerman v Davis, 683 F Supp 2d 523 (ED Mich 2010) . . . . . . . . . . 2, 6

Statutes & Rules

MCL 750.316 . . . . . . . . . . passim

MCL 750.316(1)(b) . . . . . . . . . . passim

MCL 750.356 . . . . . . . . . . 10, 24

MCL 750.356a . . . . . . . . . . 11

MCL 750.356c . . . . . . . . . . 11

MCL 750.357 . . . . . . . . . . 11

MCL 750.357a . . . . . . . . . . 11

MCL 750.358 . . . . . . . . . . 11

MCL 750.365 . . . . . . . . . . 11

iv

18 USC § 924(c)(1) . . . . . . . . . . . . . . . . . 13

MCR 6.508(D)(3) . . . . . . . . . . . . . . . . . 1, 2

Secondary Sources

1 Gillispie, Michigan Criminal Law
& Procedure, § 1:13 (Rev. 2007) . . . . . . . . . . 9

3 Gillispie, Michigan Criminal Law
& Procedure, § 1799, (2nd ed.) . . . . . . . . . . 18

3B Gillispie, Michigan Criminal Law
& Procedure, § 99:2 (Rev. 2010) . . . . . . . . . . 9

STATEMENT OF QUESTIONS PRESENTED

I. WHERE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE FROM HIS APPELLATE ATTORNEYS, DID THIS CONSTITUTES "CAUSE FOR DEFENDANT'S FAILURE TO RAISE SIGNIFICANT CONSTITUTIONAL CLAIMS DURING HIS FIRST APPEAL?

Defendant answers: NO

Plaintiff answers:

II. WHETHER A PERSON CAN LAWFULLY BE CHARGED WITH, OR CONVICTED OF, FIRST DEGREE OR FELONY MURDER WHERE THE PREDICATE OFFENSE IS MISDEMEANOR LARCENY [?]; (A) WHETHER INTERPRETATIONS OF MCL 750.316(1)(b) THAT ALLOW MISDEMEANOR LARCENY AS A PREDICATE OFFENSE FOR FELONY-MURDER ARE BASED ON A FAILURE TO RECOGNIZE AN AMBIGUITY IN THE STATUTORY LANGUAGE [?]; AND (B) WHETHER ACCORDING TO CASE LAW AND APPLICABLE PRINCIPLES OF STATUTORY CONSTRUCTION, THE PHRASE "LARCENY OF ANY KIND," AS USED IN MCL 750.316, SHOULD NOT BE INTERPRETED AS INCLUDING MISDEMEANOR LARCENY [?].

Defendant answers: NO

Plaintiff answers:

III. WHETHER DEFENDANT SHOULD BE PERMITTED TO WITHDRAW HIS GUILTY PLEA BECAUSE THE PLEA WAS ILLUSORY AND, BUT FOR TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE, DEFENDANT WOULD NOT HAVE PLEADED GUILTY?

Defendant answers: NO

Plaintiff answers:

I. WHERE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE FROM HIS APPELLATE ATTORNEYS THIS CONSTITUTES "CAUSE" FOR DEFENDANT'S FAILURE TO RAISE SIGNIFICANT CONSTITUTIONAL CLAIMS DURING HIS FIRST APPEAL.

Standard for review: "Whether a person has been denied effective assistance of counsel is a mixed question of law and fact. A judge must first find the facts and then must decide whether these facts constitute a violation of defendant's constitutional right to counsel. People v Leblanc, 465 Mich 575, 579, 640 NW2d 246 (2002). The standard applied to analyzing claims of ineffective assistance of trial counsel also applies to claims of ineffective assistance of appellate counsel. People v Reed, 449 Mich 375, 382, 535 NW2d 496 (1995).

ARGUMENT

Defendant has filed a motion for relief from judgment in which he argues that ineffective assistance of appellate counsel constitutes cause for his failure to raise his claims when Defendant initially sought leave to appeal. Defendant now amends the argument supporting his claim.

A court "may not grant relief to [a] defendant if [his] motion [for relief from judgment] [. . . .] alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal [. . . .] unless the defendant demonstrates good cause for failure to raise such grounds on appeal [. . . .] and (b) actual prejudice from the alleged irregularities that support the claim for relief." When a defendant is convicted on the basis of a guilty plea, "actual prejudice" must be shown by demonstrating that "the defect in the proceeding was such that it rendered [Defendant's] plea an involuntary one to a degree that it would be manifestly unjust to allow [his] conviction to stand," MCR 6.508(D)(3)(b)(ii), or, "in any case, the irregularity was so offensive to the maintenance of a sound judicial process that [Defendant's] conviction should not be allowed to stand regardless of its

1

effect on the outcome of the case. MCR 6.508(D)(3)(b)(iii).

"'Cause excusing procedural default is established by proving ineffective assistance of appellate counsel under the standard set out in Strickland v Washington, 466 US 668, 104 S Ct 2052, 80 L Ed 2d 764 (1984)." People v Reed, 449 Mich at 382. To overcome MCR 6.508(D)'s procedural bar and reach the merit of his other claims, a defendant must prevail on his ineffective assistance of appellate counsel claim. Edwards v Carpenter, 529 US 446, 451, 120 S Ct 1587, 146 L Ed 2d 518 (2000).

To establish his ineffective assistance of appellate counsel claim, a defendant "must show that: 1) his counsel's performance was 'objectively unreasonable,' and 2) he was 'prejudiced,' meaning 'a reasonable probability that, but for his counsel's [actions], he would have prevailed on his appeal." Coddington v Langley, 202 F Supp 2d 687, 698 (ED Mich 2002), quoting Smith v Robbins, 528 US 259, 285, 120 S Ct 746, 145 L Ed 2d 756 (2000). "There is no constitutional right to have every non-frivolous issue raised on appeal." Coddington, supra at 698 (Citation omitted.) However, "appellate counsel may be deemed deficient for failing to raise 'a significant and obvious issue without a legitimate strategic purpose.'" Zimmerman v Davis, 683 F Supp 2d 523, 533 (ED Mich 2010), quoting United States ex rel. Franklin v Gilmore, 993 F Supp 1162-1163 (ND Ill 1998). The "'hallmark of effective appellate advocacy' is 'winnowing out weaker arguments on appeal and focusing on' those more likely to succeed," Coddington, supra, quoting Smith v Murray, 477 US 527, 536, 106 S Ct 2661, 91 L Ed 2d 434 (1986). But "[a] decision cannot be fairly characterized as 'strategic' unless it is a conscious choice between [. . .] legitimate and rational alternatives. It must be born of deliberation and not happenstance, inattention, or neglect." Wood v Allen, 130 S Ct 841, 853, ___ L Ed 2d ___ (2010). "[W]hen ignored issues are clearly stronger than those

presented," the presumption that counsel provided effective assistance is overcome. Reed, 449 Mich at 404, quoting, Gray v Greer, 800 F2d 644, 646 (CA 7, 1985).

A.

After being convicted by guilty plea in the Wayne County Circuit Court, Defendant James Powell (Hereafter "Defendant") sought appointment of counsel to assist him with preparing an application for leave in the Court of Appeals. Defendant was convicted pursuant to a plea bargain in which the prosecution dropped first degree murder and felony murder charges against Defendant in consideration for Defendant pleading guilty to second degree murder, two counts of felonious assault, being a felon in possession of a firearm, and felony-firearm. (07/30/08 Plea Tr. 3:21 - 4:2) Additionally, Defendant agreed to a sentence of 25 to 40 years for the second degree murder conviction and 2 years for the felony firearm conviction, plus whatever sentence the court wished to impose for the felonious assault convictions and felon in possession of a firearm conviction. Under the plea bargain Defendant would be sentenced as a habitual offender (2nd offense). (07/30/08 Plea Tr., 4:3-7) Defendant's arguments are predicated on the trial court record, law enforcement generated reports and statements, Defendant's statement of fact in his motion for relief from judgment, and the affidavits being submitted in support of Defendant's claims for relief.

On 09/30/2008, Lee A. Somerville (P-41168) was appointed as Defendant's appellate counsel. On or about 02/18/2009, Ms. Somervill filed a motion in the trial court seeking to withdraw Defendant's guilty plea on the grounds that Defendant was ineffectively assisted by trial counsel where trial counsel where (a) trial counsel failed to seek an evaluation for competency and criminal responsibility; (b) Defendant was actually innocent of the murder and

3

assault charges and had valid self-defense and insanity defenses; and (c)
trial counsel failed to contact witnesses or prepare for trial. These claims
were never considered on the merits in the trial court because prior to a
hearing of this motion, there was a breakdown in the attorney-client
relationship. Subsequently, on 03/27/2009, the trial court granted Defendant's
motion for substitute counsel and on 04/02/2009 appointed Joseph Stewart (P-
21016) to step in as Defendant's appellate counsel. Mr. Stewart conferred with
Defendant and then neglected to follow up on the issues raised in previous
counsel's motion or raise other significant issues on Defendant's behalf.
Instead, Mr. Stewart filed an application for leave to appeal, raising the
claim that (1) Defendant's "sentence of 25 to 40 years was invalid because it
was not individualized, and (2) Due process required resentencing where the
Defendant's sentence was enhanced on the basis of facts neither admitted by
Mr. Holden [sic] nor proven to a jury beyond a reasonable doubt. The latter
claim was supposedly included to preserve a claim under Blakely v Washington,
542 Mich 305 2004). Defendant asserts that, in the context of a conviction
pursuant to a plea bargain, Mr. Stewart's claims for relief were, on their
face, lacked any legal merit. In the case of the second "Blakely" claim, Mr.
Stewart assertions were divorced from reality. The fact that the in this claim
appellate counsel referred to someone other than the Defendant, a "Mr.
Holden," indicates that counsel simply pasted another client's claim onto
Defendant's brief without regard for the factual circumstances of Defendant's
case. In reality, Mr. Stewart's pleadings in this case can accurately be
characterized as a "sham brief." Defendant establishes, on the basis of the
following, establishes "cause" and "prejudice" for his failure to raise his
claims in an earlier proceeding by demonstrating that he was ineffectively
assisted by his appellate attorneys. (It should be noted that although Ms.

Somerville failed to raise Defendant's claims during the time she represented
Defendant, the onus of Defendant's claim falls squarely upon Mr. Stewart
because he is the attorney who ultimately determined the issues that would be
raised in the Court of Appeals.

B.

Appellate counsel's failure to raise an issue on appeal is ineffective
assistance if there is a reasonable probability that the inclusion of the
issue would have changed the result of the appeal. See Howard v Bouchard, 405
F3d 495 (CA 6, 2005). [A]ppellate counsel can [also] be 'constitutionally
deficient in omitting a dead-bang winner even while zealously pressing other
strong . . . claims.' Page v U.S., 844 F.2d 300, 302 (7th Cir.1989)." (In
Coddington, supra at 698.) "A 'dead-bang winner' has been defined as 'an issue
which was obvious from the trial record." Id., quoting United States v Cook,
45 F 3d388, 395 (CA 10, 1995). When juxtaposed with the issue(s) raised by
Defendant's appellate attorneys, the claims for relief now being raised by
Defendant "are are clearly stronger than those presented" by appellate
counsel. Grey v Greer, supra. Given the trial record, witness statements, and
information provided by Defendant, neither Ms. Somerville, nor, Mr. Stewart
had a "legitimate strategic purpose" for not raising the issues now being
raised by Defendant. (In the case of Mr. Stewart, who ultimately filed
Defendant's brief on appeal, it would be ludicrous to characterize his
decision to ignore meritorius claims while raising a weak one as being a
"strategic" decision.)

