7-16

STATE OF MICHIGAN

IN THE 36TH DISTRICT COURT FOR THE COUNTY OF WAYNE

*Kenny*

CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN

        vs

|  |  |
|---|---|
|  | DISTRICT COURT |
|  | CASE NO. 07-63733 |
| JAMES ANDREW POWELL, | |
|  | CIRCUIT COURT |
|  | CASE NO. 08-6961 |
| Defendant. | |

_____/

**PRELIMINARY EXAMINATION**

BEFORE THE HONORABLE E. LYNISE BRYANT-WEEKES

Detroit, Michigan – Thursday, May 15, 2008

APPEARANCE:

For the People:
          LAWRENCE TALON    P# 36707
          (Wayne County Prosecutors Office)
          1441 Saint Antoine St.
          Detroit, Michigan 48226
          (313) 224-7544

For the Defendant:
JAMES POWELL
          DOUGLAS HAMPTON    P# 46378
          Douglas D. Hampton & Associates, P.C.
          21415 Civic Center Dr., Ste 300
          Southfield, Michigan 48076
          (248) 357-4000

          RONALD MCDUFFIE    P# 34858
          1090 Inkster Road
          Inkster, Michigan 48141
          (313) 724-9022

Reported By:
          SHARI MORTON #6722
          Certified Court Reporter
          36TH District Court

6-18-08

TABLE OF CONTENTS

PAGE

WITNESSES:

RAAD ALJIMLAWI

    Direct Examination by Mr. Talon ............... 13
    Cross-Examination by Mr. Hampton ............. 30
    Redirect Examination by Mr. Talon ............ 50
    Re-cross Examination by Mr. Hampton ........... 51

EBONY DONALD

    Direct Examination by Mr. Talon ............... 62
    No cross Examination .........................

EXHIBITS:

    NONE

ADMITTED

1

1    Detroit, Michigan

2    Thursday, May 15, 2008

3    THE CLERK:  This is Case No. 07-63733, the People

4    of the State of Michigan versus James Andrew Powell.  The

5    Defendant is charged with Count I, Murder, First Degree,

6    Homicide, Premeditated; Count II, Homicide, Felony Murder;

7    Count III and IV, Assault with Intent to Murder; Count V,

8    Weapons Firearms, Possession by a Felon; Count VI, Weapons,

9    Felony Firearms.  Defendant has a Habitual Offender, Second

10    Offense Notice.  Defendant is present.

11    MR. TALON:  Lawrence Talon, Assistant Prosecuting

12    Attorney.

13    MR. HAMPTON:  Good afternoon, Your Honor, may it

14    please the Honorable Court, Douglas Hampton on behalf of Mr.

15    Powell who stands to my left.

16    THE COURT:  All right.

17    MR. TALON:  All right.  Judge, I make a motion to

18    sequester any witnesses that may testify for the Prosecution

19    or defense.

20    MR. HAMPTON:  Mutual, Your Honor.

21    MR. TALON:  I'd ask for an exception for the

22    officer in charge.

23    THE COURT:  Okay.

24    MR. HAMPTON:  It's mutual, Judge.

25    THE COURT:  All right.  Sequester is granted.

1    MR. HAMPTON:  There are a few -- I'm sorry.

2    THE COURT:  Go ahead.

3    MR. HAMPTON:  There are a few stipulations for

4    purposes of preliminary examination.

5    THE COURT:  So counsel, none of these people are

6    witnesses, I presume?

7    MR. HAMPTON:  I was just verifying that the

8    gentleman that's sitting next to the interpreter is not and

9    will not be a witness at any time.

10    MR. TALON:  That's correct.  He's -- at best he may

11    testify to identification of the deceased as being the

12    deceased.

13    MR. HAMPTON:  Oh, we don't need that.

14    MR. TALON:  He's the brother --

15    THE COURT:  Oh.

16    MR. TALON:  -- but we're going to stipulate to that

17    today.

18    THE COURT:  Okay.  So do we need the interpreter?

19    MR. TALON:  We will need the interpreter for the

20    witnesses --

21    THE COURT:  Oh, okay.

22    MR. TALON:  -- but not for the Defendant.

23    THE COURT:  Okay.

24    MR. TALON:  And we'd ask that these two

25    individuals, I'm going to ask -- they're going to have to

4

1    step out in the hallway at the present time.  Thank you.

2        And I'll just identify them for the record.  That's

3    Ebony Donald and I believe that's her mother with her if I

4    recall correctly.

5        MR. HAMPTON:  That's correct.

6        MR. TALON:  And I will be calling Ebony Donald as

7    well.

8        THE COURT:  Okay.

9        MR. TALON:  And her mother could be a witness

10   depending on the circumstances.

11       THE COURT:  Okay.

12       MR. TALON:  Judge, I would indicate that there's a

13   stipulation that the deceased was identified as Haider, H-a--

14   i-d-e-r, Al-Ganzawi, A-l-G-a-n-z-a-w-i.

15       I'd move for the admission for purposes of preliminary

16   examination of the medical examiner's report as well as the

17   photographs of the deceased.  And I will read just a portion

18   into the record with any additions as Mr. Hampton may require

19   or like.

20       MR. HAMPTON:  No objection, Your Honor, just --

21   it's almost semantics Judge.  It's just one indication on the

22   medical examiner's form it says that he was shot in the

23   chest.  We've already talked about that, it's actually the

24   lower left abdomen but it's also explained in here --

25       MR. TALON:  I'll clarify that for the record,

5

1    Judge.

2                THE COURT:   Okay.

3                MR. TALON:   The medical examiner's report is number

4    07-07045.   It indicates that it's the post-mortem report for

5    the Haider Al-Ganzawi.   It indicates that Mr. Al-Ganzawi was

6    pronounced dead on July 22, 2007 in Dearborn and that the

7    post-mortem examination was conducted on July 23, 2007.   And

8    in the summary opinion it says that:

9                "Thirty-seven year Haider Alganzawi died of a

10               single gunshot wound to the chest.   Post mortem

11               examination revealed a gunshot wound to the left chest

12               with a wound path of rightward, downward and backward

13               through the diaphragm, mesentery, and right kidney

14               before exiting on the right abdomen.   No bullets or

15               bullet fragments were recovered.   The manner of death is

16               homicide."   It's signed by Boguslaw Pietak, M.D.,

17               Assistant Medical Examiner and dated July 26, 2007."

18               And regarding the clarification, I'll read from page

19    two, under evidence of injury where it says:

20               "Gun shot wound to left chest perforating and then

21               it says entrance left lateral chest 22 inches from the

22               top of the head and six inches left of midline is an

23               entrance wound with stipel up to three inches in maximum

24               dimension consistent with close range."   And it says,

25               "wound path rightway, downward, backward, exit right

1       lateral abdomen, 20 inches from the top of the head and

2       10 inches right of midline."

3           And the photograph shows, which is exhibit number two,

4       shows the location of the inches from the -- I think it's --

5       I know the medical examiner uses the word chest whether or

6       not that's correct medically or not, I think that the

7       photograph and the -- and whether that's consistent with our

8       lay person's definition of the word chest or abdomen, I think

9       that the photograph as well as the description showing the

10      inches from top of midline accurately tell us where it was so

11      that the Court can view it and see it.

12          MR. HAMPTON:  If the description by Brother

13      Counsel, Your Honor, the defense would agree with that

14      especially looking at the photograph itself.  So we will

15      stipulate to it's admission for exam purposes only.

16          THE COURT:  Okay.

17          MR. TALON:  Another stipulation for purposes of

18      examination, Judge, is -- and this is for the purposes of

19      Count V, for purposes of preliminary examination only.  And

20      we do have certified records of conviction which I believe

21      Brother Counsel has seen it.  I hope he has.

22          But the stipulation for examination purposes only is:

23          "that the Defendant has previously been convicted

24      of a felony and accordingly was not eligible to possess

25      a firearm on July 21, 2007."

7

1         THE COURT:  Okay.  Is that the stipulation,

2  Counsel?

3         MR. HAMPTON:  Yes, Your Honor, that's my

4  understanding for purposes of exam only.

5         THE COURT:  All right.

6         MR. TALON:  And I guess just for purposes of exam

7  is that the venue in this case is the front of 6890 Rutland

8  in the City of Detroit, County of Wayne.

9         MR. HAMPTON:  That's correct, Your Honor.

10        THE COURT:  Okay.

11        MR. TALON:  Okay.  And Judge with that I think

12  there's going to be four witnesses.  The first three will

13  require the use of the interpreter.  So I don't know if you

14  want to swear the interpreter first --

15        THE COURT: Yes.

16        MR. TALON:  -- before we bring in the witness?

17        THE COURT:  Yes, we can. Give the court reporter

18  your name.  Oh here.  I have your name on the card.  I have

19  her card.  Please raise your right hand, ma'am.  Oh, I'm

20  sorry.  Okay.

21     Do you swear or affirm that you will interpret -- I'm

22  sorry what language are we interpreting?

23        MS. AL-NAIMI:  Arabic to English, English to

24  Arabic.

25        THE COURT:  Okay.  That you will interpret Arabic

1    to English and English to Arabic to the best of your ability

2    as accurately as possible?

3            MS. AL-NAIMI:  I do.

4            THE COURT:  All right.

5            MR. TALON:  Okay.  And just for the record, I guess

6    the record should indicate since I know that the court

7    reporter may not have had the speaker up that I know that you

8    stated that you asked her to raise her right hand before --

9            THE COURT:  Oh yes, I'm sorry.

10           MR. TALON:  Okay.

11           THE COURT:  But now here's the point --

12           MR. TALON:  If you want her to stand here, Judge,

13   I'll just stand to the right of her.  Wherever you think's

14   going to be best for her to be able to see the witness and

15   interpret and also wherever you think this is going to work

16   best.

17           THE COURT:  Okay.  I think she needs to be closer

18   to the witness because as you're talking, she's going to need

19   to interpret to the witness.  Right.  So I think she needs to

20   come over here and if it's three witnesses, is she going to

21   stand up the whole time?  Okay.  Come around here and to the

22   back over here and I guess if you're -- if you need a chair

23   we'll get you some.  Just let us know if you need a break.

24           MS. AL-NAIMI:  Okay.  Thank you.

25           THE COURT:  If they go a long time with the

9

1    witnesses we'll let you take a break.  So yeah, I think this

2    will be better.  So that they'll know what's going on.  Okay.