In summary, Defendant's appellate attorneys failed to raise significant
and obvious claims for relief where:

(A) Defendant received ineffective assistance of trial counsel where:

(1) counsel failed to provide defendant with adequate information about the

elements of the offenses he was charged with, and failed to discuss

potential defenses;

(2) counsel did not advise Defendant that the plea bargain offered by the

State was illusory;

(3) counsel failed to provide Defendant with accurate information

concerning the guidelines and sentencing range;

(B) Defendant's plea was illusory because

(1) the application of MCL 750.316(1)(b) to the instant case was

unconstitutional where felony-murder was predicated on misdemeanor

larceny; and,

(2) because there was not proof beyond a reasonable doubt for each element

required to convict Defendant for first degree murder, felony murder,

or second degree murder, Defendant pleaded guilty to a crime he could

not be convicted of (2nd degree murder), in exchange for the

prosecution dropping charges for two other crimes Defendant could not

be convicted of (1st degree murder and felony murder).

Most especially, it constituted deficient performance when appellate
counsel omitted Defendant's claim that trial counsel failed to provide him
with adequate information about the elements of the offenses he was charged
with, and failed to discuss potential defenses; and, Defendant's claim that
his plea was illusory. All of the above claims were significant and had merit,
but, on these facts, these two issues were 'dead-bang' winners. Appellate
counsel knew, or should have known that "competent counsel" is a necessary
component of a voluntary plea, Brady, 397 US at 748, and a guilty plea does
not waive an appellate claim of ineffective assistance of counsel. People v
Thew, 201 Mich App 78, 506 NW2d 547, 552-555 (1993). Appellate counsel also
knew, or should have known, that "[a] guilty plea entered into in a state

5-A

court must be voluntarily and intelligently made," Holtgrieve, 174 F Supp 2d 572, 585 (ED Mich 2001), and "made with knowledge of the 'relevant circumstances and likely consequences.'" Id., quoting Brady, 397 US at 748. Thus, as a matter of law, it was 'objectively unreasonable' for Defendant's appellate attorneys to omit the claims for relief now being raised by Defendant. This is sufficient to meet the deficiency component of Strickland.

"To demonstrate prejudice in the appellate context, [a defendant] must show a reasonable probability that, but for his attorney's unreasonable failure to raise his claim[s] on appeal, he would have prevailed." Williams v Booker, 715 F Supp 2d 756, 765 (ED Mich 2010). In the circumstances of the case at bar, the prejudice inquiry "can be answered only by examining the underlying merit of" Defendant's claim that MCL 750.316 was inapplicable to this case, and Defendant's "ineffective assistance of trial counsel claim." Zimmerman, supra.

II. A PERSON CANNOT LAWFULLY BE CHARGED WITH, OR CONVICTED OF, FIRST DEGREE OR FELONY MURDER WHERE THE PREDICATE OFFENSE IS MISDEMEANOR LARCENY BECAUSE (A) INTERPRETATIONS OF MCL 750.316(1)(b) THAT ALLOW MISDEMEANOR LARCENY AS A PREDICATE OFFENSE FOR FELONY-MURDER ARE BASED ON A FAILURE TO RECOGNIZE AN AMBIGUITY IN THE STATUTORY LANGUAGE; AND (B) ACCORDING TO CASE LAW AND APPLICABLE PRINCIPLES OF STATUTORY CONSTRUCTION, THE PHRASE "LARCENY OF ANY KIND," AS USED IN MCL 750.316, SHOULD NOT BE INTERPRETED AS INCLUDING MISDEMEANOR LARCENY.

Standard of review: Questions of statutory interpretation are reviewed de novo. People v Feezel, 486 Mich 184, 205, 783 NW2d 67 (2010). Whether conduct falls within the scope of a penal statute is a question of statutory interpretation and is reviewed de novo. People v Hill, 486 Mich 658, 665-666, 786 NW 2d 601 (2010).

ARGUMENT

In the second claim raised in his motion for relief from judgment, Defendant argues that "THE FELONY-MURDER STATUTE IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED: LARCENY UNDER $1,000 IS A MISDEMEANOR AND CANNOT SUPPORT A FELONY MURDER." Defendant now amends his claim in accordance with the claim stated above.

At issue in the case at bar is whether or not the statutory phrase "larceny of any kind," as used in MCL 750.316, includes misdemeanor larcenies as well as larcenies that constitute a felony. The pertinent part of MCL 750.316 provides that

(1) A person who commits any of the following is guilty of murder in the first degree and shall be punished by imprisonment for life:

(a) Murder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing.

(b) Murder committed in the perpetration of, or attempt to perpetrate, arson, criminal sexual conduct in the first, second, or third degree, child abuse in the first degree, a major controlled substance offense, robbery,

7

carjacking, breaking and entering of a dwelling, home invasion
in the first or second degree, larceny of any kind,
extortion, kidnapping, vunerable adult abuse in the
first or second degree under section 145n, torture under
section 85, or aggravated stalking under section 411i.

The holding in People v Williams, 129 Mich App 362, 341 NW2d 143 (1983)

provides the appellate court's current position. In Williams, supra, the

defendant argued that the felony murder provisions of MCL 750.316 were

inapplicable to a case in which the predicate for the felony-murder charge was

misdemeanor larceny. Applying its previous decision in People v Oliver, 111

Mich App 734, 743, 314 NW2d 740 (1981), the Court in Williams held that, as

used in MCL 750.316, "[t]he statutory phrase 'larceny of any kind' includes

larcenies that are misdemeanors as well as larcenies that are felonies," 341

NW2d at 146 (Citation omitted.)

> [t]he cardinal rule of statutory construction is to arrive at
> and effectuate the intent of the legislature. Nonetheless, a
> statute must admit of some ambiguity before a court will
> examine the legislative intent behind it in an attempt to
> ascertain meaning. [. . .] Here, the language is unambiguous
> and the legislative intent should be determined accordingly.
> The phrase "larceny of any kind" means just that. The
> difference between felony and misdemeanor larceny will often
> depend on the value of the property stolen. MCL 750.356; MSA
> 28.588. A larceny or attempted larceny is no less of an
> aggravating circumstance in the context of a murder charge if
> the killing is for 35 cents as opposed to $100 or $5,000.

Williams, 341 NW2d at 146 (Emphasis added.)

Defendant Powell is contending that the reasoning in Williams, supra, is

flawed where it rests on the premise that the statutory language at issue is

"unambiguous." Id. at 146. Defendant asserts that in Williams the Court's

assertion that the statutory "language is unambiguous," and the conclusion

that follows from that, are both incorrect. In the text of MCL 750.316(1)(b),

the phrase "larceny of any kind" refers to any of the 22 different kinds of

larceny enumerated under Chapter LII of the Michigan Penal Code. There is

8

textual and structural support for Defendant's interpretation of the statute.

"In construing a statute in which a public offense has been declared in general terms of the common law without more particular definition, the courts generally refer [for guidance] to the common law." Mich. Crim. Law & Procedure, Vol. 1, § 1:13 (Rev. 2007). "A well recognized rule for construction of statutes is that when words are adopted having a settled, definite and well known meaning at common law it is to be assumed they are used with the sense and meaning they had at common law unless a contrary intent is plainly shown." People v Flick, 487 Mich 1, 11, 790 NW2d 295 (2010), quoting People v Covelevsky, 217 Mich 90, 100, 185 NW 770 (1921). As a matter of law, "[l]arceny is defined by the common-law offense and is classed as a felony." Mich. Crim. Law & Procedure, Vol. 3B, § 99:2 (Rev. 2010) (footnoting People v Dyer, 79 Mich 480, 44 NW 937 (1890) and Drennan v People, 10 Mich 169, 1862 WL 1092 (1862).

MCL 750.316 has historically been applied to felonies and not to misdemeanors. "In Michigan, the elements of felony murder are:

> (1) [t]he killing of a human being (2) with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316. [. . . .] Larceny of any kind is a felony enumerated in the felony murder statute.

People v Thew, 201 Mich App 78, 85, 506 NW2d 547, 550 (1993) (quoting People v Bush, 187 Mich App 316 327, 466 NW2d 736, 751 (1991)) (Emphasis omitted.) See Riley v Berghuis, 388 F Supp 2d 789, 800 (ED Mich 2005).

Michigan's courts have routinely considered "intent to commit the underlying felony" to be an element of felony murder. See, e.g., People v Smith, 478 Mich 292, 733 NW2d 351 (2007); People v Kelly, 231 Mich App 627, 643, 588 NW2d 480 (1998); and People v Brannon, 194 Mich App 121, 125, 486

9

NW2d 83 (1992). Defendant's interpretation of MCL 750.316(1)(b) also finds

support in an earlier Court of Appeals opinion. Significantly, in People v

Gimotty, 216 Mich App 254, 549 NW2d 39 (1996), felony murder is defined

> as a murder committed during the perpetration of, among other
> things, "larceny of any kind." Larceny is the taking and
> carrying away of the property of another, done with felonious
> intent and without the owners consent. [. . .] Simple larceny
> and first-degree retail fraud are both defined in that Larceny
> chapter of the Penal Code. [. . .] [MCL 750.356 . . .] governs
> simple larceny and prohibits "larceny by stealing of the
> property of another . . . ." (Emphasis added.) [MCL 750.356c .
> . .] provides in relevant part that a person who "[w]hile a
> store is open to the public, steal property of the store that
> is offered for sale at a price of more than $100.00" is guilty
> of the felony of first-degree retail fraud. (Emphasis added.)
> The plain language of the first degree retail fraud statute
> makes it clear that the Legislature intended the offense as a
> larceny offense.

549 NW2d at 41.

Thus, in Gimotty, supra, the Court acknowledges that the Legislature

intended "larceny of any kind," as it occurs in MCL 750316(1)(b), to mean

other felony larceny offense enumerated in the Larceny Chapter of the Penal

Code.