3            MR. TALON:  Okay?  And we're going to bring in,

4    could you bring in Raad first?

5            THE COURT:  Do you need her to hold the mic, you

6    think you going to need the mic?

7            INTERPRETER:  I don't know.

8            THE COURT:  It's probably best --

9            INTERPRETER:  I have a loud voice.  You don't have

10   to worry about it.

11           THE COURT:  Okay.  Counsel, I am going to let you

12   know in a few moments we're going to get started with the

13   witness.  Hopefully we can at least finish this one witness

14   but I will be taking a brief break because I have order a

15   couple of bits to eat --

16           MR. TALON:  Oh Judge, that's fine.

17           THE COURT:  -- my staff has been going since 9:00

18   o'clock this morning without a break.  And I'm going to let

19   them go in the hall so we won't faint.

20           MR. TALON:  Judge, that's fine.  As long as there's

21   an order the that witness won't have the opportunity to speak

22   to the other witnesses --

23           THE COURT:  Oh, yes.

24           MR. TALON:  -- during the break time.  That's fine

25   with me.

1        THE COURT:  Okay.  That's fine.  Yeah.  I mean they

2   can -- when it comes I'm going to let them get something.

3        MR. TALON:  Okay.

4        THE COURT:  Okay, just wanted to make you aware,

5   cause they've been going all day.

6     All right.  Raise your right hand?  Does he speak any

7   English?

8        MR. ALJIMMAWI:  I speak a little.

9        THE COURT: Okay.  Do you solemnly swear or affirm

10   that the testimony you are about to give will be the truth?

11        MR. ALJIMMAWI:  Yes.

12        THE COURT:  You understood what I said?

13        WITNESS:  Yes.

14        THE COURT:  Okay.  Have a seat.

15        MR. HAMPTON:  Your Honor, I would just like to make

16   and inquiry before he starts.

17        THE COURT:  Okay.  Of the witness?

18        MR. HAMPTON:  Well -- of the Prosecutor.

19        THE COURT:  Oh, okay.  Go ahead.

20        MR. HAMPTON:  It's my understanding that this

21   witness speaks perfect English.  It's the other two witnesses

22   that don't.  I'm not even sure but --

23        THE COURT:  Okay.

24        MR. HAMPTON:  -- we don't think it's necessary.

25        THE COURT:  Oh.

1    MR. TALON:  Well, we can or if you prefer to do it,

2    whichever way you want to do it, Judge.

3    THE COURT:  Well, sir.  What is your name?

4    MR. ALJIMMAWI:  Raad Aljimlawi.

5    THE COURT:  Do you need an interpreter?

6    WITNESS:  I don't know.  Some questions I don't

7    understand.  I understand some, some not.

8    THE COURT:  Okay.  Well, we'll have the interpreter

9    here.  If you don't understand a question --

10   INTERPRETER:  Ask me.

11   THE COURT:  -- ask her and then we'll --

12   INTERPRETER:  Interpret.

13   THE COURT:  -- interpret it.

14   WITNESS:  All right.

15   THE COURT:  I need to you to hold the mic cause you

16   seem like you have a soft voice.

17   WITNESS:  Yeah.

18   THE COURT:  Okay.  And then you have a heavy

19   accent, at least from my prospective --

20   WITNESS:  Uh hmm.

21   THE COURT:  -- so, I want to you talk as clear as

22   you can --

23   WITNESS:  Okay.

24   THE COURT:  -- and then if you need something

25   interpreted let us know.  Okay?

```
 1                   (Souad Al-Naimi sworn by the Court to interpret

 2                   English into Arabic and Arabic into English)

 3                       R-A-A-D   A-L-J-I-M-L-A-W-I

 4       After having been first duly sworn to tell the truth, the whole

 5       truth, and nothing but the truth, testified as follows:

 6                              DIRECT   EXAMINATION

 7       BY MR. TALON:

 8       Q    Tell me your name?

 9       A    Raad Aljimlawi.

10       Q    Okay.  I'm going to ask you some questions in English.

11       A    Okay.

12       Q    If you don't understand my questions, say I don't understand.

13       A    Okay.

14       Q    Okay.  I'm going to ask you to try to answer them in English;

15            is that okay?

16       A    Uh hmm, yes.

17       Q    All right.  If you are not able to answer them in English,

18            will you tell me?

19       A    Yeah.

20       Q    And you have to remember, when you testify instead of saying

21            uh hmm or yeah, you have to use words like yes or no.

22       A    True.

23       Q    Okay.  Good.  How old are you?

24       A    Twenty-eight.

25       Q    During his lifetime, did you know someone by the name of
```

| | | |
|---|---|---|
| 1 | | Haider Al-ganzawi? |
| 2 | A | He's my friend. |
| 3 | Q | Were you there the night he was shot? |
| 4 | A | Yes. |
| 5 | Q | Do you remember the date? |
| 6 | A | Nope. |
| 7 | Q | Do you remember what month? |
| 8 | A | Nope. |
| 9 | Q | Do you remember what year? |
| 10 | A | No.  Because I that girl I have head injury. |
| 11 | Q | Okay. |
| 12 | | MR. HAMPTON:  Judge, I missed that. |
| 13 | | THE COURT:  He has a head injury. |
| 14 | | MR. HAMPTON:  Okay. |
| 15 | MR. TALON CONTINUED: | |
| 16 | Q | Was it this year or was it -- do you know was it 2008? |
| 17 | A | No, I think it was in 2007. |
| 18 | Q | Do you know what city it happened in? |
| 19 | A | Detroit. |
| 20 | Q | Do you know what street it happened on? |
| 21 | A | Yes. |
| 22 | Q | What street? |
| 23 | A | Rutland. |
| 24 | Q | Do you see someone in this courtroom that you know -- or let |
| 25 | | me state that over -- Do you see someone on in this courtroom |

1       that you saw the night that Haider was shot?

2   A   Yes.

3   Q   Can you point to that person and tell me where they are

4       sitting and what type of clothing they are wearing?

5   A   Sitting on the right side and I think he's go on white and

6       blue.

7   Q   Okay.

8             MR. TALON:   Judge, I think that I indicate for the

9       record that the witness has identified the Defendant James

10      Andrew Powell.

11           THE COURT:   Hmm.

12           MR. TALON:   If you want a closer description?

13  MR. TALON CONTINUED:

14   Q   You say the right side.  You see me; is that correct?

15   A   Yes.

16   Q   All right.  Where do you go from me to that person?

17   A   Number three.

18   Q   All right.  I'm number one?

19   A   Yeah.

20   Q   Okay.  Is Mr. Hampton number two?

21   A   Yeah.

22   Q   And am I standing behind --

23   A   Yes.  Number Three.

24   Q   Okay.

25             MR. TALON:   Judge, I think that adequately

1       indicates he's identified the Defendant James Powell.

2                   THE COURT:  It does.  The record will reflect the

3       identification of Mr. Powell.

4  MR. TALON CONTINUED:

5  Q    Did you know Mr. Powell before that night?

6  A    I know him from the neighborhood I saw him.

7  Q    Okay.  You knew him from the neighborhood?

8  A    Yes.

9  Q    I didn't understand the end of your statement.

10 A    From the neighborhood.

11                  THE COURT:  I saw --

12 Q    Okay.

13                  THE COURT:  Hold on, Counsel.

14 Q    I saw him?

15                  THE COURT:  Right.

16 Q    If I understand you correctly, you said, I saw him from the

17      neighborhood.  I saw him?

18 A    Yeah.

19 Q    All right.

20 A    I seen him that day when he came to my friend and he robbed

21      him.

22 Q    Okay.  Just try to listen to my questions and just answer my

23      question.

24 A    Sure.

25 Q    Okay.  Did you know him by any name?

1    A    They called him Jay.

2    Q    Jay?

3    A    (Nodding his head)

4    Q    You have to answer out loud.

5    A    Yes.

6    Q    Okay.  Was it light or dark when Haider was shot?

7    A    Dark.

8    Q    Okay.  Before you saw Mr. Powell, where were you?

9    A    I was sitting on the porch.

10   Q    Okay.  Who else was sitting on the porch?

11   A    Me and Haider's brothers and my friend, Ali and some guys.

12        (Inaudible) said he was on vacation from his army.  And he

13        was sitting in his car by the driveway --

14   Q    Okay.  All right.

15   A    Yeah.

16   Q    Who , what --

17             MR. TALON:  I'm sorry Judge, go ahead.

18             THE COURT:  I didn't understand what he said.

19        Okay.  Can you repeat your answer.  You were sitting on the

20        porch and I think you said something about a driveway?

21             WITNESS:  Yeah.  I was talking about that guy who

22        shot my friend Haider.  He was just standing in the driveway

23        by his car?

24             THE COURT:  He was sitting in the driveway in his

25        car?

17

1     WITNESS:  He was standing in the car.

2     THE COURT:  Standing in the car?

3     WITNESS:  Yes.

4     THE COURT:  Okay.  Standing in his car in the

5     driveway.

6     WITNESS:  Yeah.

7     MR. TALON:  Okay --

8     WITNESS:  (Inaudible), you know.

9     THE COURT:  I don't know what he said.

10    MR. TALON:  Judge, maybe, let me try.  Maybe I can

11    try to clarify.

12    THE COURT:  Okay.

13  MR. TALON CONTINUED:

14    Q    Haider was standing in the car or next to car?

15    A    Standing in the car.  Like how you stand in a chair or
      something.  Yeah, well like standing there.  You know,
      standing there.  Not standing in the car, but standing out
      the car.

19    Q    Okay.

20    A    Like out of car.

21    Q    Outside the car?

22    A    Yeah.

23    Q    Okay.  You were on the porch?

24    A    Yes.

25    Q    Other people were on the porch too?

1    A    Yes.

2         MR. HAMPTON:  Objection.  That's leading, Judge.  I

3    would just ask him to ask was there anybody there, he was

4    saying other people.  That's leading him to say that there

5    were other individuals that were outside.