Construing "larceny of any kind" as referring only to felonies in no way

implies that a homicide occurring during the commission of a misdemeanor

larceny is not a felony. Such conduct clearly constitutes a felony. Such

conduct clearly constitutes a homicide. It does not, however, constitute the

crime of felony-murder under MCL 750.316. A homicide that occurs during a

misdemeanor larceny should be charged in the same manner as a homicide that

occurs during the commission of any other misdemeanor. It is absurd to posit

that the Legislature intended to apply the felony-murder statute only to one

misdemeanor offense but not to other misdemeanor offenses. This may be why the

word "misdemeanor" does not occur anywhere in the text of MCL 750.316. The

Legislature is aware that a person committing a misdemeanor does not possess

"an intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." Thew, 201 Mich App at 85; Riley, supra at 800-801. Therefore, in light of the common law definition of "larceny," and the manner in which the courts historically have treated the term at issue, it is reasonable to construe the phrase "larceny of any kind" as referring to other kinds of felonious larcenies, rather than "misdemeanors." As mentioned above, Chapter LII of the Michigan Penal Code enumerates 22 different offenses under the general term "larceny." A non-exhaustive list includes larceny motor vehicles or trailers (MCL 750.356a), larceny from the person (MCL 750.357), larceny of livestock (MCL 750.357a), larceny at a fire (MCL 750.358), and larceny from car or persons detained or injured by accident (MCL 750.365). As a matter of law, "a provision of the law is ambiguous [. . .] when it is equally susceptible to more than a single [meaning or interpretation]." Mayor of City of Lansing v Michigan PSC, 470 Mich 154, 166, 680 NW2d 840 (2004) (Internal citations omitted.) Above, Defendant has established that interpreting the phrase "larceny of any kind" as referring to the other forms of larceny enumerated in the Penal Code is, at the least, as reasonable as the Court of Appeals interpretation. The phrase at issue "is equally susceptible to more than" one interpretation. Id., 470 Mich at 166. Contrary to the holding in Williams, the language of MCL 750.316(1)(b) is not "unambiguous." This is a crucial point because presumptions as to legislative intent follow upon the conclusion that statutory language is "unambiguous." See, e.g. Hill, 786 NW2d at 606. On the other hand, statutory language that is deemed "ambiguous" entails a different approach. Under "[t]he rule of lenity," in cases involving "some degree of ambiguity . . . that ambiguity is generally resolved in the favor of the defendant." United States v McGee, 494 F3d 551,

555 (CA 6, 2007).

B.

The issue here is how the phrase "larceny of any kind," as it occurs in MCL 750.316(1)(b) should be interpreted. A useful point of departure is the Court's statement in Williams that "[t]he phrase 'larceny of any kind' means just that." Id. 341 NW2d at 146. Paraphrasing American Civil Liberties Union v Dept. of Defense, Defendant respectfully submits that a court should "not begin (and thereby end) its analysis with a simplistic 'any' means 'any.' To the contrary, it [should begin] by observing that [t]he word 'any' considered alone cannot answer this question [. . .] because although it demands a broad interpretation, [the court] must look beyond that word itself." 543 F3d 59, 69 (CA 2, 2008) (Citations and punctuation omitted.) Furthermore, "[a]lthough a phrase or a statement may mean one thing when read in isolation, it may mean something substantially different when read in context." G.C. Timmis & Co. v Guardian Alarm Co., 468 Mich 416, 662 NW2d 710, 713 (2003) (Citations omitted.) "The interpretive process does not [. . .] remove words and provisions from there context, infuse these words and provisions with meanings that are independent of such context, and then re-import these context free meanings back into the law. The law is not properly read when its words and provisions are isolated and given meanings that are independent of the rest of its provisions." Michigan PSC, 470 Mich at 168. However, in Williams the Court, first, designated the statute "unambiguous," and then erroneously assigned the phrase "larceny of any kind" a meaning independent of the context in which the phrase occured.

A substantial body of case law supports expansive interpretation of the word "any." For example, in United States v Gonzales, 520 US 1, 117 S Ct 1032, 137 L Ed 2d 132 (1997), the United States Supreme Court "held that the

12

expansive word 'any' and the absence of restrictive language 'left no basis in the text [of 18 USC § 924(c)(1)] for limiting' the phrase 'any other terms of imprisonment' to federal sentences." Ali v Bureau of Prisons, 552 US 214, 128 S Ct 831, 838-839, 169 L Ed 2d 680 (2008), quoting Gonzales, 520 US at 4-5. The case at bar is distinguished from Gonzales, supra, where in Gonzales the Supreme Court found "no basis in the text" of 18 USC § 924(c)(1) for limiting expansive scope of the word "any." The same is not true of MCL 750.316(1)(b), which offers an ample basis for limiting the scope of the phrase "larceny of any kind."

Expanding the scope of "larceny of any kind" to include misdemeanors goes against fundamental principles of statutory interpretation. Ejusdem generis, for example, is "a principle of statutory interpretation providing that 'where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" United States v Douglas, 634 F3d 852, 858 (CA 6 2011), quoting Wash. State Dept. of Soc. & Health Servs. v Guardianship Estate of Keffeler, 537 US 371, 384-85, 123 S Ct 1017, 154 L Ed 2d 972 (2003). (See People v Vasquez, 465 Mich 83, 89, 631 NW2d 757 (2001) (In seeking meaning, words and clauses will not be divorced from those which precede and follow.) (Citation omitted.). Interpreting the phrase "larceny of any kind" as it occurs in MCL 750.316(1)(b) does not entail construing a disjunctive phrase "with one specific and one general category." Ali, 128 S Ct at 839. In the text of MCL 750.316(1)(b) "larceny of any kind" is "a general or collective term" occuring in "a list of specific items separated by commas," and, therefore, it is appropriately interpreted according to the doctrine of ejusdem generis. When it is construed in this manner, "larceny of any kind" clearly refers to felonies. In MCL 750.316, the phrase "larceny of

any kind" occurs in a list of over 20 specific items, all of which are felonies. The word "misdemeanor" does not occur and is not alluded to anywhere in the statute.

"The doctrine of noscitur sociis is [also] helpful in discerning the meaning of [the term "larceny of any kind"] in this statute. This doctrine is premised on the notion that 'the meaning of statutory language, plain or not, depends on context.'" Griffith ex rel. Griffith v State Farm Auto Ins. Co., 472 Mich 521, 533, 697 NW2d 895 (2005). "[N]oscitur a sociis, according to which 'a word is known by the company it keeps[,]' is appropriately applied to statutes containing strong contextual cues." Ali 128 S Ct at 839 (Citation omitted.) See, e.g. Gutierrez v Alabama, 528 US 250, 254-258, 120 S Ct 740, 145 L Ed 2d 747 (2000) (applying the principle of noscitur a sociis to narrow the scope of the relevant phrase "any election" where it was closely surrounded by six specific references to gubernatorial elections). Logically, it follows that if the term "larceny of any kind" is included in an extensive list comprised exclusively of felonies, then under the well established rules of statutory construction the term is properly interpreted as referring to felonies.

C.

In conclusion, Defendant has demonstrated the following factors as supporting his position: (1) the common law history of the crime of "larceny;" (2) ambiguity in the statutory language; the presence of an ambiguity in the text of MCL 750.316(1)(b); (3) prior judicial interpretations of words and phrases, including the phrase "larceny of any kind;" and (4) instructive case law applying fundamental maxims of statutory interpretation. Considering these factors, together with the primary concern of MCL 750.316(1)(b) and judicial definitions of the elements constituting felony murder, it is untenable to

14

accept an interpretation of Michigan's felony-murder statute that permits any misdemeanor to be a predicate offense for felony murder. This is not a meaningless exercise in the context of this case. Here, Defendant's assertions as to the constitutionality of MCL 750.316 impact directly on Defendant's grounds for relief in this case. Firstly, if the provisions of MCL 750.316 are inapplicable to the factual circumstances of this case, then Defendant's guilty plea was invalid for reason of being illusory where Defendant pled guilty to second degree murder in return for the prosecutor dropping first degree murder and felony murder charges that Defendant could not lawfully be convicted of. Secondly, the viability of the instant claim is relevant to the question of whether his trial and appellate attorneys performed ineffectively by not recognizing and raising the claim.

Based on the forgoing, Defendant requests that this Court grant relief from judgment.

III. DEFENDANT SHOULD BE PERMITTED TO WITHDRAW HIS GUILTY PLEA BECAUSE THE PLEA WAS ILLUSORY AND, BUT FOR TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE, DEFENDANT WOULD NOT HAVE PLEADED GUILTY.

Standard for review: "Whether a person has been denied effective assistance of counsel is a mixed question of law and fact. A judge must first find the facts and then must decide whether these facts constitute a violation of defendant's constitutional right to counsel. Leblanc, 465 Mich at 579.

ARGUMENT

To establish ineffective assistance of counsel, a "defendant must satisfy the two-part test articulated in Strickland." People v Carbin, 463 Mich 590, 599-600, 623 NW2d 884 (2001). This means that a defendant must demonstrate that (1) counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense. Strickland, 466 US at 687.

> The Strickland analysis also applies to claims of ineffective assistance of counsel involving counsel's advice offered during the plea process. Hill v Lockhart, 474 U.S. 52, 58, 106 S.Ct. 366, 88 L.Ed.2d (1985). According to the Supreme Court, a petitioner who asserts that his counsel was constitutionally ineffective for encouraging him to plead guilty must prove both that his counsel's performance was deficient and that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."

Magana v Hofbauer, 263 F3d 542, 547 (CA 6, 2001), quoting Lockhart, 474 US at 59.

A.

In the case at bar Defendant is asserting that his trial counsel performed deficiently by (1) failing to provide defendant with an adequate explanation of the elements of the crimes he was charged with; (2) failing to discuss possible defenses with Defendant; (3) failing to contest the illusory nature of the plea; and (4) misinforming Defendant of the actual sentencing guidelines range. "Determination of whether a plea was induced by ineffective

16

assistance of counsel 'depends in large part upon a prediction of what the outcome of a trial might have been, as well as whether the petitioner was naturally misinformed about the relevant circumstances and likely consequences of the plea.'" Doyle v Scutt, 374 F Supp 2d 474, 485 (ED Mich 2004) (quoting Lockhart, 474 US at 60). The law requires defendant to establish the factual predicate for his claims, Carbin, 463 Mich at 600, and this requires an explanation "of all the relevant circumstances surrounding the plea." Holtgreive v Curtis, 174 F Supp 2d 572, 586 (ED Mich 2001).

Trial coursel failed to explain elements the
charges or discuss possible defenses to each charge.
    "A guilty plea is the most serious step a defendant can take in a criminal prosecution. For that reason, the plea 'not only must be voluntary, but must be [a] knowing, intelligent [ac]t done with sufficient awareness of the relevant circumstances and likely consequences.'" People v Thew, 201 Mich App 78, 506 NW2d 547, 555 (1992) (quoting Brady v United States, 397 US 742, 747-748, 90 S Ct 1463, 25 L Ed 2d 747 (1970)). "When a defendant argues ineffective assistance in the context of a guilty plea,the defendant is essentially arguing that counsel failed to provide sufficient information regarding the consequences, elements, or possible defenses of the plea." People v Fonville, 291 Mich App 363, 804 NW2d 878, 890 (2011), quoting people v Davidovich, 238 Mich App 422, 427, 606 NW2d 387 (1999). "Absent sufficient information, the plea would be unknowing and, consequently, involuntary." Fonville, supra. "[G]uilty pleas have been found to be involuntary or unknowing on the basis of ineffective assistance of counsel where the defense counsel has failed to explain to his client the nature of the charges or to discuss possible defenses to the charges to which [the defendant is pleading guilty." Thew, 506 NW2d at 553. In this instance trial counsel's failure to adequately inform Defendant of the nature of the charges and available

defenses left Defendant unable to make an informed and intelligent decision to plead guilty.