6         MR. TALON:  I'm sorry.  I'm sorry, Judge, I thought

7    I was just restating.

8         THE COURT:  You were.

9         MR. TALON:  Okay.

10        THE COURT:  He said that already.

11        MR. TALON:  Okay.

12        MR. HAMPTON:  Okay.  I missed that, Your Honor.

13   I'm sorry.

14        THE COURT:  That's okay.  You may continue,

15   Counsel.

16   MR. TALON CONTINUED:

17   Q    Who's house was this?

18   A    Haider.

19   Q    Was it light or dark?

20   A    Dark.

21   Q    Did you see Mr. Powell come there?

22   A    Yeah.

23   Q    How did he come there?

24   A    He come, he asked Haider about money.  Haider, he told him I

25        don't give you money.

19

1    Q    Okay.  Let me ask you this.  Did you see Mr. Powell when he

2         got there?

3    A    Yes.

4    Q    Did he walk or come another way?

5    A    He come to us walk.  Like when he asked about the money --

6    Q    Who's he?

7    A    And he tell Haider like fuck you.  And Haider was like fuck

8         you bitch and Haider pushed him.  And Haider pushed him.

9                   THE COURT: Counsel.  Hold on, sir.  Hold on.

10                  MR. TALON:  Judge, maybe, maybe it might be easier

11        if we do it in Arabic.

12                  THE COURT:  It may be.  Just because -- okay, it

13        may be.

14                  MR. TALON:  Because sometimes there's a difference

15        between understanding and being able to articulate in a way

16        that --

17                  THE COURT:  It is.  Okay.  Sir, we're -- I'm going

18        to use the interpreter, only because at least for me, I'm

19        having a little difficulty understanding you.

20                  WITNESS:  Yes.

21                  THE COURT:  So I'm going to use the interpreter, is

22        that okay with you?

23                  WITNESS:  Sure.

24                  THE COURT:  Okay.  So, what I want is if you could

25        just wait for her to tell you the question in Arabic and then

1    answer to her and let her repeat it, so that I'm certain that

2    the understanding of the question is correct.  Okay?

3                    MR. TALON:  You would like for him to answer to the

4    interpreter in Arabic as well?

5                    THE COURT:  Yes, I do.

6                    MR. TALON:  Okay.

7                    THE COURT:  Let's try that.

8                    MR. TALON:  All right.

9    MR. TALON CONTINUED:

10   Q    Is Arabic your nature language?

11   A    Yes.

12                   MR. TALON:  Okay.  Indicating for the record, he

13   answered in English.

14                   THE COURT:  Yes, okay.  That's okay.  We're going

15   to work through it.

16                   MR. TALON:  Okay.

17                   THE COURT:  I just want to make sure he's

18   understanding the question.

19                   MR. TALON:  All right.

20   MR. TALON CONTINUED:

21   Q    How did Mr. Powell get to Rutland?

22   A    He was walking.

23   Q    Did you see where he was walking from?

24   A    He came from Woodland and Rutland, Woodlock (ph) and Rutland.

25   Q    Was this the first time you saw him that day?

1   A   No.

2   Q   Okay.  When did you see him first that day?

3   A   I always see him when I'm driving.

4   Q   Okay.  Was this the first time you saw him at Haider's house

5       that day?

6   A   What do you mean?

7   Q   Okay.  Maybe I should rephrase it.

8   A   Please.

9   Q   Okay.  And I think what I'll do, I'm going to move on to a

10      different question at this time.

11              THE COURT: Okay.

12  Q   When you saw Mr. Powell walk from Rutland -- and walk from

13      Rutland from Woodlock --

14  A   To Rutland.

15  Q   -- okay.

16              MR. TALON:  Indicating he answered in English.

17              THE COURT:  Yes.

18  Q   Where did Mr. Powell walk to?

19  A   He came to Haider.

20              MR. TALON:  Indicating that he answered the

21      question in Arabic, without it first being interpreted.

22              THE COURT:  Okay.

23              MR. TALON:  Okay.

24              MR. HAMPTON:  Your Honor, we take it rolling.  He

25      doesn't have to stop and do that every time he respond.

1    Judge I'll accept the answer everything.

2                MR. TALON:  Okay.

3                MR. HAMPTON:  I'll accept the answer every time.

4                MR. TALON:  Okay.

5                MR. HAMPTON:  You don't have to break up the

6    testimony.

7                THE COURT:  Okay.  Right.  If he understands --

8    okay, let's do it this way.  If he understands the question,

9    he can answer but I want you to answer in Arabic so that I

10   can make sure I understand the answer.  So if you understand

11   the question just answer to the interpreter and let her tell

12   us.  And then if you don't understand the question, then

13   we'll interpret the question.  And or if it seems he's

14   responding and it doesn't match the question then we'll do

15   something different.

16               MR. TALON:  Okay.

17               THE COURT:  That might be easier to move it along.

18   MR. TALON CONTINUED:

19   Q    When Mr. Powell walked up to Haider did you hear any talking?

20   A    Yes.

21   Q    Could you understand what was being said?

22   A    About money.

23   Q    Okay.  Did you hear Mr. Powell say anything to Haider?

24   A    Yes.

25   Q    What did you hear Mr. Powell say to Haider?

1   A   He told him give me money.

2   Q   Did you hear Haider say anything in response?

3   A   He told him no, I will not give you money.

4   Q   Did Haider -- I'm sorry -- did you hear Mr. Powell say

5       anything else at that time?

6   A   Yes.

7   Q   What did you hear Mr. Powell say then?

8   A   He start to tell him give me money, give me money, give me

9       money, until Haider, he got upset.   Then Haider tell him

10      words.   Then Mr. Powell answered.   Then he had a gun and he

11      shoot him.

12  Q   Okay.   Did you hear the words that Mr. Haider said to Mr.

13      Powell?

14  A   Yes.

15  Q   Do you remember what those words were?

16  A   Mr. Powell said first, motherfucker.   After that, Haider told

17      him this word.

18  Q   Okay.

19                  THE COURT:   We understood those.

20                  MR. TALON:   All right.

21                  THE COURT:   We understood those.   It's okay.

22  MR. TALON CONTINUED:

23  Q   All right.   Mr. Haider -- so first Mr. Powell used the word

24      motherfucker to Haider?

25  A   Haider --

24

1    Q    Is that correct?

2    A    Yes.

3    Q    All right.  In response, Haider said to Mr. Powell fuck you

4         bitch --

5

6    A    Um hmm.

7    Q    -- is that correct?

8    A    Yes.

9    Q    Okay.  And if I recall correctly, you said Haider pushed Mr.

10        Powell?

11   A    Yes.

12   Q    Where did Haider push Mr. Powell?

13   A    He pushed him in his chest.

14   Q    Okay.  What happened after Haider pushed Mr. Powell?

15   A    He pulled the gun and he shot him.

16   Q    Okay.  Who pulled the gun?

17   A    Mr. Powell.

18   Q    All right.  Did you see what kind of gun it was?

19   A    No.

20   Q    Do you know the difference between a rifle and a handgun?

21              MR. TALON:  Indicating, shaking his head no.

22   A    No.

23   Q    Was it a long gun?

24              MR. TALON:  And I'm showing with my hands, arms

25        wide.

1    Q    Was it a long gun?

2    A    No.

3    Q    Was it a little gun?

4    A    I'd think it's a little gun.

5    Q    Okay.  How many shots did Mr. Powell fire then?

6    A    He shot Haider, the shot the car and he shot the house.

7    Q    Okay.  Which did he shoot first?

8    A    He shot Haider first.

9    Q    Okay.  What happened to Haider after Mr. Powell shot him?

10   A    Haider he was like walking.  Easy, you know, when he shot

11        him.  Like when I take him to the hospital he was walking.

12   Q    Okay.

13   A    (Inaudible)

14   Q    All right.  So Mr. Powell shot Haider first; is that correct?

15   A    Yes.

16   Q    He shot the car?

17   A    He shot the car.

18   Q    What else did you see Mr. Powell shoot?

19   A    He shoot the house, but I didn't see it until the police came

20        and they showed me.

21   Q    Okay.  When -- what did you see at the house that the police

22        showed you?

23   A    He wants to tell me in Arabic.

24   Q    Okay.

25   A    On the roof of the house and the window.  And near the door

1    outside.

2    Q    Okay.  This damage to the house there before Mr. Powell came

3         over?

4    A    What do you mean by damage?

5    Q    Okay.  Did you see bullet holes?

6    A    When the police came and the police made the report they

7         showed me.  I thought only the car and Haider, but the police

8         man showed me --

9              MR. HAMPTON:  Well, objection then, Your Honor.

10   That would be speculation as to the other part of the

11   testimony.  If he knows specifically of Haider and he knows

12   specifically of the car, then any other testimony would be

13   obviously hearsay.  That's something that he heard from the

14   police officer.

15             MR. TALON:  Well, no.  I'm just trying to show --

16   establish it circumstantially by asking what he was shown,

17   have him describe what he was shown and then I'm going to ask

18   him if he saw this damage before the shooting.  And depending

19   on his answer, it either circumstantially supports it or it

20   doesn't mean one thing anyway or the other.

21             THE COURT:  I'll allow it.

22             MR. TALON:  Okay.  I have to remember my train of

23   thought which is unusual for me to forget.

24   MR. TALON CONTINUED:

25   Q    Did the police show you bullet holes in the window or the

27

| 1 | | house? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | Were the bullet holes in the window or the house there |
| 4 | | before-- |
| 5 | A | No. |
| 6 | | |
| 7 | Q | Okay.  And by before I mean before Mr. Powell came over and |
| 8 | | fired the gun? |
| 9 | A | No. |
| 10 | Q | After Mr. Powell fired the gun, did you see Mr. Powell leave? |
| 11 | A | Yes. |
| 12 | Q | How did you see him leave? |
| 13 | A | After he did that he was running and the car, Escalade, came |
| 14 | | and took him. |
| 15 | Q | Okay.  Did you see the Escalade before Mr. Powell did the |
| 16 | | shooting? |
| 17 | A | No. |
| 18 | Q | Did you see the Escalade after Mr. Powell did the shooting? |
| 19 | A | When he shoot. |
| 20 | Q | All right.  You saw the Escalade when Mr. Powell shot or |
| 21 | | after Mr. Powell shot? |
| 22 | A | When he shot. |
| 23 | Q | Okay.  Where did the Escalade come from? |
| 24 | A | It come from almost like from Woodlock and Rutland. |
| 25 | Q | Okay.  Did you see Mr. Powell get in the Escalade? |

1      A     Yes.

2      Q     Where in the Escalade did he go in?

3      A     In the front.

4      Q     Driver or passenger side?

5      A     No, passenger side.

6      Q     Did you see who was driving?

7      A     Yes.

8      Q     Who was driving?

9      A     (Inaudible)

10     Q     Okay.

11                    THE COURT:  What -- I'm sorry.  What did he say?

12                    WITNESS:  Woman.

13                    MR. TALON:  Okay.

14                    THE COURT:  Oh, a woman, a girl.  Okay.

15                    MR. TALON:  More politically correct.

16                    THE COURT:  Right.

17                    MR. TALON:  It's accurate.

18                    THE COURT:  Right.

19                    MR. TALON:  All right.

20     MR. TALON CONTINUED:

21     Q     Where did the Escalade go then?

22     A     It went left, they went left.

23     Q     Did you see Mr. Powell shoot at anyone else beside Haider?

24     A     No.

25     Q     Okay.

1                MR. TALON:  Judge, I don't think I have any further

2      questions right now.