The elements of felony murder are "(1) [t]he killing of a human being (2)with the intent to kill, to do great bodily harm, or to create a high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.356." Thew, 506 NW2d at 550. "The statute [. . .] requires that the defendant intended to commit the underlying felony at the time the homicide occurred." People v Brannon, 194 Mich App at 125 (Emphasis added.) "Larceny" was the underlying felony in the instant case and, whether viewed as a felony or misdemeanor, larceny is a specific intent crime. People v Pohl, 202 Mich App 203, 507 NW2d 819, 820-21 (1993). "The felonious intent required for larceny, animus furandi, is an intent to permanently deprive the owner of his property." People v Goodchild, 68 Mich App226, 232, 242 NW2d 465 (1976). In the case at bar, there was ample evidence showing that this case began with a dispute between Defendant and Heider over money which the Defendant believed was owed to him by Heider. (See Attachments A and C.) Counsel had the information provided to him by his client as well as the testimony and statements of witness. Based on this, counsel should have informed Defendant that a "claim of right" defense was available for the alleged "larceny" underlying the felony murder charge. "A claim of right defense arises when there is a dispute regarding a defendant's intent at the time of the taking." People v Cain, 238 Mich App 95, 605 NW2d 28, 42-43 (1999); 3 Gillespie, Michigan Criminal Law & Procedure (2nd ed), §1799, pp. 2144-2145. "According to this defense, if a defendant had a good-faith belief that he had a legal right to take the property at issue, then the defendant cannot be convicted [of larceny] because he did not intend to

18

deprive another person of property." Id. One taking [or attempting to take] property under claim of right, no matter how unfounded, has not committed "larceny" since felonious intent is an essential ingredient of larceny. People v Holcomb, 395 Mich 326, 235 NW2d 343, 346 (1975). The defense will apply even if the defendant's belief is unreasonable or mistaken. See People v Karasek, 63 Mich App 706, 710-11, 234 NW2d 761 (1975). Here, it should be immediately obvious that where there is no larceny there can be no felony murder since the third element defining felony murder, an underlying offense, would be absent. Michigan's Supreme Court dealt with similar factual circumstances in People v Holcomb, supra, in which the defendant had been charged with armed robbery. In Holcomb the defendant testified that the alleged victim "had sold him some 'bull drugs' which made his 'head hurt.'" 235 NW2d at 345. When confronted with this accusation, the victim "swung at [Defendant Holcomb] and told him he was in the wrong building." Id. Testifying in the trial court that "he went to [the victim] to get his money back, not to rob him," Holcomb said, "I am not guilty of armed robbery. I might have committed a crime, but the intention wasn't going to stick no one up. I went to ask for my money back and there was a fight there." Id. The Supreme Court addressed Holcomb's "claim of right" defense by quoting People v Henry, 202 Mich 450, 455, 168 NW 534 (1918). Reversing the conviction in Henry, the Court stated the law in this way:

> If the defendant in good faith believed that the money which
> he demanded was his money, and that he was entitled to its
> possession, he could not be guilty of either robbery or
> larceny in taking it, because there would be no felonious
> intent, [ ]and if the defendant, for any reason whatever,
> indulged no such intent, the crime cannot have been
> committed.[ ]

Holcomb, 235 NW2d at 346. (Internal citation and and punctuation omitted.)

Evidence in the instant case also supports a finding of manslaughter rather than murder in the first or second degree, or felony murder. If in

doing an act which would have been a misdemeanor at common law a person causes the death of another, he may be guilty of manslaughter, People v Springer, 100 Mich App 418, 298 NW2d 750 (1980); the same is true of offenses which are made misdemeanors by statute. People v Amos, 163 Mich App 50, 414 NW2d 147 (1987). There is ample record evidence showing the provocation required for a finding of voluntary manslaughter. (See attached Affidavit and Exhibit 1, "Summary of Witness Statements and Testimony.")

Finally, defense counsel failed to contest the felony murder charge against Defendant on constitutional grounds. "[A]s a general matter, counsel has no duty to present novel theories or arguments. Byrd v Trombley, 580 F Supp 2d 542, 557 (ED Mich 2008). A 'facial' challenge to the constutionality of MCL 750.316(1)(b) was not the issue. What counsel failed to do is challenge the applicability of Michigan's felony murder statute to the factual circumstances of the case at bar. This issue should not be characterized as "novel," because, given the ambiguity in the statute and the different ways in which it has been treated by the courts, there was a "reasonable basis" for raising the claim. In the above circumstances, counsel had "a duty to conduct a reasonable investigation of the" applicable law and facts. Byrd, supra.

Counsel failed to advise Defendant of, or
<u>challenge the illusory nature of the plea</u>.

In consideration for Defendant's pleading guilty to second degree murder, two counts of felonious assault, felon in possession of a firearm, and felony fire, and to being a second offense habitual offender, the prosecution dismissed the first degree murder and felony murder charges. (See 07/30/08 Plea Tr., 3:21-4:2.) In this plea "bargain" defendant would also need to agree to serve prison sentences of 25 to 40 years for second degree murder, 2 years for felony fire arm, as well as whatever sentences the court chose to impose for the two felonious assault counts and for being a felon in possession of a

20

firearm. As a second habitual offender, Defendant was also subject to sentence enhancement. On its face, this amounted to an illusory plea in which (1) Defendant would plead guilty to a crime he could not be convicted of (second degree murder) in order to avoid prosecution for two more crimes he could not be convicted of (first degree murder and felony murder), and (2) would expose himself to a possible sentence of 60 or more years. If Defendant had gone to trial he would have been able tocontest the factuality of contradictory statements givenby witnesses. Defendant would also have strong defenses against charges for which the evidence was weak and insufficient. Even if Defendant were to be convicted, there is a strong likelihood that he would be convicted of manslaughter, which carries a much lesser sentence. Hence, Defendant received no benefit for pleading guilty.

Counsel misinformed Defendant about the sentencing guidelines and the actual sentencing range.

The amount of time a defendant faces is "a fundamental relevant circumstance and likely consequence" of which a defendant should be made aware. Holtgrieve, supra at 585. An attorney can be ineffective by not informing his client of the correct sentencing range. United States v Morris, 470 F3d 596 (CA 6, 2006). Sentencing errors in the context of guilty plea cases involve other considerations, but at issue in this case is not whether there were sentencing errors. Defendant's contention is that counsel performed deficiently by failing to correctly calculate the sentencing guidelines range when advising Defendant. Defendant pleaded guilty in reliance on the information provided to him by his attorney, and counsel knew that Defendant's central concern arose from fear of a life term or excessively lengthy sentence. The specific guidelines errors have been pointed out in Defendant's motion for relief from judgment. Had Defendant known that the sentencing range for the crimes charged was less than that indicated by his attorney, he would

have insisted on the lesser sentence.

In summary, the deficient performance component of Strickland is satisfied where Defendant has established that his plea was given in reliance on counsel's misadvice and, as such, was not "the result of a sufficiently informed choice that constituted a voluntary and knowing act." Thew, 506 NW2d at 555.

B.

"To establish the prejudice component of Strickland, Defendant must show there is a reasonable probability that, but for counsel's ineffectiveness, he would not have pleaded guilty but would have insisted on a trial. Magana v Hofbauer, supra. In Hill v Lockhart, the Eighth Circuit Court of Appeals determined that "erroneous parole eligibility advice" given to a criminal defendant constituted ineffective assistance of counsel. 894 F2d 1009, 1010 (CA 8, 1990). Significantly, the Lockhart Court stated that "not every instance of a lawyer's failure to inform a client accurately of parole eligibility will reach the level of a constitutional violation," and "[i]n some situations correct advice about parole will be merely a a collateral matter." Id. This statement is significant because it indicates that the specific type of advice given by counsel was not the determinative factor in the Court's reasoning. The holding in Lockhart was based on the finding that:

> [1] there was a reasonable probability that the result of the plea process would have been different but for the erroneous information [. . . .] [2] [g]iven the attorney's knowledge of his client's particular concern, a failure to check the applicable law was especially incompatible with the objective standard of reasonable representation in Strickland [. . . .] [and] [3] the misadvice was of a solid nature, directly affecting [defendant's] decision to plead guilty.

Lockhart, 894 F2d at 1010.

22

All of these factors are present in the case at bar. First, there is a "reasonable probability" that "but for the erroneous information," Defendant would not have pleaded guilty but would have insisted on a trial. Secondly, counsel knew that "the dispositive issue for [Defendant] in accepting or rejecting a plea bargain" was the number of years he could be imprisoned. Knowing of his client's "particular concern," counsel's failure to explain the elements of the crimes charged and discuss available defenses with Defendant was incompatible with an objective standard of reasonableness. And thirdly, as in Lockhart, counsel's "misadvice was of a solid nature, directly affecting [Defendant Powell's] decision to plead guilty." Id. at 1010.

Defendant's assertion is also supported by Rinehart v Brewer, 561 F2d 126 (CA 8 1997), cited by the Court of Appeals in People v Thew, supra. In Rinehart,

> the Eighth Circuit Court of Appeals affirmed an order granting habeas corpus relief in a case where a teenager's plea of guilty of second-degree murder was involuntary because defense counsel's failure to explain adequately the nature of the charges and the consequences of his guilty plea as well as his failure to discuss "the very real possibility" of a manslaughter defense supported a finding of ineffective assistance of counsel.

Thew, 506 NW2d at 553.

Here, as in Rinehart, supra, counsel failed "to adequately explain the nature of the charges" to Defendant, failed to discuss possible defenses and "the very real possibility" that Defendant could be found guilty of the lesser charge of manslaughter. If his attorney had explained to him the elements of the crimes charged and the available defenses, Defendant would not have pleaded guilty. Instead, Defendant would have insisted on a trial. Likewise, had counsel explained to defendant that the plea agreement was illusory, or contested the applicability of MCL 750.316 to this case, defendant would have insisted on a trial. Additionally, if Defendant had been correctly informed by

23

counsel regarding the range of the sentencing guidelines, defendant would not have accepted the plea agreement.

The prejudice to Defendant is illuminated by the fact that, from the outset, Defendant was grossly overcharged. "[A]n analysis focusing solely on outcome determination, without attention to whether the result of the proceedings was fundamentally unfair or unreliable is defective." Lockhart v Fretwell, 506 US 364, 369-70, 113 S Ct 838, 122 L Ed 2d 180 (1993). In this case it is clear from the record and the statements of the prosecutor's own witnesses that the factual circumstances of this case supported, at most, a charge of manslaughter. There was ample evidence of provocation, and ample evidence that Defendant was not committing a larceny. The prosecutor overcharged defendant in order to obtain a plea to second degree murder -- a crime the prosecutor and defendant's attorney knew was not committed. The prosecutor does have discretion in deciding what charges to file. United States v Armstrong, 517 US 456, 464, 116 S Ct 1480, 134 L Ed 2d 687 (1996). But the prosecutor's discretion is "subject to constitutional constraints. Id. A prosecutor's discretion in charging is abused in a case where the facts would support a charge under either of two statutes, and discretion is applied arbitrarily. People v Sunday, 183 Mich App 504, 455 NW2d 321 (1990). And, furthermore, the prosecutor's obligation is to seek justice, and not merely to convict someone. People v Waterstone, 287 Mich App 368, 789 NW2d 669 (2010); Simpson v Warren, 662 F Supp 2d 835 (ED Mich 1009). Counsel could have made known the misconduct and unfairness by filing a timely motion to quash the information as to the murder charges. But just as the prosecutor failed to ensure a fair trial, a fair trial was denied to Defendant by counsel's ineffectiveness.