3                THE COURT:  Okay.  Counsel, any cross-examination?

4                MR. HAMPTON:  There is, Your Honor, thank you.

5                        CROSS-EXAMINATION

6  BY MR. HAMPTON:

7  Q    Is it Raad?

8  A    Yes.

9  Q    Raad?  Okay.

10  A    Yes.

11  Q    You remember the dates that we're talking about that all of

12      this happened, right?

13  A    No.

14  Q    The date of the shooting of Haider, you remember that day?

15  A    No.

16  Q    Not the date but the day.  You remember what happened that

17      day; is that correct?

18  A    Yes.

19  Q    Okay.  And I believe you testified that you saw James Powell

20      walk up to the house?

21  A    Yes.

22  Q    Do you recall telling the police that you saw him get out of

23      an Escalade at the house?  Having a written statement where

24      you wrote out the statement and signed your name to it?

25  A    I don't remember because, I don't remember.

1    Q    Okay.  You don't remember?

2    A    Yeah.

3    Q    So, it's possible that you could have wrote out a statement

4         saying that the Escalade pulled up to the house and James got

5         out of the Escalade; is that true?

6    A    I don't, I'm not sure.

7    Q    You're not sure?

8    A    No, I'm not sure.

9    Q    Did you have an opportunity to take a look at your written

10        statement prior to coming in and testifying today?

11   A    No.

12   Q    Okay.  Fair enough.  You said you saw James around the

13        neighborhood while you are driving; is that right?

14   A    Yes.

15   Q    Isn't it true that James has been over to Haider's house with

16        you on a number of occasions all summer long?

17   A    No.

18   Q    No?  Isn't it also true on that very same day, you were in

19        that Escalade that you described on direct examination, that

20        you were riding around with James that day in that Escalade?

21   A    No.

22   Q    Not at all?  You're sure about that?

23   A    I'm sure.

24   Q    Okay.  You said you saw James walk up to the house, right?

25   A    Yes.

1    Q    Okay.  And you're outside, correct?

2    A    Yes.

3    Q    You're sitting down where?

4    A    On the porch.

5    Q    You're sitting on the porch.  Okay.  And then I believe you

6         testified that, Ali was out there, that's the one that's in

7         California, right?

8    A    Yes.

9    Q    And where in California is he?

10   A    I don't know.

11   Q    You don't know?

12   A    He's just my friend, you know, he's not my cousin or

13        something.

14   Q    But you know that he's living in California right now.

15   A    Yes, his family they moved him with them.

16   Q    His family moved him?

17   A    No, they moved to California and he moved with them.

18   Q    Okay.  When did they move to California?

19   A    I don't remember dates.  I can't remember that good, you see

20        I have a car accident (inaudible).

21   Q    I understand.

22   A    You know.

23   Q    It was after this shooting, correct?

24   A    Huh?

25   Q    They moved to California after the day that Haider was shot,

1    correct?

2   A   Yes.

3   Q   Okay.  Do you know if was a week or a month after or months

4    after?

5   A   Maybe one month or two months.

6   Q   One month or two months?

7   A   Yes.

8   Q   Do you know where in California that they moved to?

9         MR. TALON:  Objection, relevancy.

10        MR. HAMPTON:  Judge, he's an eyewitness to this

11   whole --

12        MR. TALON:  Well, that may be true.  And if there's

13   a request to locate him, it should come through us.

14     As far as identifying information as to where to find a

15   witness, we believe it puts witnesses in danger.  We're not

16   going to ask this witness to tell us where he is.

17        MR. HAMPTON:  Well, Judge, I'm not going to ask for

18   his address, but if this individual has specific information

19   as to an eyewitness -- which I wanted him to be at this exam

20   today.  The information that was given to us so far is that

21   the father moved him out of state.

22     This is the first that we've heard one, that the whole

23   family moved which I do not believe is true.  But the whole

24   family moved and two, nobody knew where he was.  California

25   is the first I've ever heard of this.

33

1            And I'd certainly have the ability to make a record at

2       least that this individual or maybe all of them know where he

3       is for purposes if I have to go to trial.  I've got to get an

4       investigator to locate this person.  I don't want to look in

5       Sacramento and San Diego.  Do you understand what I'm saying?

6            THE COURT:  I understand.  But I don't know that

7       it's relevant to today.  I understand.  And I agree with

8       Counsel, that perhaps it's a discovery issue and if you need

9       a witness located and then they don't provide that

10      information then you have another issue.

11           MR. HAMPTON:  That's why I wanted to make a record

12      of it, Your Honor.

13           THE COURT:  Okay.

14           MR. HAMPTON:  Thank you.

15   MR. HAMPTON CONTINUED:

16   Q    You were sitting on the porch, correct?

17   A    Correct.

18   Q    Okay.  And how many steps are on this porch?

19   A    Three.

20   Q    Three?  And where were you sitting on the porch?

21   A    On the right side.

22   Q    On the right -- so you were up actually on the porch?

23   A    Yeah.

24   Q    Okay.  And you said Ali, the seventeen year old, was out

25        there as well?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Haider was out there? |
| 3 | A | Yes. |
| 4 | Q | Where was Haider standing? |
| 5 | A | In his car. |
| 6 | Q | Okay.  He's in the driveway or is he in the street -- |
| 7 | A | In the driveway by the porch. |
| 8 | Q | He's sitting in the car or standing -- |
| 9 | A | No, standing in the car. |
| 10 | Q | Is it a convertible? |
| 11 | A | No.  It's a regular car. |
| 12 | Q | He's standing up? |
| 13 | A | No, he was standing and put his back on the car. |
| 14 | Q | He's standing outside of the car and leaning against the -- |
| 15 | A | Yeah, yeah. |
| 16 | Q | -- car?  I thought they were going to go there but I had to |
| 17 | | clarify that.  Okay.  He's standing outside the car and |
| 18 | | leaning on the car, correct? |
| 19 | A | Yeah. |
| 20 | Q | Okay.  And that's in the driveway? |
| 21 | A | Yeah. |
| 22 | Q | And who else was out there with you? |
| 23 | A | And his brothers. |
| 24 | Q | Okay. |
| 25 | A | I mean like two guys they take him to the hospital with his |

| | | |
|---|---|---|
| 1 | | brother. |
| 2 | Q | His brother -- |
| 3 | A | His two brothers. |
| 4 | Q | -- is outside.  Two brothers, what are their names? |
| 5 | A | Ali and Yass. |
| 6 | Q | I'm sorry? |
| 7 | A | Ali and Yass. |
| 8 | Q | Ali and Yass.  Okay.  So we have -- just getting this clear |
| 9 | | -- we have you on the porch, Haider leaning on the vehicle in |
| 10 | | the driveway, Ali and Yass.  Where are they standing? |
| 11 | A | On the porch, too. |
| 12 | Q | They're on the porch.  Just sitting on the porch? |
| 13 | A | Yeah. |
| 14 | Q | Are they on the steps or are they up on the porch? |
| 15 | A | No, they're up on the porch. |
| 16 | Q | Okay.  And then there was another individual that you said. |
| 17 | | Who is this person? |
| 18 | A | Huh? |
| 19 | Q | There was someone else?  Who else was there? |
| 20 | A | Oh, one who's name was Mohammad.  He came to take Haider with |
| 21 | | his car to the hospital. |
| 22 | Q | Okay. |
| 23 | A | He was there.  He was there and we took Haider in his car to |
| 24 | | the hospital. |
| 25 | Q | Okay.  Is Mohammad from Detroit? |

36

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Mohammad's not from Philadelphia? |
| 3 | A | He's Iraqi. |
| 4 | Q | He's Iraqi?  Okay.  And does he live in Detroit? |
| 5 | A | Yeah. |
| 6 | Q | He lives in Detroit now? |
| 7 | A | Yeah. |
| 8 | Q | Was there anyone else? |
| 9 | A | No. |
| 10 | Q | No one else?  Was Mohammad there by himself or did he bring |
| 11 | | somebody with him? |
| 12 | A | No.  He just come to us. |
| 13 | Q | Okay.  What time of the day did Mohammad come to your house? |
| 14 | A | It was like in the afternoon. |
| 15 | Q | In the afternoon? |
| 16 | A | Yeah. |
| 17 | Q | So he was there all day -- |
| 18 | A | Yes. |
| 19 | Q | -- correct? |
| 20 | A | Because Haider just came from vacation and we were sitting |
| 21 | | comfortably there. |
| 22 | Q | Okay.  You said earlier that you just saw Jimmy in the |
| 23 | | neighborhood -- |
| 24 | A | Yeah. |
| 25 | Q | -- that correct? |

| 1  | A | Yeah. |
|----|---|-------|
| 2  | Q | You don't have any interaction with Jimmy, you all weren't -- |
| 3  |   | never talked? |
| 4  | A | No.  I see him, hi, hi.  He like sometimes he tell me he gets |
| 5  |   | some money, whatever that's it. |
| 6  | Q | That's it? |
| 7  | A | Yeah. |
| 8  | Q | Do you recall telling the police that you know Jimmy from |
| 9  |   | playing basketball with him and smoking weed? |
| 10 | A | Yeah. |
| 11 | Q | That too? |
| 12 | A | Yeah. |
| 13 | Q | Okay.  Where do you smoke weed at?  Don't you smoke weed at |
| 14 |   | the house on Rutland? |
| 15 | A | No. |
| 16 | Q | Not at all? |
| 17 | A | No. |
| 18 | Q | Never. |
| 19 | A | No, I smoke sometimes at Rutland, I'm not going to lie to |
| 20 |   | you. |
| 21 | Q | I don't want you to that's why you're under oath. |
| 22 | A | Yeah, I do. |
| 23 | Q | Okay. |
| 24 | A | Like, you know, sometimes we sitting like outside playing |
| 25 |   | basketball, we play, we smoke, we chill. |