In Conclusion, there is a reasonable likelihood that Defendant would

24

have prevailed on the more serious charges of murder, or would have, at most, been convicted of manslaughter. The prejudice component of <u>Strickland</u> is established where, inthe instant case the (1) proceedings were fundamentally unfair, and (2) there is a reasonable probability that the outcome would have been different, but for counsel's ineffectiveness.

Based on the forgoing, Defendant is requesting that this Court grant him relief from judgment, or, alternatively, order an evidentiary hearing and permit Defendant to create a testimonial record in support of his ineffective assistance of trial counsel claim.

<u>Relief Requested</u>

Defendant James Powell respectfully requests that this Court grant his motion for relief from judgment and permit him to withdraw his plea, or, in the alternative, conduct such hearings and grant such other relief as this Court deems necessary.

Date: January 31, 2012

Respectfully submitted,

James Powell
DEFENDANT IN PRO PER

26

STATE OF MICHIGAN

IN THE WAYNE COUNTY CIRCUIT COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff,

v.

JAMES ANDREW POWELL,

     Defendant.

_____/

Case No: 08-6961

HON. TIMOTHY M. KENNY

STATE OF MICHIGAN)
              ) ss.
COUNTY OF IONIA)

## SUPPLEMENTAL AFFIDAVIT

I, James Andrew Powell, being the Defendant in the above captioned case, and being first duly sworn, state that:

1. I have read the forgoing Supplemental Memorandum of Law and the Attachments affixed hereto, and believe the statements contained in these documents are true.

2. I informed my trial attorney and both of my appellate attorneys that prior to the shooting, I was involved in a heated argument with Haider Al-Ganzawi over money he owed me.

3. Before I was pushed by Haider Al-Ganzawi, I became increasing fearful because the demeanor of his brothers and friends became overtly hostile as Haider and I argued.

4. I would have retrieved my gun from "Los" at that time no matter what was going on because getting that gun was not related to my dispute with Haider over my money. I generally carry a gun for my personal safety in the neighborhood, and believe that this is why Ebony Angel Donald was not

AFFIDAVIT Page 1 of 2

surprised when "Los" dropped the gun off in her vehicle. I did not have the gun when I previously visited Haider's house. I returned to Haider's house because I believed he was going to pay me money he owed to me. I did not think that I would need or use a gun when I returned to Haider's house.

5. I was never informed by any of my attorneys that I had a valid "claim of right" defense, nor was I aware of the legal significance of the prosecutor's statement that "there could be an argument made somewhere along the lines that the Defendant was trying to get back money that he felt was rightfully his." (See Friday, May 23, 2008 Preliminary Examination transcript, 36th District Court Case No. 07-63733.) I would not have entered the plea bargain I entered into if I was aware of the "claim of right defense" available to me.

6. If I had been made aware that the sentencing guidelines range for my case was actually less than what my trial attorney told me it was, I would not have agreed to enter a plea bargain involving a minimum sentence of 27 years.

7. I would not have pleaded guilty if my trial attorney would have explained to me the elements of the offenses I was charged with committing.


JAMES ANDREW POWELL
PRISON NO. 537041

Subscribed and sworn to me, a Notary Public
for the County of Ionia, Michigan,
this 1ˢᵗ day of ~~January, 2012.~~ February, 2012

/s/
NOTARY PUBLIC - COUNTY OF IONIA
MY COMMISSION EXPIRES: May 12, 2013

NORMAN S PEARCE
NOTARY PUBLIC, STATE OF MI
COUNTY OF KENT
MY COMMISSION EXPIRES May 12, 2013
ACTING IN COUNTY OF Ionia

AFFIDAVIT Page 2 of 2

ATTACHMENT B

-------------------------------------------

(Preliminary Examination Transcript (hereafter "PT)

Summary of Testimony

At the 05/15/2008 preliminary examination, RAAD ALJIMWALI (hereafter, "Witness" or "W") testified that:

[on direct examination]

1) he was a friend of Haider Al-Ganjawi (PT 13:25-14:3) and was present the night Haider was shot (PT 14:34).

2) At the time of the incident it was dark outside and W was on front porch with Haider's brothers, his friend, Ali, and "some guys" (PT 17:6-12). Haider was standing by his car in the driveway (PT 17:12-18:22).

3) Due to a previous head injury, W could not recall the night, date, month or year the incident occurred (PT 14:5-13).

4) W saw Defendant approach Haider's house on foot (PT 20:1-5), walked up to Haider, and asked him about money; Haider told Defendant he would not give him money (PT 19:21-24). Defendant said "fuck you" to Haider, and then Haider said "fuck you bitch" to the Defendant and pushed the Defendant (PT 20:7-8, 25:3-8).

5) W also testified Defendant repeated told Haider to give him money until Haider got upset and told Defendant "words" (PT 24:8-10), and that Defendant first called Haider "motherfucker" and then Haider told Defendant "this word" (PT 25:3-8).

6) W saw Defendant shoot Haider, the car, and the house (PT 26:5-6).

7) W did not see Defendant shoot the house until the police came and showed W bullets holes in the house (26:18-27:8).

8) After firing the gun, Defendant left running and an Escalade being driven by a woman came and took him. Defendant did not shoot at anyone other than Haider (PT 28 - 30).

B - 1

[on cross examination]

9) W testified he did not recall giving the police a written statement in which he claimed he saw Defendant get out of an Escalade (PT 30:22-31:8), and denied riding around with Defendant in an Escalade on the day of the shooting (PT 31:18-23).

10) W stated that witness Ali Al Hameed moved to California after the shooting incident, but due toa head injury W does not recall when this occurred (PT 32:5-33:7).

11) W admits knowing Defendant from playing basketball and smoking weed with Defendant (PT 38:8-25).

12) W does not know whether or not Haider owed Defendant money (PT 40:1-2).

[on re-cross examination]

13) W testified that he saw Defendant arguing with Haider (PT 44:2-14) and that after Defendant shot Haider, Defendant ran away and started shooting until a car came to pick him up (PT 45:1-6). W also claimed that the Defendant was running and looking for him and the others and shooting (PT 45:8-10), and also claims that he heard all 4 shots and saw Defendant fire the gun all four times (PT 43:16-17).

14) W also claims that after Defendant shot Haider, Defendant ran and did not approach Haider or anyone else (PT 45:17-20).

15) W further testified that when the shots were fired, he and others who were on the porch ran into the house and went into the basement to hide (PT 44:1-4; 50:15; 51:2), and further stated that he didn't see all four shots fired but the police showed him shots had been fired (PT 44:5-7).

16) W claimed that Defendant and Haider were friends and that Haider never had any problems with Defendant (PT 48:8-10).

17) W stated that Haider never actually spent time with Defendant (48:14-17), but that W knew that Defendant and Haider were friends and acquaintances (PT 49:4).

NOTE: During direct examination the Judge removed from the courtroom a person who may have been signalling Witness during the proceedings (PT 48:20-49:3).

At the 05/15/2008 preliminary examination hearing, the Witness EBONY ANGEL DONALD exercised her Fifth Amendment right not to testify (05/15/2008 PT 56:10-67:8; 05/23/2008 PT 8:5-9); when the examination reconvened on 05/23/2008, the Judge signed an order for immunity (PT 8:7-13), and Witness testified [on direct examination] that:

1) Defendant was W's boyfriend; W knew Defendant for approximately 5 years and they had a one year old child together (PT 9:16-19).

2) On 07/21/2007, at approximately 2:30 p.m., W drove with Defendant in her father's Escalade to 6890 Rutland (PT 10:9-17, 10:20-11:3). W dropped Defendant off at a house with "a bunch of" Arabic guys standing outside (PT 11:12-12:8).

3) W went home after dropping Defendant off and "about a couple hours later" received a call from Defendant asking W to come back (PT 12:19-23). W then went to the house of Defendant's aunt on Grandmont, about 3 or 4 blocks from Rutland, arriving there at approximately 5:30 p.m. (PT 12:24-13:15). W then received another call from Defendant and then drove to Rutland (PT 13:22-14:3).

5) When W arrived on Rutland she saw defendant "in the middle of the street" with "the Arabic guys" on the other side of the street from the house (PT 14:5-15). W rolled down a window and conversed with Defendant. Defendant, driving his aunt's Sebring, had W follow him back to Grandmont (PT 14:22-15:24). W stated that after arriving at the aunt's house, Defendant went upstairs and left. W went to sleep in the basement (PT 16:6-17:16). Defendant re

B - 3

Defendant returned a couple of hours later and W drove him back to the Rutland house (PT 17:18-18:13).

7) At the Rutland location W observed "four or five Arabic guys" sitting on the porch and leaning on the car in the driveway (PT 18:14-19:7). Defendant told W he was going to talk to a buddy of his and walked towards the house; W did not see where defendant went after that (PT 19:8-25). 30 minutes later defendant return to W's vehicle, told W he would only be a few minutes more, and then returned to the house where the Arabic guys were still outside (PT 20:1-15). At this juncture W could not observe Defendant (PT 20:16-21:3).

8) W testified that 20 minutes later she drove defendant around on Grandmont so that he could "get something from" Defendant's cousin, "Los" (PT 21:6-22:5). After defendant walked away, W drove over to Grandmont, rolled down her window, and "Los" walked up and set a small silver gun on the passenger's seat of W's vehicle (PT 22:6-24:1).

9) W drove back to Rutland and parked; Defendant got in the vehicle and put the gun on his hip (PT 24:4-15). Defendant told W he would be right back, got out of the truck and walked back towards the house on Rutland. W sat in her vehicle listening to music for 20 - 25 minutes (PT 25:7-12). W heard a couple of little shots and Defendant came back to the vehicle and banged on the window (PT 25:14-21), W let defendant in and defendant told W to drive (PT 25:23-26:2). W testified that Defendant seemed scared and asked W to drive to his mother's house (PT 26:3-17). When they arrived at the house, Defendant and W went to sleep. Defendant said nothing to W (PT 26:18-23), and the following morning W went home (PT 27:21-22).

10) W did not see Defendant again until April of 2008 (PT 29:1-9), and only heard from Defendant by letter (PT 29:13-18). W claimed she was not entirely truthful in her statement to the police (PT 30:4-8), and that she was not

truthful when she testified under oath at an investigative subpoena (PT 30:9-15).

Witness testified [on cross examination] that:

11) W did not know what happened the final time Defendant went to the house on Rutland (PT 38:8-22); W did not see who fired shots, why shots were fired, or where the shots she heard came from (PT 38:23-40:9).

12) W stated that on July 25, 2007, she gave a statement under oath (PT 42:20-43:2), and that at that time she made no mention of Defendant having a gun (PT 43:5-7), and there was no mention of W being involved in the case (PT 43:8-13).