38

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | (Inaudible),like Arabic or (inaudible) you know?  Like we're |
| 3 | | all noble and everything. |
| 4 | Q | Okay.  So is it your testimony today that Jimmy has never |
| 5 | | been over to the house on Rutland with you? |
| 6 | A | No. |
| 7 | Q | Never? |
| 8 | A | Never. |
| 9 | Q | And again that day, for clarification, the only time that you |
| 10 | | saw Jimmy that day was the time that he walked up to your |
| 11 | | house; is that correct? |
| 12 | A | Yes. |
| 13 | Q | When Haider was shot, correct? |
| 14 | A | Yes. |
| 15 | Q | No other time earlier that day did you see Jimmy, right? |
| 16 | A | No. |
| 17 | Q | Okay.  And then before that you only saw Jimmy when you were |
| 18 | | smoking weed or playing basketball, right? |
| 19 | A | Yes. |
| 20 | Q | He's never been over to the house on Rutland? |
| 21 | A | No. |
| 22 | Q | You indicated that Jimmy walked up to the house and he went |
| 23 | | up to Haider and asked for money, money, money; is that |
| 24 | | correct? |
| 25 | A | Yeah. |

1    Q    Okay.  Do you know if Haider owes Jimmy any money?

2    A    No.

3    Q    You don't know?

4    A    I don't know.

5    Q    So, he may have; is that correct?

6              MR. TALON:  That calls for speculation.  I would

7         object to that question.

8              THE COURT:  Sustained.

9    MR. HAMPTON CONTINUED:

10   Q    He asked for money, correct?

11   A    Yes.

12   Q    And I believe you testified on direct examination that Haider

13        told him no, correct?

14   A    Yes.

15   Q    And then there were words exchanged back and forth, correct?

16   A    Yes.

17   Q    And I believe that you testified that Haider got upset; is

18        that right?

19   A    Yes.

20   Q    Okay.  As a matter of fact, he said motherfucker or something

21        like that?

22   A    Yes.

23   Q    And called Jimmy a bitch; is that correct?

24   A    No.  Jimmy he called him, hey there motherfucker and Haider

25        called him, fuck you bitch.

| | | |
|---|---|---|
| 1 | Q | Fuck you bitch.  Okay.  And then I believe you testified that |
| 2 | | Haider -- |
| 3 | A | (Inaudible) |
| 4 | Q | -- let me ask it.  That Haider pushed Jimmy; is that correct? |
| 5 | A | Yes. |
| 6 | Q | And then you said at that point, Jimmy pulled out a gun and |
| 7 | | shot Haider? |
| 8 | A | Yes. |
| 9 | Q | Okay.  And you said that there were, if I remember correctly, |
| 10 | | four shots, right? |
| 11 | A | Yeah. |
| 12 | Q | Okay.  We have the shot for Haider, correct? |
| 13 | A | Um hmm. |
| 14 | Q | We have -- |
| 15 | A | Yes. |
| 16 | Q | -- we have a shot at the car? |
| 17 | A | Yeah. |
| 18 | Q | Now what car is that? |
| 19 | A | It's Haider's car. |
| 20 | Q | Haider's car. |
| 21 | A | Yes. |
| 22 | Q | Okay.  Where was Haider standing when he was shot? |
| 23 | A | By the back door. |
| 24 | Q | By the what? |
| 25 | A | Back door. |

1    Q    Of the car?

2    A    Yeah.

3    Q    Okay.  He was shot at the car, correct?

4    A    Yeah.

5    Q    So we have one shot at Haider, one shot at the car, correct?

6    A    Yes.

7    Q    And then there was a shot up on the roof, correct?

8    A    Yeah.

9    Q    Okay.  And then I believe you testified that the fourth shot

10         was at a window -- you saw the bullet at a window, correct?

11    A    Yes, the police showed me.  I mean the --

12    Q    I'll get there.  I'll let you.  You saw a shot in the window,

13         correct?

14    A    Yes.

15    Q    Okay.  Now if you're standing in front of the house, where is

16         this window where you saw the bullet?

17    A    On the left side, outside the window on the porch.

18    Q    Okay.  You have the stairs to the porch, right?

19    A    Yeah.

20    Q    You walk up the stairs, I'm assuming you walk into the front

21         door, correct?

22    A    Yes.

23    Q    Okay.  And then if you make a left on the porch, there's a

24         space where the house is and then there is a window, correct?

25    A    Yeah.

1    Q    Is there two windows?

2    A    Two windows, yes.

3    Q    Okay.   There's one window, space for the house, and then a

4         second window, right?

5    A    Yes.

6    Q    Okay.   Where did they find that bullet that you were talking

7         about that went through the window?

8    A    The left side.

9    Q    The far left side, right?

10   A    Yes.

11   Q    The far left, the window closes to the edge of the house,

12        correct?

13   A    Yes.

14   Q    All right.   And you were out there, correct?

15   A    Yes.

16   Q    You saw all four shots, correct?

17   A    Yes.

18   Q    Right?

19   A    Yes.

20   Q    Haider, the car, the roof and the window on the far left side

21        of the house, correct?

22   A    Yeah.

23   Q    Okay.   The other -- when the shots started were the other

24        guys down on the ground in the yard or the porch, the

25        driveway area -- the other individuals that were outside?

| | | |
|---|---|---|
| 1 | | Were they off the porch and down on the grass area or the |
| 2 | | walkway?  When the shots were fired? |
| 3 | A | No.  We were running in the house and we went to the basement |
| 4 | | to hid. |
| 5 | Q | Okay.  But just a minute ago, you said you saw all four |
| 6 | | shots, correct? |
| 7 | A | I told you I didn't see it but the police showed it to me. |
| 8 | Q | Okay.  How many shots did you hear? |
| 9 | A | I heard four. |
| 10 | Q | Okay.  So you hear four shots, correct? |
| 11 | A | Yes. |
| 12 | Q | And when the shots took place with Mr. Haider and Mr. Powell |
| 13 | | were arguing -- |
| 14 | A | Um hmm. |
| 15 | Q | -- where were you? |
| 16 | A | Sitting on the porch. |
| 17 | Q | Okay.  And you saw Mr. Haider and Mr. Powell arguing, right? |
| 18 | A | Yeah. |
| 19 | Q | Okay.  Now you testified that after Haider was shot he was |
| 20 | | still walking around, correct? |
| 21 | A | Yeah, he walked to the car to take him to the hospital. |
| 22 | Q | Okay.  So when Haider was shot he didn't fall, correct? |
| 23 | A | No. |
| 24 | Q | All right.  He was still standing there, right? |
| 25 | A | Yes. |

44

1    Q    And Mr. Powell was still standing there, right?

2    A    No, he ran away.

3    Q    Right.  I'll get there but when he first shot, they were both

4         still standing there, right?

5    A    No, when he shot, he ran away and started shooting until that

6         car come pick him up.

7

8    Q    So, was his back to him running, just shooting back?

9    A    Yes.  No, it was like running and looking for us and

10        shooting.

11   Q    He runs away correct?

12   A    Yeah.

13   Q    Okay.  And so you see him shoot Haider --

14   A    Um hmm.

15   Q    -- and run away, right?

16   A    Yeah.

17   Q    He didn't approach Haider or approach anybody, he shoots and

18        he runs, correct?

19   A    Yeah.

20   Q    All right.

21            MR. HAMPTON:  One moment, Your Honor?

22            THE COURT:  Sure.

23            MR. HAMPTON:  Your Honor, one second.  It was one --

24            THE COURT:  Okay.

25            MR. HAMPTON:  -- piece of testimony that I'm

1    looking for.

2                    THE COURT:  All right.

3                    MR. HAMPTON:  Just one last follow-up question.

4    MR. HAMPTON CONTINUED:

5    Q    You said that you'd never had any interaction with Mr. Powell

6         except for playing basketball and weed, and smoking week

7         sometimes, right?

8    A    Yes.

9    Q    Isn't it true, Raad, that you had been calling him on the

10        phone that whole day?  You were talking to him on his cell

11        phone?

12   A    No.

13   Q    You never called him.  You never talked to him on the cell

14        phone?

15   A    No.

16   Q    You're under oath, you understand what that means, correct?

17   A    Yes.

18   Q    You never called to talked to James Powell on the phone that

19        day or any other day, right?

20   A    I'm not sure (inaudible).

21   Q    You don't recall whether or not you had telephone

22        conversations with Mr. Powell?

23                    MR. TALON:  Judge, my objection's going to be as to

24        the fact that the first question was whether or not he had

25        called him that day on the cell phone.  The next question was

1    whether he called him that day or any other day and the third

2    question is not specific.  Particularly concerning the

3    language difficulty we have, I believe that the questions are

4    not clear and could lead to a, you know --

5            MR. HAMPTON:  Okay.  That's fair enough.  I'll try

6    to clarify it.

7            MR. TALON:  Thank you.

8            THE COURT:  Right.  Clarify the question.  Try not

9    to have a compound question.

10           MR. HAMPTON:  I'll do that.

11           THE COURT:  Okay.

12  MR. HAMPTON CONTINUED:

13    Q    On the day that Haider was shot, did you talk to Mr. Powell

14        on the telephone at all?

15    A    No.

16    Q    Okay.  On any day before Haider was shot, had you ever talked

17        to Mr. Powell on the telephone?

18    A    Yes.

19    Q    Yes?  All right that's a little different than what you told

20        us before.  Did you have his cell phone number?

21    A    Yes.

22    Q    Okay.  How often would you say that you talked to him?

23    A    (Inaudible)

24           THE COURT:  Hold on.  Stop.

25           MR. HAMPTON:  Not getting it.

1        THE COURT:  No.  Tell it to the interpreter.

2        INTERPRETER:  Okay.  What was the question?

3        THE COURT:  How often did he talk to Mr. Powell

4    before the shooting?