13) W testified that in her July 24, 2007 statement to the police she made no mention of Defendant picking a gun up out of her vehicle (PT 43:14-22), or of W going to get a gun and bring it to the scene where the incident occurred (PT 43:23-44:3). W further stated there was no mention of this information in statements she signed for the police (PT 9-14), and that today was the first time she was claiming that Defendant got a gun and brought it back to the scene (PT 44:16-19).

14) On the day of the incident, W saw Defendant talking with some Arabs on three occasions (PT 44:20-24), and did not witness any type of arguments or anything that could be called "adversarial" 44:25-45:24). W witnessed no arguments or confrontations when she stopped a the house at 8:00 p.m. or at 10:00 p.m (PT 45:25-46:16).

The Witness ALI ALGANZAWI testified at the 05/23/2007 preliminary examination hearing [on direct examination] that:

1) W is the brother of Haider Al-Ganzawi and W saw the Defendant shoot Haider Al-Ganzawi at the victim's home (PT 53:1-54:8).

2) W stated he never saw Defendant prior to the day of the incident (PT

B - 5

54:15-19), and stated that Defendant came "and said he wanted money but my brother was leaning on the car. [. . .] He didn't give him money so he shoot him" (PT 54:22-55:1)

3) W stated Defendant shot two times, and "then he shot up" shot the Witness's car, and "two windows" (PT 55:6:-7). W testified that after this, Defendant "was walking backwards and he was still shooting" at the Witness and others (PT 55:9-10), and that this caused W to flee into the basement (PT 55:10-11). As he was fleeing into the basement, or while he was in the basement, W claimed he saw the Defendant go towards the street "still shooting," and that "a lady came, a friend" in a big car and took off with Defendant (PT 55:16-23). W further claimed Defendant "kept shooting at the glass" and "kept shooting so he could separate the people and hit the glass (57:17-21).

4) W testified that Defendant did not take anything from his brother, Haider (PT 55:24-56:1) and that Defendant did not come in the same car he left in (PT 56:16-18).

Witness testified [on cross examination] that:

5) W recalled giving the police a statement on the day of the incident (58:18-23, 60:6-12).

6) W stated he arrive at the house on Rutland only 5 minutes before the incident (60:17-21), and that he did not know that his brother Haider and the Defendant were friends (PT 60:25-61:). W then stated his brother was not Defendant's friend (PT 61:4-13). W stated Defendant was a friend of Raad and then stated he is not sure (PT 61:15-18).

7) W testified that when Defendant asked for money he was angry (PT 61:23-25), and that Defendant did not have a gun in his hand when he asked for money (PT 62:3-8).

8) W testified that Haider did not push Defendant prior to the shooting, and only made a gesture with his hand (PT 63:20-64:3), and that he didn't recall telling the police that Haider stood up and pushed Defendant and that maybe the translator thought he had said that (PT 64:9-25).

9) On cross-examination, W stated he saw Defendant shoot Haider two times, shoot twice at the glass, and once up in the air (PT 65:1-5), and further stated that Defendant shot Haider twice, two other shots, and one at the door and another shot up (PT 65:25-66:3).

Witness testified [on redirect examination] that:

10) W saw Defendant shoot Haider in the stomach twice, shoot the windows twice, shoot once up in the air, and one at the door (PT 67:7-10) or one at the car (PT 67:14).

11) Asked who else was on the porch with him when the incident occurred, W answered, "Me, I ran to the basement" (PT 67:17-19).

The Witness YASSER ALGANZAWI testified at the 05/23/2007 preliminary examination hearing [on direct examination] that:

1) W is the brother of Haider Al-Ganzawi and was standing on the porch near the door of Haider's house when Haider was shot (PT 69:17-25). At the time of the incident, Haider was standing against the car in the driveway (PT 70:1-4).

2) W stated he never saw Defendant prior to the shooting (PT 70:5-8). W claimed he didn't know how the Defendant arrived, but that he walked up and "said give me money," and shot Haider after Haider told Defendant he wasn't giving him money (PT 70:21-71:7).

3) W testified that Defendant put his hand in his pocket when Haider told him he didn't have any money (PT 71:12-15), and that following this he just heard shots (PT 71:16-17). W stated "we didn't see" Defendant take anything

B - 7

from Haider, and that after the shooting, Defendant "called and then that car came and took him" (PT 71:21-25).

4) W testified Haider did not push Defendant and that Defendant shot Haider when Haider told him to go (PT 72:8-14).

Witness testified [on cross examination] that:

5) when W came home at 5:00 p.m., the people present at the house were the Witness, the witness's brother, and Haider (PT 74:8-14). Raad arrived just before Haider was shot (PT 76:9-15). W then testified that Ali Hameed arrived with Raad (PT 76:23-77:15), and that "there was just the three of us and then Raad came with the other one and then after that my brother got shot and I lost it [and] I don't know what happened (PT 77:25-78:3).

6) After the shooting, W saw Defendant talking on a cell phone and a car came and picked Defendant up (PT 78:25-79:20).

7) W claimed that he didn't tell the police that Haider pushed the Defendant and that he didn't know what he was signing when he signed the statement for the police (PT 79:21-81:6).

ATTACHMENT C

-------------------------------------------

Summary of Witness Statements

(1) AL GANZAWI ALI KHUDEIR (07/22/07 statement to Sgt. K. Gardner)

When the incident occurred, Witness was sitting on the porch talking with (the victim) "Haider, Ali, Yeas, Rod [Raad] and another Ali." A "black male" walked up, pulled out a gun, and started pointing it, saying, "Money, money." Haider stood up, pushed the man with the gun out, and said, "No money." That is when the man started shooting. There were 4 shots fired. "[T]he first two [shots] hit Haider, then the other shots went back and forth." The man who did the shooting was a 21 year old black male with a medium complexion, sideburns and chin hair, wearing a white t-shirt and blue jeans. He came from a gray truck, possibly a Cadillac. After the shooting, the truck pulled up and "the guy got in." Witness identified the driver of the vehicle as being a black female, between 21 and 24 years old, 5'6" or 5'7, with a heavy build (220-230 lbs) and a medium complexion. Witness stated he never saw the man before but would recognize him if he saw him again. Witness stated that "Rod" was the only person present who knew the shooter. When asked if the shooter got any money, Witness said "yes."

(2) RAAD ALJIMWALI (07/22/07 statement to P.O. Ed Williams)

Witness states he was standing in front of his house with his brother, Haider, Muhammad, Yaz, and Ali. A "guy named Jimmy pulled up in a two-tone Cadillac Escalade, got out on the passenger side, and then walked up and asked Haider if he had $100.00. When Haider said "No," Jimmy started walking away, saying, "Oh it's like that?" Then Jimmy pulled a gun from his waistband and started shooting at Haider. There were 4 or 5 shots, and when the shooting stopped, "the other guys tried to grab Jimmy so he started shooting at them. Jimmy then ran, "jumped back in the Escalade, and drove north on Rutland." Witness stated that he had known "Jimmy" from smoking weed and playing basketball with him. Witness stated he had known "Jimmy" for about one year and precisely identified the house where he believed Jimmy lived. (Compare testimony of Raad Aljimwali in Attachment B.)

(3) ALI AL HAMEED (07/22/07 statement to Inv. Marie Handy)

In the first of two statements given to the police, Witness stated he when the incident occurred he was sitting on the porch, laughing and talking with his uncle Haider (the victim), his two brothers - Ali Ganzawi, Yass Ganzawi, and a friend named Muhammad. Shortly before 11:00 p.m., Jimmy was dropped off by his girl and asked Witness's uncle (Haider) for $100.00 that was owed. Haider said he didn't have it and told Jimmy to leave his property. Witness told Inv. Handy that he "then saw Jimmy on his cell phone . . . telling his girl to go upstairs to get his gun." Approximately 10 minutes later Jimmy's girl returned and he, Jimmy, walked to the vehicle and got in on the passenger side. According to this witness, Jimmy then got out of the vehicle and, pulling a gun from his back, said to Haider, "Oh its like that," and then fired a shot. When this occurred, Haider was standing by his car in the driveway, and Jimmy was standing on the sidewalk and partly on the grass. After the shot was fired

Witness states he "ran into the house to the back door and out, [and heard] three more shots. Following these statements, Inv. Handy asked Witness what Haider owed Jimmy money for. On this occasion, Witness denied that Haider owed Jimmy money and claimed that Jimmy wanted to borrow $100.00 from Haider. On this occasion he also told Inv. Handy that he knew Jimmy for about a week and that Jimmy used to "come around and chill" with Haider.

(07/24/07 statement to P.O. K.A. Miller)

In the second of two statements he gave the police, Witness stated that he saw, and was acquainted with, the person who shot his uncle. He claimed he had known the shooter for about a week and that the shooter had attempted to sell him a pit bull puppy for $80.00. Witness stated he told the shooter that he didn't want his puppy, but took the shooters cell number. Witness stated that he called this number after the shooting because he wanted the police to know the shooter's name, "Jimmy Bush." Witness gave police Jimmy Bush's address and described the vehicle he was in.

(4) YASS KHDEIR AL-GANZAWI (07/20/07 [sic] interview with Sgt. K. Gardner)

Witness stated to Sgt. Gardner that he and others were sitting on the porch when a man approached with his hand behind his back and down by his side. When the man he had not seen before "walked up and started asking for money[,] Haider stood up and there was an argument and Haider told him there was no money. Haider pushed him and he raised the gun and started shooting." According to this witness, the man shot Haider two times in the stomach, and then shot two more times as he backed up. Witness stated that to get away, the man "called for the driver in the truck to come." Witness also claims that the shooter took an unspecified amount of money from Haider. Witness also told the police that he could not see the truck very good and could not see the driver or tell what color the truck was.

(5) EBONY ANGEL DONALD (07/24/07 interview with P.O. K.A. Miller)

Witness stated she was with her boyfriend, James (Defendant), on 04/21/07, and that they met up at his "Aunties" house at around 5:30-6:30 p.m. James left for a few hours and returned at around 8:00 p.m. James then left in his Aunt's silver Sebring and called Witness about 15 minutes later to come over on Rutland. Witness stated that when she arrived at Rutland she saw James in the street, in front of his car and talking with "a short Arabic guy." About 5 minutes later, James asked witness to follow him back to his Aunt's house. James left and then returned 1 hour or 1½ hours later and asked Witness to drive him back to Rutland. Witness pulled up past a house with four Arabic males in front. James told witness that he was going to talk with a buddy of his, and then "walked back to where the Arab guys were at." About 20 minutes later James returned to Witness's vehicle and said "Don't leave. I'll only be a few more minutes." Witness stated that right after she heard maybe three firecrackers or pops, James returned, banged on the window to get in, and told Witness to drive to his mother's house. When they arrived James was "panicky." Witness stated she saw James fumbling with his pants, but when asked if she saw James with a gun, Witness answered, "No." Later, when asked if she had ever seen James with a gun, Witness said,"Yes. A square black one."

DETROIT
DEPARTMENT
POLICE

## WITNESS STATEMENT
### CASE PROGRESS

FILE/CASE NO.

| PRECINCT/SECTION | | | COMPLAINANT | |
| HOMICIDE | | | HAIDER AL-GAMZAWI | |

| DATE | TIME | PLACE | STATEMENT TAKEN BY |
| 7/22/07 | | | SGT. K. GARDNER |

| WITNESS | | | RACE / SEX / AGE | D.O.B. | HGT. | WGT. |
| ALI AL-GANZAWI ALI-KHUDEIR  A 97025238  KENTUCY LIC | N A/M | | | 5'8 | 190 |

SOC. SEC. NO.    RESID.    PHONE BUS. RES.