5        WITNESS:  Sometime when we want to play football

6    together --

7        MR. TALON:  Basketball.

8        WITNESS:  -- or we want to have weed together.

9    Because he was a friend for Haider and Haider doesn't have

10   any problem with him.

11       MR. HAMPTON:  Okay.  That almost followed up with

12   my next few questions.

13   MR. HAMPTON CONTINUED:

14   Q    So Haider actually spent time with Mr. Powell, correct?

15   A    No.

16   Q    But you just said that they were friends?

17   A    (Inaudible)

18   Q    Did you ever see Mr. Powell visit Haider at his house on

19   Rutland?

20       THE COURT:  Sir, in the back, you can't do that.

21   Can't do it.  I don't want you to --

22       MR. HAMPTON:  I didn't catch that.

23       THE COURT:  Right.  I need you to not do it.  I'm

24   not -- yeah.  Cause he's sort of answering questions.

25       MALE VOICE:  Well, it's my neck, cause it hurts.

1      THE COURT:  Right, well.  I'm sorry, you can't do

2  your neck in here.  So, I'm going to have to have you leave.

3  Okay.  All right.

4      MR. HAMPTON:  Did you get all of that?

5      INTERPRETER:  Yes.

6      MR. HAMPTON:  All right.  I'm sorry, Judge, where

7  was I?  The, oh, how visiting Haider, okay.

8  MR. HAMPTON CONTINUED:

9  Q   Did you ever see Mr. Powell visit Haider at the house on

10     Rutland?

11 A   No.

12 Q   Okay.  But you know that they were friends, acquaintances,

13     correct?

14 A   Yes.

15 Q   All right.  But you weren't friends with him?

16 A   No.

17 Q   Okay.  But you had his cell phone number and you called him

18     periodically?

19 A   Yeah.  I mean I'm a friend of him but not like that much.

20     You know, like from the neighborhood we're all --

21 Q   But you call him up to smoke weed, right?

22 A   Yeah.

23 Q   Okay.

24      MR. HAMPTON:  Yes.  Nothing further, Your Honor.

25      THE COURT:  Okay.

1                          MR. TALON:  Just a few questions.

2                          THE COURT:  All right.

3                                   REDIRECT EXAMINATION

4        BY MR. TALON:

5        Q    How big -- what is the size of the porch?

6        A    Between five and six people can sit in it.

7        Q    Okay.  Is it the same size as this desk or bigger?

8        A    No, it's bigger.

9        Q    When you ran in the house -- what was Haider doing when you

10            ran in the house?

11       A    Can you ask the question again?

12       Q    What -- describe what Haider was doing at that time you ran

13            into the house?

14       A    When he came to the house?

15       Q    No.  After the gun shots you ran in the house?

16       A    Yes.

17       Q    Okay.  Where was Haider -- did you see Haider before you ran

18            in the house?

19       A    Yes.  I see him.

20       Q    Okay.

21       A    I seen him.

22       Q    Did you see him after he was shot but before you ran in the

23            house?

24       A    Before he got shot?

25       Q    Let me ask.  I'll just do it this way.  After you went to the

1       basement, did you come out of the basement at some time?

2    A  Yes.

3    Q  Okay.  When you came out of the basement, was Haider still

4       there?

5    A  Yes, he was there and he was holding his stomach?

6    Q  He was holding his side.

7    A  Side.

8              MR. TALON:  Indicating the witness just put his

9       hand just to the side of his side.

10             THE COURT:  Okay.

11   Q  Was he standing or sitting or lying?

12   A  He was standing.

13   Q  Who took him to the hospital?

14   A  His brother, Yass and Mohammad.

15   Q  Okay.

16             MR. TALON:  I'm not going to ask any further

17      questions.

18             MR. HAMPTON:  I'll ask it.

19             MR. TALON:  Okay.  All right.

20             MR. HAMPTON:  Judge, just one follow-up question.

21             THE COURT:  Okay.

22                    RE-CROSS EXAMINATION

23   BY MR. HAMPTON:

24   Q  After Haider was shot, before you ran into the house, did you

25      see Haider?

51

1   A   Yes, I saw?

2   Q   What was he doing?

3   A   He was holding his side.

4   Q   But he was standing in the same place, right?

5   A   Yes.

6   Q   He was not running away, ducking or anything like that.   He

7       was just standing there, correct?

8   A   Yes.

9              MR. HAMPTON:   Thank you.

10             MR. TALON:   Nothing further.

11             THE COURT:   Okay.   Thank you so much sir.   You can

12      step down.   You have to wait in the hall.

13             MR. TALON:   Judge, are you going to take your break

14      now?

15             THE COURT:   Yes, I'm going to take a brief break.

16             MR. TALON:   Before you take your break.   There is a

17      witness who based on representation for McDuffie, I believe

18      is going to take the fifth.   I have an application for an

19      order granting immunity to the witness as well as a proposed

20      order of immunity is the case law as well.   I've given a copy

21      to both Mr. McDuffie and Mr. Hampton ahead of time.   I can

22      give you a copy to take a look at it over the break --

23             THE COURT:   Okay.

24             MR. TALON:   -- that might save us some time.

25             THE COURT:   Sure.   Okay.   All right.   Court stands

1      in recess.

2                    MR. HAMPTON:  How long, Judge.

3                    THE COURT:  Just about five or six minutes or so.

4                    MR. HAMPTON:  Oh is that right?

5                    THE COURT:  Yes.

6                    (Court recessed)

7                    (Court reconvened)

8                    THE COURT:  Counselor, we're talking about the fact

9      that it's 4:00 o'clock.  And we're not going to finish today

10     because I'm not going to hold the staff past at least 5:00

11     o'clock which is actually passed the time the court closes.

12     But I would stay until 5:00.

13              But here's the issue, I have to adjourn only til a day

14     next week because the last time I adjourned and I wasn't on a

15     criminal docket, I caused havoc in the court house because

16     they have to find me a courtroom and you know, we have to see

17     who doesn't have an afternoon and all that.  So, I can give

18     you an afternoon, but I need it to be next week.

19                    MR. TALON:  Afternoon?

20                    MR. HAMPTON:  I was going to suggest next --

21                    THE COURT:  Counsel is shaking his head something

22     awful.

23                    MR. HAMPTON:  I would just suggest next Friday

24     afternoon.

25                    THE COURT:  My staff is going to hate me for that

1       too.

2                   MR. HAMPTON:  Or Friday morning, well?

3                   MR. TALON:  I can't do Friday morning.

4                   THE COURT:  Can't do Friday morning.

5                   MR. TALON:  I can't do Friday morning.

6                   THE COURT:  Right.  And I can't either because, you

7       know, I'll be on exam.  I mean I could but --

8                   MR. TALON:  I've got a triple homicide exam on,

9       actually on Thursday.  I'm the on duty person on Monday for

10      all warrants and I've been trying to get all types of

11      discovery and everything ready for that triple.

12                  THE COURT:  So, Counselor, you're saying you can

13      not do Friday afternoon.

14                  MR. HAMPTON:  No, Friday afternoon is okay for me.

15                  THE COURT:  Okay.

16                  MR. HAMPTON:  Yeah, but the --

17                  THE COURT:  Okay.  What --

18                  MR. HAMPTON:  Tuesday I can't.  Wednesday I can,

19      Judge, in the afternoon.

20                  THE COURT:  Yes, but Counsel said he'll be getting

21      ready for the triple murder.  So I won't infringe upon his

22      separation.

23                  MR. HAMPTON:  If we could Friday, Judge, that's

24      fine for me.

25                  THE COURT:  I'll do it.  I know my staff, see Rene

1      is not in here right now, when she comes back and finds out I

2      adjourned this to a Friday afternoon, I'll be disciplined but

3      I'm going to do it.  So next Friday afternoon, we'll continue

4      the exam.

5              MR. TALON:  Okay.

6              MR. HAMPTON:  You want us to come a little early.

7      Cause I don't know what you normally do when you're off

8      criminal docket.

9              THE COURT:  Right.  Well, no I will still be on

10     criminal next week.

11             MR. HAMPTON:  Oh, okay.

12             THE COURT:  So, I'll just -- if we scheduled this,

13     then I presume they won't schedule me another murder --

14             MR. HAMPTON:  Okay.

15             THE COURT:  -- for the afternoon.  I'll make sure

16     of it.  I'll sent an email out today.  So, I'll still be on

17     criminal which means you'll just still come here --

18             MR. TALON:  Okay.

19             THE COURT:  -- cause I'll be in this courtroom.

20             MR. HAMPTON:  Okay.

21             THE COURT:  You can try to come, maybe we can say,

22     since it'll be a Friday --

23             MR. TALON:  We could say 1:00 o'clock or whatever

24     time you want.

25             THE COURT:  Yes, let's say 1:00 o'clock.  And if

1    you get here at 1:00 o'clock, as long as I'm still held over

2    like I was today, and I hope I won't ever to held over like

3    that again, we'll start at 1:00 o'clock.  You know, we'll

4    finish up with our regular exams that morning or whatever and

5    then--

6              MR. TALON:  Judge you keeping this same courtroom?

7              THE COURT:  Yes, I keep this courtroom for the

8    whole two weeks that I'm on exams.  So, next Friday, 1:00

9    o'clock we'll finish.  But you can call your next witness.

10             MR. TALON:  Judge, People call their next witness,

11   Ebony Angel Donald.

12             THE COURT:  Yes, I mean, well, if she going to take

13   up to 5:00 o'clock pretty much, yes.  Okay.

14        Ma'am, can you give the spelling of your name to the

15   court reporter?  Okay.  Please raise your right hand.

16        Do you swear or affirm that the testimony you will give

17   will be the truth?

18             MS. DONALD:  Yes, I do.

19             THE COURT:  You can have a seat.  Okay.

20             MR. MCDUFFIE:  May it please the Court, Your Honor,

21   my name is Attorney Ronald McDuffie, I represent Ms. Donald.

22   And I informed the Prosecutor that my client is going to take

23   the Fifth Amendment.  And as a matter of fact, I received

24   some documents when we first came to court today indicating

25   that they have a certain application that they are going to

1    make in this court.