EMPLOYER
NONE

DEPARTMENT    BADGE NO.    SHIFT

RESIDING WITH:
SELF

CHILDREN/ SCHOOL:

RELATIVES/    ADDRESS    PHONE
KARIM KASIM AL-KHAFAJI

Q CAN YOU TELL ME HOW HAIDER WAS shot tonight?

A THE WE Were sitting ON the Porch And We Were Just TAlking
It Was ME, HAIDER, ALI, YEAS, Rod AND ANother ALI.
While We Were talking A black Male came walking UP. He
Walked up And he pulled out A gun And started pointing it
AND SAying, MONEY MONEY. HAider Stood up And he pushed
Him And said No Money. That Is When He started Shooting.
THE FIRST TWO Hit Haider, then the others shots Went back
And Forth. When the black guy came walking UP he
came From A GRAY TRUCK Maybe A CAdillac I THink.
After the Shooting the TRUCK pulled UP AND A
Female Was driving The Guy got into the TRUCK

X Haitam
KARI
ALI ALGANZAWI

Q Describe the man that did the Shooting?

A BM 21; 5'11; SKINNY; Kind of Medium Complexion; Sideburns Chin hair; White T' shirt; Blue Jeans; Small gun Maybe 25 cal.

Q Describe the Female?

A No I can't

Q Was the Female Driving?

A Yes

Q the man that did the Shooting, Did he get in the Front Seat or back SEAT?

A Front

Q Have you Ever Seen the man before?

A NO

Q Would you recognize him If you see Him Again?

A Yes

Q How Many times did the man Fire the gun?

A 4 TWO And then TWO 4

Q Did he get Any money?

A Yes    X Haithem

Q Do you Know IF Anyone that Was With you on the Porch Know the man that shot HAider?

A ONly Ted Know the man

Q Was there Any other Men or Women With the man that did the shooting?

A No one man, ONE Woman

X Haitham

HAITAM SALEH AL·JUBURY
16432 Memorial
5/7/1978 ▓▓▓▓▓▓▓ (INTERPTER)

KARIM ———— (INTERPTER)

ALI AL GANZAWi

DETROIT
DEPARTMENT OF
POLICE

## WITNESS STATEMENT

### CASE PROGRESS

FILE/CASE NO.

| PRECINCT/SECTION | COMPLAINANT | | |
|---|---|---|---|
| Homicide | | | |

| DATE | TIME | PLACE | STATEMENT TAKEN BY |
|---|---|---|---|
| 7-22-07 | 1⁰⁰ Am | F/O 6890 Rutland | P.O. Ed Williams |

| WITNESS | RACE/SEX/AGE | D.O.B. | HGT. | WGT. |
|---|---|---|---|---|
| Raad Aljmlawi | M/ 27 | | 5'6" | 120 |

| SOC. SEC. NO. | RESIDENCE | PHONE BUS. RES. |
|---|---|---|

| EMPLOYER | | BADGE NO. | SHIFT |
|---|---|---|---|

| RESIDING WITH: | DEPARTMENT |
|---|---|

| | CHILDREN/SCHOOL: |
|---|---|

| RELATIVES/FRIENDS: | ADDRESS | PHONE |
|---|---|---|
| Ali Algihize | | |

Q - Mr. Aljmlawi, what can you tell me about the fatal shooting that occurred in front of 6890 Rutland late last night (7-21-07)?

A - I was standing in front of my house along with my brother, Haidere Algihize, Muhamad, Yaz, + Ali. While we were outside a guy named Jimmy pulled up in a Two-tone Cadillac Escalade, I believe it was brown and silver with 22" chrome rims. Jimmy got out the passenger side of the truck and walked up to Haidere. He asked Hadiere if he had $ $100. for him. Haidere told Jimmy no. Jimmy started walking away and saying "Oh it's like that"? The next thing I know Jimmy pulled a gun from his waist band and just started shooting at Haidere. When he stopped shooting the other guys tried to grab Jimmy so he started shooting at them. Jimmy ran and jumped back in the Escalade and drove off North on Rutland. Muhamad + Yaz put Haidere in the car and drove him to the hospital.

Q - What is Jimmy full name and describe him?

A - Jimmy Bush. B/M/ 21-22 6'2" thin build, 170 lbs. Drk complex, with a short hair cut. with a thin mustache + beard.

Q - Do you know where Jimmy lives?

A - On Grandmont St. he lives in the 5th or 6th House south of Warren on the East side of the street.

Q - Was Jimmy + Haidere having any problems?

A - No

Q - How do you know Jimmy?

A - I have known him for about 1 yr. We use to live on mettal St. So we met Jimmy smoking weed + playing basket ball.

Q - How many shots did Jimmy fire?

A - 4-5

Q - AL-OIMLAViRAA)

(CONTINUED)

Q - Was anyone else in the Escalade with Jimmy?

A - Yes, his girlfriend was driving.

Q - Do you know her name?

A - No.

Q - Can you describe her?

A - B/F/ 21-24 5'6" - 5'7", heavy build 220-230 lbs med complex with blond hair.

Q - Did she ever get out the truck?

A - No

Q - What type of gun did jimmy have?

A - I'm not sure, it was a black handgun

Q - Did Hardere have a gun?

A - No.

* AL J MCKVI RAAID

DETROIT
DEPARTMENT
POLICE

**WITNESS STATEMENT**

CASE PROGRESS

| | | |
|---|---|---|
| PRECINCT/SECTION Homicide | COMPLAINANT Haider Khudeir AL-Ganzawi | FILE/CASE NO. |
| DATE 07/22/07  TIME 1:40 AM  PLACE 6890 Rutland | STATEMENT TAKEN BY Inv. J. Harris Hardy | |
| WITNESS Ali-A-HAMEED | RACE/SEX/AGE W/M/17  D.O.B. ~~███~~  HGT 5"11  WGT 165 | |
| SOC. SEC. NO. | RESIDENCE ~~███~~  Dearborn, MI 48126  ~~███~~ | |
| EMPLOYER Student | DEPARTMENT Henry Ford Community College  BADGE NO.  SHIFT | |
| RESIDING WITH: MAHAHA LAHMOD (MOTHER) | CHILDREN/SCHOOL: | |
| RELATIVES/FRIENDS | ADDRESS | PHONE |

Q- WHAT CAN YOU TELL ME ABOUT THE FATAL SHOOTING OF HAIDER AL-GANZAWI

A- I WAS HERE, WE WERE ALL SITTING ON THE PORCH, TALKING LAUGHING

Q- WHO IS WE

A- MY UNCLE HAIDER, HIS TWO BROTHERS ALI GANZAWI, YASS GANZAWI, MAHAMMED WHO IS A FRIEND.

Q- WHAT TIME WAS THIS

A- SOME TIME AFTER 10:00PM

Q- THEN WHAT HAPPENED

A- A GUY NAME JIMMY BUSH B/M/21 CAME OVER SOME TIME BEFORE 11PM HE HAD BEEN DROPPED OFF BY HIS GIRL. JIMMY ASK MY UNCLE FOR $100.00 THAT WAS OWED. MY UNCLE STATED THAT HE DIDN'T HAVE IT AND TO LEAVE HIS PROPERTY. I THEN SAW JIMMY ON HIS CELL PHONE, HE WAS TELLING HIS GIRL TO GO UP STAIRS TO

X Ali Alhameed

3D D 10 3 (REV. 4-7 8)

get his gun. Approx ten minutes later His girl returned, Jimmy walked over to the vehicle and got into the passenger side. He got out pulling a gun from his back and said to my uncle "oh it's like that" and fired a shot.

Q - Where was your uncle standing

A - By his vehicle in the driveway

Q - Where was Jimmy

A - On the sidewalk, partially on the grass.

Q - What did you do

A - I ran into the house to the back door and out, I heard three more shots.

Q - What did Harder owe Jimmy a $100.00 for.

A - No, Jimmy wanted to borrow a $100 from Harder

Q - Who conveyed Harder to the hospital

A - Mahammed and his brother Joas.

Q - How long have you known Jimmy

A - About 1 week He comes around and chill with my uncle.

X _____

DETROIT
DEPARTMENT
POLICE

## WITNESS STATEMENT

### CASE PROGRESS

FILE/CASE NO.
07-209

| PRECINCT/SECTION Homicide Section | COMPLAINANT ALGANZI HAIDER | | |
|---|---|---|---|
| DATE 7-24-07 | TIME 1:55P | PLACE F/o 6890 RutLand | STATEMENT TAKEN BY P.O.K.A. Miller |

| WITNESS Ali AL-Hameed | RACE/SEX/AGE W/M/17 | D.O.B. | HGT. 5-11 | WGT. 165 |
|---|---|---|---|---|

| SOC. SEC. NO. | RESIDENCE | PHONE BUS. RES. |
|---|---|---|

| EMPLOYER | DEPARTMENT | BADGE NO. | SHIFT |
|---|---|---|---|

RESIDING WITH: MALIHA LAHHMOD - MOTHER

CHILDREN/SCHOOL:

| RELATIVES/ FRIENDS: | ADDRESS | PHONE |
|---|---|---|

Q: ALi on July 22 2007 ALGANZI HAIDER WAS FATALLY SHOT IN FRONT OF 6890 RutLand?

A: Yes.

Q: Did You See The Person That Shot ALGANZI?

A: Yes.

Q: Are you Familiar with This Person or Are You Acquainted with The Shooter?

A: Yes.

Q: How Long Have you Known The Shooter?

A: For About A Week. He Would Come By Here At RutLand. THE FORTH DAY I Saw Him He Came By Here At RutLand And WANTED TO Sell me A LiTTLe MuTT PiT Bull Puppy. He Tried To Charge me $80.00 To Take His Puppy. I Told Him I Don't Want His Puppy. He Said Take my Cell NumBer Down And Call me.

Q: What Cell Number Did He give You?

A:

CSD D 103 (REV. 4-7 6)

C of D-72-ST(4-76)

Q: Did you ever call his number?

A: Yes. I called him after my uncle was shot so I could give you his name. I wanted you to know his name is Jimmy Bush. That's what was on his answering message.

Q: I am going to show you a photograph. Do you recognize this person?

A: Yeah. That's him. That's the guy that shot my uncle.

Q: How far away were you from the shooter?

A: About 10'. I was on the porch. He was behind the couch on the left side of the driveway.

Q: What time did this take place?

A: About 10:45 pm.

Q: How was the lighting at that time?

A: A street light and my front door was open with the lights on inside.

Q: Was the porch light on?

A: No. The lights inside were enough. He was at the house for about 10 minutes.

Q: Are you possitive that the person in the photo is the person you saw shoot your uncle?

A: Yes.

Q - DESCRIBE Jimmy

A - 6/14/21  6'2  240 lbs.  MED COMPLEX
Slight Facial Hair, He's Always
Hype up Like He's on Pills or
Something.