2              THE COURT:  Right.

3              MR. MCDUFFIE:  I have a suggestion that might

4    alleviate the necessity of having to arguing their

5    application which I just received, because I would like an

6    opportunity to respond in writing.

7              THE COURT:  Okay.

8              MR. MCDUFFIE:  It's my understand the Court's going

9    to adjourn this matter until next Friday.  If the Court would

10   give me the opportunity to respond in writing and during the

11   interim the Prosecutor and I would have an opportunity to

12   discuss the matter which may result in something.

13             THE COURT:  Okay, so.

14             MR. TALON:  One, I haven't asked her any questions.

15             THE COURT:  Right.

16             MR. TALON:  So two, I've got a petition or

17   application for order of immunity as well as a proposed order

18   or immunity.  I don't -- and so.

19             MR. MCDUFFIE:  Well, Your Honor, my client is

20   entitled to have an opportunity to respond in writing for

21   something that was tendered immediately before court today.

22             MR. TALON:  Well, Judge --

23             MR. MCDUFFIE:  She's entitled -- if she's going to

24   assert her Fifth Amendment right and then the Prosecutor

25   indicates to you -- well, I just submitted an application so

1    we want the court to make a ruling on this immediately.

2    Judge, at least, this witness should have an opportunity to

3    respond to likewise in writing.

4              MR. TALON:  Well, Judge, let's see where and what

5    point she's going to have to assert her fifth.

6              MR. MCDUFFIE:  She's going to assert her fifth as

7    soon as she states her name.

8              MR. TALON:  I don't think she has a right to assert

9    her Fifth Amendment when I ask her what her name is.

10             MR. MCDUFFIE:  I said as soon as she says her name

11   she's going to assert her the fifth.

12             And if I tell the Court as an officer of the court, that

13   that's what the witness is going to do, the Prosecutor does

14   not have a right to tell this Court well we still want to go

15   forward on my application that I just tendered.

16             MR. TALON:  I, I, I --

17             MR. MCDUFFIE:  I'm not going to interrupt you.  But

18   he could have let me know that prior and tendered a copy of

19   the document so we could have responded in writing.

20             MR. TALON:  Well, Judge --

21             MR. MCDUFFIE:  I received --

22             MR. TALON:  Go ahead.

23             MR. MCDUFFIE:  I received these documents as soon

24   as we appeared in court today, Judge.

25             MR. TALON:  Well Judge, my --

1                  MR. MCDUFFIE:  And that became no to my client at

2          that time.

3                  MR. TALON:  Well Judge, I suppose he and I could

4          have a fight about it, but I don't think it's necessary.   I

5          got the file yesterday afternoon.   The file had indicated

6          that Mr. McDuffie had told the Prosecutor here last time that

7          she was going to assert the fifth.   So I thought that he

8          would be ready to -- with whatever legal argument he had or

9          some sort of -- but he hasn't.   But I think it's still at

10         this point, I still think I have some right to ask her some

11         questions to find out if she's going to take the fifth and at

12         what point she's going to take the fifth.

13                 THE COURT:  Okay.   Well Counsel, what's your name

14         again, I'm sorry.

15                 MR. MCDUFFIE:  Ronald McDuffie, Your Honor.

16                 THE COURT:  Well, Mr. McDuffie, all right.   So

17         you're saying that because I too was handed the application

18         when the Court went on recess and I had an opportunity to

19         review it.   And should the Court - you're, let me make sure

20         that I'm clear on what on what you're saying.

21             Should the Court be inclined to grant the People's

22         request, you're saying that you haven't had an opportunity to

23         review it amply to make sure that it is what it says it is,

24         is that your point?

25                 MR. MCDUFFIE:  Absolutely.   Because on it's face,

1    the initial allegation, well, counsel said that his client

2    wanted -- that's not true whatsoever.  But counsel inserting

3    that in the document and then going on the record to tell the

4    Court that when we were here the last time, Counsel said his

5    client -- that's the furthest thing from the truth.  So I

6    should at least have the opportunity to respond in writing,

7    Judge.

8         THE COURT:  Okay.  Counsel, for the People, since

9    we have another witness that you could call, I'm not going to

10   tell you what order to call your witnesses in.  I'm asking

11   you because this application has been presented to me and

12   counsel is requesting an opportunity to respond in writing,

13   do you still want to go forward with this witness and let her

14   assert the fifth and then proceed with the request for the

15   application?

16        MR. TALON:  Yes.  I don't think it's appropriate --

17   well, first of all, if she hasn't -- Mr. McDuffie didn't tell

18   me or somebody that she was going to assert the --

19        MR. MCDUFFIE:  Nobody, nobody.

20        MR. TALON:  Okay. Then I must have been, by the

21   grace of God, decided it was appropriate to prepare an

22   application for an order granting immunity beforehand.  I got

23   the information somehow, somewhere along the line, I believe

24   I say in good faith, that Mr. McDuffie must have communicated

25   to someone that it got the information to me that she was

60

1          going to request that.

2                    THE COURT:  Or at least he communicated with

3          someone and their understanding of the conversation became

4          his client intends to plead the fifth.

5                    MR. TALON:  That's right.

6                    THE COURT:  So maybe he didn't tell them that --

7                    MR. TALON:  Well.

8                    THE COURT:  -- but that's what they got from the

9          conversation and then they relayed it to you.

10                   MR. TALON:  Right.  Otherwise, I certainly would

11         have been surprised I think had she come in here and asserted

12         the fifth.

13              Nonetheless, I still think that I'm correct to ask her

14         some questions and let's hear what's going to happen at that

15         point.

16                   THE COURT:  Okay.

17                   MR. TALON:  Because it's her decision.

18                   THE COURT:  You're right.  And she obviously has

19         consulted counsel.  So, I'm going to allow the witness -- I'm

20         going to allow you to, should it become necessary counsel, to

21         respond if your client asserts her Fifth Amendment right at

22         this point and then the People still wish to present and

23         offer her immunity in exchange for her testimony, then you

24         will have an opportunity to respond in writing.  And we will

25         call her, the People will have to recall her next week.

1                    MR. MCDUFFIE:  Thank you, Judge.

2                    THE COURT:  That's my ruling.

3                    E-B-O-N-Y    D-O-N-A-L-D

4    After having been first duly sworn to tell the truth, the whole

5    truth, and nothing but the truth, testified as follows:

6                        DIRECT    EXAMINATION

7    BY MR. TALON:

8    Q    Tell us your name, please?

9    A    Ebony Donald.

10   Q    How old are you Ms. Donald?

11   A    Twenty-five.

12   Q    How far did you go in school?

13   A    A bachelor's degree.

14   Q    And what is your bachelor's degree in?

15   A    Small business management and entrepreneurship.

16   Q    I'm not going to ask you where you work, but I'm going to ask

17        you are currently employed?

18   A    Yes.

19   Q    What type of work do you do?

20   A    Manager.

21   Q    Okay.  So you're doing a type of work that is consistent with

22        your training?

23   A    Yes.

24   Q    On July 24, 2007, did you give a statement to Detroit Police?

25   A    At this time, I would like to assert my fifth amendment?

                                62

1    Q    Okay.  On July 25, 2007, did you testify under oath pursuant

2         to a subpoena that you had been given?

3              MR. MCDUFFIE:  Judge, I'm going to object, she has

4         a continuing objection because she indicating that she's

5         asserting her fifth.  For the Prosecutor to continue to

6         asking her questions and for her to continue to say I'm

7         asserting my fifth, she going to continue to say the fifth,

8         Judge.  So this is an exercise in futility for him to

9         continue asking the question and he knows she's asserting her

10        fifth amendment right, Judge.

11             MR. TALON:  I think that – I think argument here,

12        that she has a right to assert her fifth amendment to a

13        question like that is without founding in the law.  I don't

14        think she has the right.  How does that incriminate her?  How

15        does that incriminate her?  It doesn't.  You know the fifth

16        amendment allows her not to incriminate her as to past

17        events.  This is a murder prosecution, how does the fact that

18        she testified under oath incriminate her?

19             MR. MCDUFFIE:  Excuse me, Judge, my client has

20        asserted her fifth and she will continue.  For the

21        Prosecution to make a conclusion of how can this possibly --

22        Judge, he can't read her mind, he doesn't know what's in her

23        mind.  If she wants to assert the fifth, it's her right to

24        assert it.  Not the Prosecutor to tell the witness she can't.

25             MR. TALON:  Judge, the other thing I think that the

1     Court can take into consideration. I think it would be

2     proper for me to provide this Court with addition to the

3     application for order granting immunity and the proposed

4     order granting immunity, a copy of her testimony of her

5     investigative subpoena transcript as well as a copy of her

6     statement because the Court can take those things into

7     consideration as to whether or not she has a valid fifth

8     amendment right or not.

9           MR. MCDUFFIE: And Judge, I think we're at the

10    juncture where you indicated once she asserted her fifth

11    amendment right, then we would adjourn her testimony until I

12    could file a response to the application.

13          THE COURT: Counsel, is your intention that you're

14    going to ask her each question and see if she asserts her

15    fifth amendment right to each question.

16          MR. TALON: No, Judge, I think we've come to point

17    where it's clear that she's not going to answer any of the

18    questions of mine without asserting the fifth.

19          THE COURT: Right.

20          MR. TALON: So that's why I think though, I think

21    there's two things I think I could give you a copy of the

22    investigative subpoena transcript, a copy of her statement of

23    which I'll have to make a copy of, for you to review along

24    with the application of the proposed order so that you can

25    determine when we come back next week --

1            THE COURT:  Okay.

2            MR. TALON:  -- whether or not she has a valid fifth

3      amendment right or not and how to address it.  And the other

4      thing that I would indicate so that I think it's clear, not

5      really certain from my discussions with Mr. McDuffie is that,

6      the order that I proposed to her grant of immunity, in the

7      statutes that I have cited, 780.701 and 780.702, only allow

8      for new immunity.