Q - DESCRIBE THE Vehicle THAT Jimmy
Was IN

A - 2004  2 TONE Escalade Beige/
dark Beige with 22" Rims.
HE Resides At 6870 GrandMont.

X alt a[signature]

DETROIT
DEPARTMENT
POLICE

WITNESS STATEMENT
CASE PROGRESS

| PRECINCT/SECTION | | | COMPLAINANT | | FILE/CASE NO. |
|---|---|---|---|---|---|
| Homicide | | | Haider Al. Gam Zawi | | |
| DATE 7/20/07 | TIME 200 Am | PLACE Oakwood Hospital | STATEMENT TAKEN BY Sgt. K. Gaelaer | | |
| WITNESS YASS KHDEIR AL·GANZAWII | | | RACE/SEX/AGE | D.O.B. | HGT. 5'3 WGT. 220 |
| | | RES. | | PHONE BUS. | |
| EMPLOYER | | | DEPARTMENT | BADGE NO. | SHIFT |
| RESIDING WITH: Haider AL· GAM ZAWI | | | CHILDREN/SCHOOL: | | |
| RELATIVES: Karim Kasim AL-KHAFJI | | ADDRESS | | | PHONE |

Q What can you tell me concerning the shooting
of Haider?

A We were sitting on the porch when the guy came
walking up to the porch. When he was walking
up, he had his hand behind His back down by
his side. He walked up And started Asking for
money. Haider stood up And there was
An Argument And Haider told him there was
No money. Haider pushed him And He raised
the Gun And started Shooting.

Q How many times did the man Shoot the gun?

A The First Two Times he Shot Haider in his
Stomach And then He Started backing up he
Shot Two more Times

X H.I.Khair

3 (REV. 4-7G)

Q How did the man that did the shooting get Away?

A He called For the driver in the Truck to come

Q Did you see the driver in the Truck?

A No Sir

Q What color Was the TRUCK?

A It could not see it Very good

Q Did the man Get any Money?

A Yes I don't Know how much he took

Q Who did he take money From?

A From Haider

Q What Type of Gun did you see?

A A Little gun

Q IF you saw the man Again, Would you recognize him?

A Yes Sir

Q Have you Ever Seen the man before?

A No Sir First time

Q Did you see the man Shoot Haider?

A Yes

X Haitham

KARIM                    X YASE

C of D-72-ST (4-78)

Q Can you describe the man that shot Haider?

A Bm; medium complexion; 5'11; skinny;
White T Shirt; sweat pants

X Hutler

KARIM

X Ya

DETROIT **WITNESS STATEMENT** FILE/CASE NO.
DEPARTMENT CASE PROGRESS
OF POLICE

| PRECINCT/SECTION | | COMPLAINANT | |
| Homicide Section | | | |

| DATE | TIME | PLACE | STATEMENT TAKEN BY | | |
| 7-24-07 | 9:15 Pm | 9976 Churchill Dr. | P.O. K.A. Miller | | |

| WITNESS | RACE/SEX/AGE | D.O.B. | HGT. | WGT. |
| Ebony Angel Donald | B/F/24 | | 5-9 | |

| SOC. SEC NO. | RESIDENCE | | PHONE BUS. RES. |
| | | | |

| EMPLOYER | DEPARTMENT | BADGE NO. | SHIFT |
| | | | |

| RESIDING WITH: | CHILDREN/SCHOOL: Donald |
| Mother/Father/Sister/Daught. Angela, Richard, Jasmin, Kennedy |

| RELATIVES/ | ADDRESS | PHONE |

Q: Are you Familiar with a person by the name of James Andrew Powell?

A: Yes.

Q: Is he your Boyfriend?

A: Yes. We have been together for 2-2½ years.

Q: I am going to show you a photograph. Do you recognize this person?

A: Yes. That's James.

Q: Were you with James on Saturday, July 21, 2007?

A: Yes. I met him at his house on Grandmont 10856. It's his aunties house.

Q: What time did you meet up with James?

A: It was around 5:30P-6:00P.

Q: Was he with you the whole night?

A: No. He left for a few hours and came back around 8:00 Pm.

X _[signature]_

CoD D.103 (REV. 4-7.6) C of D-72-ST(4-76)

(EBONY)

Q: WHAT VEHICLE DID JAMES LEAVE WITH?

A: HIS AUNTS SILVER SEABRING.

Q: WHEN WAS THE NEXT TIME YOU SAW JAMES?

A: ABOUT 15 MINUTES LATER. HE CALLED ME ON MY CELL PHONE AND TOLD ME TO COME OVER ON RUTLAND. HE SAID THAT HE WOULD BE OUT IN FRONT. HE TOLD ME TO TAKE THE SIDE STREETS.

Q: HAD YOU BEEN OVER ON RUTLAND BEFORE?

A: NO.

Q: WHAT DID YOU SEE WHEN YOU GOT OVER ON RUTLAND?

A: JAMES WAS IN THE STREET IN FRONT OF HIS AUNTS CAR.

Q: WAS THE CAR FACING WARREN?

A: NO. MY CAR WAS FACING WARREN. HIS CAR WAS ON THE OPPOSITE SIDE.

Q: DID YOU SEE ANYBODY TALKING WITH JAMES?

A: A SHORT ARABIC GUY.

Q: HOW LONG DID YOU STAY?

A: ABOUT 5 MINUTES THEN JAMES TOLD ME TO FOLLOW HIM BACK OVER TO HIS AUNTS HOUSE.

Q: DID YOU GET OUT OF THE CAR ON RUTLAND?

A: NO

Q: WHAT HAPPENED NEXT?

X _Ebony L. Donell_

(EBONY)

A: JAMES TOLD ME TO STAY AT HIS AUNTS HOUSE HE WOULD BE BACK.

Q: DID YOU SEE HIM LEAVE?

A: NO.

Q: DID HE RETURN?

A: YES ABOUT ONE HOUR TO 1½ HOURS HE RETURNED

Q: WHAT TOOK PLACE NEXT?

A: HE ASKED ME TO DRIVE HIM BACK OVER ON RUTLAND.

Q: DID YOU DRIVE?

A: YES.

Q: CONTINUE?

A: I DROVE HIM OVER AND PARKED ON THE RIGHT SIDE FACING WARREN.

Q: DID YOU PARK IN FRONT OF THE SAME HOUSE AS EARLIER?

A: NO. JAMES TOLD ME TO PULL UP. I PULLED UP PAST THE HOUSE WITH THE PEOPLE.

Q: HOW MANY PEOPLE WERE IN FRONT OF THE HOUSE?

A: FOUR ARABIC MALES.

Q: DID JAMES TELL YOU WANT HE WAS DOING?

A: THAT HE WAS GOING TO TALK TO A BUDDY OF HIS.

X Ebony L. Doll

C of D-72-ST (4-76)

(EBONY)

Q: DID YOU SEE WHERE JAMES WENT WHEN HE GOT OUT OF THE TRUCK?

A: HE WALKED BACK TO WHERE THE ARAB GUYS WERE AT.

Q: DID JAMES EVER RETURN TO YOUR TRUCK?

A: YES HE CAME BACK TO THE CAR. I ROLLED DOWN MY PASSENGER WINDOW AND HE SAID "DON'T LEAVE I'LL ONLY BE A FEW MORE MINUTES". THIS WAS LIKE 20 MINUTES AFTER WE PARKED.

Q: DID YOU HEAR ANY COMOTION AFTER HE LEFT THE CAR TO GO BACK?

A: NOTHING OTHER THAN FIRECRACKERS OR POPS.

Q: WHAT HAPPENED NEXT?

A: JAMES WAS BANGING ON THE WINDOW TO GET IN.

Q: HOW LONG AFTER THE POPS OR FIRECRACKER NOISE DID JAMES RETURN TO THE VEHICLE.

A: RIGHT AWAY.

Q: WHAT DID JAMES SAY?

A: JUST DRIVE. I WAS GETTING UPSET. HE SAID IN A LOUD VOICE DRIVE TO MY MOMS HOUSE.

Q: DID YOU KNOW WHAT HAPPENED?

A: NO.

Q: WHERE DID YOU DRIVE TO?

A: HIS MOTHERS HOUSE ON VIRGINIA PARK.

X Elijah Donald

(EBONY)

PAGE 5

Q: DID YOU SEE JAMES WITH A GUN?

A: NO.

Q: WHAT WAS JAMES WEARING THAT NIGHT?

A: A WHITE T-SHIRT, BLUE SHORTS, WHITE SHOES.

Q: HOW MANY POPS DID YOU HEAR?

A: MAYBE THREE.

Q: WHEN YOU GOT TO JAMES' MOTHERS HOUSE HOW DID JAMES APPEAR?

A: PANICKY, PACING.

Q: DID YOU ASK HIM WHAT HAPPENED?

A: YES. HE WOULDN'T SAY.

Q: DID JAMES TALK TO ANYBODY ON THE PHONE WHEN YOU GOT TO VIRGINIA PK.?

A: IF HE DID HE WOULD GO DOWNSTAIRS OR OUTSIDE.

Q: HAVE YOU EVER HEARD ANYBODY CALL JAMES JIMMY BUSH?

A: JUST A GIRL.

Q: WHAT NUMBER DO YOU CALL JAMES AT?

A: 799-4139

Q: HAVE YOU EVER SEEN JAMES WITH A GUN?

A: YES. A SQUARE BLACK ONE.

X _____

(EBONY)

Q: IS THERE ANY PART OF THIS STATEMENT THAT IS NOT TOTALLY ACCURATE?

A: WHEN JAMES CAME TO THE CAR AND TOLD ME THAT HE WILL BE A FEW MORE MINUTES. HE GOT INTO THE CAR AND ADJUSTED HIS PANTS. HE WAS FUMBLING WITH SOMETHING ON THE RIGHT SIDE OF HIS DRAWERS.

Q: DID YOU SEE A GUN?

A: NO. I DIDN'T SEE A GUN. HE WAS SITTING ON THE PASSENGER SEAT AND I COULD SEE HE WAS MOVING SOMETHING AND ADJUSTED SOMETHING. THEN HE JUMPED OUT AND TOLD ME NOT TO LEAVE. HE WOULD BE RIGHT BACK.

Q: WHEN HE RETURNED TO YOUR CAR. DID HE SHOW YOU A GUN?

A: NO.

Q: IS THERE ANYTHING ELSE YOU WOULD LIKE TO CHANGE OR ADD TO THIS STATEMENT?

A: NO MA'AM.

STATE OF MICHIGAN

IN THE WAYNE COUNTY CIRCUIT COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff,

v.

JAMES ANDREW POWELL,

      Defendant.

_____/

Case No: 08-6961

HON. TIMOTHY M. KENNY

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 31, 2012, he caused to be served upon the Plaintiff's Attorney one copy of Defendant's MOTION TO SUPPLEMENT POST-CONVICTION PLEADINGS, MEMORANDUM OF LAW, and ATTACHMENTS by depositing the same with designated prison staff for mailing by P.S. Mail, postage prepaid, and in an envelope addressed to:

      Wayne County Prosecutor
      Frank Murphy Hall of Justice
      1441 St. Antoine
      Detroit, MI 48226

JAMES ANDREW POWELL
PRISON NO: 537041