9            THE COURT:  Right.

10            MR. TALON:  You know, as oppose to transactional

11      immunity.  I don't think that the law in Michigan under these

12      circumstances provides for transactional immunity, new

13      immunity but not transactional immunity.  So I guess the

14      issues that I anticipate that we'll have to deal with is one,

15      whether or not she's entitled to immunity.  And two, if so,

16      what type of immunity.  And with that I think, Mr. McDuffie,

17      I have I believe, presented the issue to the Court?

18            THE COURT:  Yes.  And Mr. McDuffie to respond in

19      writing to your request.  So, okay.  Mr. McDuffie if you

20      could respond by Thursday so that I will have it --

21            MR. MCDUFFIE:  No doubt, no doubt.

22            THE COURT:  -- before Friday and then I can review

23      both.  Counsel, of course, any addition that you give to the

24      Court, you need to make available to Mr. McDuffie.

25            MR. TALON:  I gave Mr. McDuffie a copy of the

1    Investigative subpoena transcript.  I assume he has a copy of

2    her written statement, because I noticed that the witness, in

3    fact, had a copy of her written statement earlier when she

4    arrived in court.

5             MR. MCDUFFIE:  As an officer of the court, Judge,

6    Prosecutor did in fact together with the application and the

7    proposed order also tendered a copy of the sworn statement

8    that was given.  I received all of that this afternoon,

9    Judge.

10            THE COURT:  Okay.

11            MR. TALON:  Do you have a copy --

12            THE COURT:  Okay.  But what about her statement?

13            MR. MCDUFFIE:  I have a copy of that already since

14   the last Prosecutor.

15            THE COURT:  Oh.

16            MR. MCDUFFIE:  And just so the record is clear.

17   The last Prosecutor was Mr. Muscat.  Mr. Muscat has asked me

18   at that time what was going to take place as it relates to my

19   client.  And I indicated to him that my client anticipated

20   taking the fifth amendment.  At that time, Mr. Muscat said,

21   well, if we give her immunity then she'll have to testify.  I

22   said, my client's taking the fifth.  That was the extent of

23   it.

24            And then for the Prosecutor to insert in the application

25   well, defense counsel said he wanted immunity.  That's

1    nothing to be further from the truth, but I'm not going to

2    hold this Prosecutor responsible because he didn't know what

3    went on the last time.

4              THE COURT:  Right.  Okay.  Well the record is

5    clear.

6              MR. TALON:  Judge, I think my petition is accurate.

7              THE COURT:  Okay.  All right, ma'am, you may step

8    down at this time.

9              MR. MCDUFFIE:  Thank you, Your Honor.

10             THE COURT:  And you need to be back on Friday --

11             MR. HAMPTON:  Thank you, Your Honor.

12             THE COURT:  -- at 1:00 o'clock.

13             MR. MCDUFFIE:  Thank you, Your Honor.

14             MR. TALON:  Your Honor, can I have two seconds?

15             THE COURT:  You may.

16             MR. TALON:  Judge, I know that he's out of the

17   courtroom but just, you don't want to start the next witness?

18             THE COURT:  Probably not.  Is it a witness that's

19   going to require an interpreter?

20             MR. TALON:  Yes.

21             THE COURT:  Probably not because I'm not sure if

22   this interpreter will be the one to return and perhaps the

23   witness can -- I want them to start out with the same person

24   if they can so that they can --

25             MR. TALON:  Okay.

1        MR. HAMPTON:  Sorry.

2        MR. TALON:  When Mr. Hampton stepped out, so the

3   records clear, I simply asked the Court whether or not you

4   were going to want to start with the next witness or not.

5   And you asked me whether or not they were to require an

6   interpreter and I said yes.  So you were --

7        THE COURT:  I'm more inclined not to start with

8   them.  How many witnesses do you have left?

9        MR. TALON:  Well, including the lady, it would be

10  three.

11       THE COURT:  Okay.  I'm inclined not to start

12  because we wont' finish, because I would release the staff at

13  5:00.

14       MR. TALON:  Okay.

15       MR. HAMPTON:  I mean I understand that, I kind of

16  want to go too.  But the point that I'm making, Your Honor,

17  and I know this isn't on the detective and it's not on the

18  Prosecutor --

19       THE COURT:  Um hmm.

20       MR. HAMPTON:  I hate when this happens especially

21  in murder exams.

22       THE COURT:  I do too.

23       MR. HAMPTON:  Now this witness gets a witness to go

24  with questions that he asked.  You know, you understand what

25  I'm saying Judge.

1              MR. TALON:  I know.

2              MR. HAMPTON:  And just, I understand, just by

3    telling hey, don't talk to him.  I mean.

4              THE COURT:  I know they will.

5              MR. TALON:  I instructed them out in the hallway

6    not to discuss with each other their testimony.  And I

7    certainly have no problem bringing them back into the

8    courtroom and --

9              MR. HAMPTON:  At the very least, Your Honor.

10             THE COURT:  Okay.

11             MR. TALON:  -- re-instructing them of that.  I

12   always think that's appropriate.

13             THE COURT:  Okay, we can do that.  I can do that.

14   But yeah, I hate when this happens as well and sometimes it's

15   not a prudent thing to schedule these exams in the afternoon.

16   Although I guess I understand why the Court over how ever

17   many years they have been doing this why they think this may

18   be better, but sometimes it turns out not to be better,

19   because we don't get to finish.

20             MR. TALON:  Right.

21             THE COURT:  And then we have an issue of trying to

22   schedule it within the next two weeks when the same Judge who

23   begins the exam is still on exams and that creates a problem

24   as well.

25             But just so that the record is clear, this is the

69

1       Court's decision to adjourn the matter, number one because my

2       staff has gone all day without the requisite break at even a

3       lunch break.  And then two, because we were reminded recently

4       that the staff, you know, is entitled to leave work at a

5       reasonable time so that they can do the things that they have

6       to do and the Court won't incur unnecessary, so it depends on

7       who's judging unnecessary, overtime pay that would have to be

8       paid to the staff and that sort of thing.  And then at this

9       point, they're probably just mentally exhausted.  So, I am

10      going to adjourn and the witnesses have entered the room.

11      Can you --

12                   MR. TALON:  Yes, all I ask is if Ali --

13                   MR. AL-GANZAWI:  Yes.

14                   THE COURT:  Madame interpreter, can you come

15      forward please?

16                   MR. TALON:  You can stay there.

17                   THE COURT:  No, no, not you sir.  Stay there.

18                   MR. TALON:  You can stay there.  Yes, you can stay

19      there.

20                   THE COURT:  The interpreter, please.

21                   MR. TALON:  And I'll give the Court, I'll give the

22      reporter the spellings after.  But this is Ali Khudeir Al-

23      Ganzawi.

24                   MR. AL-GANZAWI:  Yes.

25                   MR. TALON:  And Yass Haider Al-Ganzawi.

page

1          MR. AL-GANZAWI:  Yes.

2          MR. TALON:  He's standing up.  As well as the first

3     witness that came back from the court, Raad Aljimlawi.

4          MR. ALJIMLAWI:  Yes.

5          MR. TALON:  And in addition to that there's the

6     Mothon Al-Ganzawi.

7          MR. AL-GANZAWI:  Yes.

8          MR. TALON:  Who is not a witness but his brother is

9     in the courtroom.  Judge, and we indicated, they have to come

10    back next Friday at 1:00 o'clock.

11         MR. ALGANZAWI:  Next Friday we come at 1:00?

12         THE COURT:  Hold on, sir.

13         (Interpreter interprets)

14         MR. TALON:  Do not talk about the case with each

15    other.

16    Judge, although I think it's appropriate that if the

17    Prosecutor or the detective wanted to talk to them I think

18    that's appropriate.

19         THE COURT:  That is.  So tell them it's okay to

20    talk to the --

21         MR. TALON:  And I know I don't have to say this

22    Judge, but just so the record is clear, provided it's not

23    about the substance of the testimony of Mr. Raad Aljimlawi.

24         THE COURT:  That's okay, but tell them it's okay to

25    talk to the Prosecutor or the investigator.

1          (Interpreter interprets)

2          THE COURT:  Investigator.  Okay.  Tell them that it

3    will not be beneficial to them or to the People if it appears

4    that their testimony is, what word do I want to use,

5    rehearsed or practiced to be more in line.  I want them to

6    testify truthfully when they return.

7          (Interpreter interprets)

8          THE COURT:  Okay?  All right.  Understand?  You

9    understand?

10          MR. AL-GANZAWI:  (Speaks in his Arabic language)

11          THE COURT:  Okay.  Hold on.  Hold on, sir.  Tell

12   him what he said, don't tell me.  To make sure it's

13   appropriate.  Counsel.  He was speaking but I don't want to

14   know.  Just say that he was speaking in Arabic.  Is it

15   appropriate for me to know what he said.  Ask Counsel, tell

16   him what he said.  No, uh huh, tell him in his ear.

17          MR. TALON:  Okay.  He simply said why do you want

18   to postpone it, the criminal is here.  What do you want to

19   do?  Which is a very understandable thing.

20          THE COURT:  Okay.  Yes.

21          MR. TALON:  That's Mr. Ali Khudeir Al-Ganzawi.

22          THE COURT:  Sir, I'm postponing it because it is

23   now 4:30.  Me and my staff have been working non-stop since

24   9:00 o'clock this morning and actually we were in the

25   courthouse before 9:00 o'clock.

1           MS. INTERPRETER:  Should I interpret?

2           THE COURT:  Yes, tell them what I said.  The union

3  requires that I let them go home because it's time for them

4  to get off work.  Especially since they didn't get a lunch

5  break at all.  So I can't stay here and listen to three more

6  witnesses because we wouldn't finish until 9:00 o'clock

7  tonight.  So, we're going to have to come back next week at

8  1:00 o'clock and then we'll listen to the other three

9  witnesses.  Okay?  All right.  So Court is in recess.

10          MR. TALON:  Thank you, Judge.  I'm going to give

11  you a copy right now of the statement as well as the

12  Investigative subpoena. I'll do that.

13           THE COURT:  Okay.

14           (Whereupon this matter concluded)

15           **********************************

16

17

18

19

20

21

22

23

24

1

2

3

4

5

6                                    **CERTIFICATE**

7

8       STATE OF MICHIGAN )

9                                  )ss

10      COUNTY OF WAYNE    )

11

12

13              I, Shari Morton, Certified Court Reporter, do

14      hereby certify that the foregoing pages 1 through 74,

15      inclusive, comprise a complete, true and correct transcript

16      of the testimony and proceedings taken in this matter on

17      Thursday, May 15, 2008.

18                        _Shari Morton_

19      _____

20                        Shari Morton
21                        421 Madison
22                        Detroit, Michigan 48226
23

24

25

26