FC
7-16

Kenny

STATE OF MICHIGAN

IN THE 36TH DISTRICT COURT FOR THE COUNTY OF WAYNE

CRIMINAL DIVISION

PEOPLE OF THE STATE OF MICHIGAN

        vs

JAMES ANDREW POWELL,

Defendant.

DISTRICT COURT
CASE NO. 07-63733

CIRCUIT COURT
CASE NO. 08-6961

_____/

## PRELIMINARY EXAMINATION

BEFORE THE HONORABLE E. LYNISE BRYANT-WEEKES

Detroit, Michigan – Friday, May 23, 2008

APPEARANCE:

For the People:

    LAWRENCE TALON    P# 36707
    (Wayne County Prosecutors Office)
    1441 Saint Antoine St.
    Detroit, Michigan 48226
    (313) 224-7544

For the Defendant:
JAMES POWELL

    DOUGLAS HAMPTON    P# 46378
    Douglas D. Hampton & Associates, P.C.
    21415 Civic Center Dr., Ste 300
    Southfield, Michigan 48076
    (248) 357-4000

    RONALD MCDUFFIE    P# 34858
    1090 Inkster Road
    Inkster, Michigan 48141
    (313) 724-9022

Reported By:

    SHARI MORTON #6722
    Certified Court Reporter
    36TH District Court

1



6-18-08

## TABLE OF CONTENTS

WITNESSES:                                                    PAGE

EBONY ANGEL DONALD

     Direct Examination by Mr. Talon ...............    8
     Cross-Examination by Mr. Hampton  .............   31
     Redirect Examination by Mr. Talon ............   46


ALI AL-GANZAWI

     Direct Examination by Mr. Talon ...............   52
     Cross-Examination by Mr. Hampton ..............   58
     Redirect Examination by Mr. Talon .............   66
     Re-cross Examination by Mr. Hampton ...........   67

YASSER AL-GANZAWI

     Direct Examination by Mr. Talon ...............   69
     Cross-Examination by Mr. Hampton ..............   73

EXHIBITS:                                     ADMITTED


    NONE


1

1              Detroit, Michigan

2              Friday, May 23, 2008

3              THE CLERK:  This is Case No. 07-63733, the People

4     of the State of Michigan versus James Andrew Powell.  The

5     Defendant is charged with Count I, Murder, First Degree,

6     Homicide, Premeditated; Count II, Homicide, Felony Murder;

7     Count III and IV, Assault with Intent to Murder; Count V,

8     Weapons Firearms, Possession by a Felon; Count VI, Weapons,

9     Felony Firearms.  Defendant has a Habitual Offender, Second

10    Offense Notice.

11             MR. TALON:  Lawrence Talon, Assistant Prosecuting

12    Attorney.

13             MR. HAMPTON:  Douglas Hampton on behalf of Mr.

14    Powell.  Your Honor, I believe today we are continuing the

15    exam.

16             MR. TALON:  Yes.

17             THE COURT:  Yes.

18             MR. TALON:  Judge, we had Ebony Angel Donald on the

19    witness stand last time.  I'll ask Mr. McDuffie and the

20    witness to come in and then I'll continued.

21             THE COURT:  All right.

22        Counsel, before we get started, I think it would be --

23    if we continue the exam today that we have the individuals --

24    I'm not sure if these are the same individuals that were

25    present last time or if they are different individuals.

1          MR. TALON:  Okay.  Shall we ask for an order of

2     sequestration Judge?  After --

3          THE COURT:  Right.  The order of sequestration is

4     still in place.

5          MR. TALON: Okay.  We have -- the witness that we're

6     going to call in court today --

7          THE COURT: Right.

8          MR. TALON:  -- Ebony Donald.  The other witnesses

9     we're going to call are out in the hall way.

10         Judge, when we were here last, Ms. Donald indicated that

11    she was not going to testify pursuant to the fifth amendment.

12    Mr. McDuffie was here.  I gave the court an application for

13    an order granting immunity to witness Ebony Donald, Angel

14    Donald.  I believe Mr. McDuffie, he gave me a reply, I don't

15    know if he gave you a reply Judge?

16         THE COURT:  He did.

17         MR. TALON:  And I believe we're ready now to ask

18    the Court to sign the order of immunity that I presented to

19    the Court.  I have another copy here and I'd ask that you

20    sign it and date it and I ask the clerk to make a true copy

21    so that I can give it to Ms. Donald.

22         THE COURT:  All right.  Before I sign it, counsel

23    for Ms. Donald.  I've had an opportunity to review your

24    response and my question to you in respect to your response

25    -- have you had an opportunity to see the order of immunity?

---

4

1        MR. MCDUFFIE:  For the record, Your Honor, Ronald

2    McDuffie appearing on the behalf of Ms. Donald.

3        Your Honor, yes I have and not only that I've had an

4    opportunity to discuss this matter with the Prosecutor.  And

5    we're satisfied with the order as presented Judge.

6        THE COURT:  Okay.

7        MR. TALON:  I have three copies here, Judge, I

8    don't know how --

9        THE COURT:  Well, I have the one that you gave me

10   last time, I --

11       MR. TALON:  It's the same, it's all the same.

12       THE COURT:  Okay.

13       MR. TALON:  I just want to make sure that -- I'll

14   need one true copy to give to the witness and then we can

15   have a true copy for the court file and I can give Mr.

16   McDuffie one and if I could have one.

17       MR. HAMPTON:  Your Honor, before we start the

18   hearing, can I give my client a pad so he can take notes for

19   me?

20       THE COURT:  Yes.

21       FEMALE OFFICER:  I need to speak to you, Your

22   Honor, regarding that pen.

23       THE COURT:  Oh, okay.  Approach.

24       (Bench conference on the record)

25       (Bench conference concluded)

1          THE COURT:  Go on the record.  All right with

2    respect to defense counsel's request that Mr. Powell be

3    allowed to utilize an ink pen to take notes, I would just for

4    the record.  And the officer's concern with respect to the

5    same.

6          Mr. Powell, I'm going to allow you to use this ink pen

7    to take notes.  I believe -- I didn't see how you put it in

8    your pocket, I don't know what happened.  I'm going to give

9    you the benefit of the doubt that that was inadvertent.

10   Should it appear to the Court that you're trying to do

11   something else with the ink pen other than take notes, to

12   assist in your defense, then I'm going to have the pen

13   removed from you.  And then you'll just have to tell counsel

14   whatever you need to.  Okay?

15          DEFENDANT:  Thank you.

16          THE COURT:  All right.  So he can have the pen.

17          MR. HAMPTON:  Thank you, Your Honor.

18          THE COURT:  And we'll just make sure that we get

19   the pen back.

20          MR. HAMPTON:  I'll make sure I get -- I actually

21   like that pen, Judge.

22          THE COURT:  All right.

23          MR. HAMPTON:  I'll make sure I get it back.

24          THE COURT:  I need at least one now so I can give

25   it to her before she testifies.

1    You can't talk to her.  What are you saying?

2              DEFENDANT: I had some candy in my top pocket that--

3              THE COURT:  No, just leave that for yourself.

4    Counsel, I don't know if you were made aware that the

5    interpreter is not here yet.  So, I'm not sure what's going

6    to happen after this witness.  I hope that they get here

7    because I --

8              MR. TALON:  The problem is since I left my calender

9    (inaudible).

10             THE COURT:  Yes, and the problem is going to be

11   because --

12             MR. TALON:  Your office --

13             THE COURT:  -- they keep fussing at me when I put

14   criminals back before the witness.  So we can go ahead and

15   start and then you can, she can do the others now.  On which

16   one, the one they had.  Counsel, she needs to put a date on

17   it.  I'm sorry.  I can't keep stealing Judge Millender's

18   court reporter to finish the exam.  All right.

19             Raise your right hand.  Do you swear or affirm this

20   testimony you are about to give is the truth?

21             MS. DONALD:  Yes.

22             THE COURT:  All right.  You can have a seat.

23             R-A-A-D   A-L-J-I-M-L-A-W-I

24   After having been first duly sworn to tell the truth, the whole

25   truth, and nothing but the truth, testified as follows:

1                          DIRECT   EXAMINATION

2       BY MR. TALON:

3       Q     Tell us your name please?

4       A     Ebony Angel Donald.

5       Q     Okay.  And Ms. Donald, you were here last week?

6       A     Yes.

7       Q     And last week when you took the fifth amendment; is that

8             correct?

9       A     Yes.

10      Q     Okay.  And with the People having made an application for an

11            order of immunity, I'd like to hand you a true copy of the

12            order for immunity that was signed and entered by this Judge

13            just a couple of minutes ago.

14                          (Prosecutor handing document to witness)

15            Have you had an opportunity to read it?  Have you had an

16            opportunity to read it?

17      A     Yes.

18      Q     Okay.  And your lawyer, Mr. McDuffie, is in the courtroom

19            here today?

20      A     Yes.

21      Q     Now, Ms. Donald, do you know someone by the name of James

22            Powell?

23      A     Yes.

24      Q     Do you see Mr. Powell --

25                          MR. HAMPTON:  Stipulating to the identification,

1          Your Honor.

2                    MR. TALON:   Judge, I'd still like to do it.   I

3          appreciate it but I'd still like to do it.

4                    THE COURT:   Okay.

5     MR. TALON CONTINUED:

6     Q    Do you see Mr. Powell here in court?

7     A    Yes.

8     Q    And where is he?

9     A    Right over there (indicating).

10                   MR. TALON:   Indicating for the record, the witness

11         has pointed to and identified the Defendant, James Andrew

12         Powell.

13                   THE COURT:   The record will reflect the

14         identification of Mr. Powell.

15    MR. TALON CONTINUED:

16    Q    How long have you known Mr. Powell?

17    A    I don't know maybe about five or six years.

18    Q    Okay.   And do you and he have a child together?

19    A    Yes.

20    Q    How old is the child?

21    A    She's one.

22    Q    Now, how far have you gone in school?

23    A    I have a bachelor's degree.

24    Q    Okay.   And in what area is your bachelor's degree?

25    A    It's in small business management and entrepreneurship.

1    Q    All right.  Now, I'd like to ask you some questions back

2         about July 21, 2007.  And ask if you were with Mr. McDonald

3         (sic) in the area of 6890 Rutland in the City of Detroit?

4    A    You said with who?

5    Q    In the area -- I'm sorry -- Mr. Powell?

6    A    Yes.

7    Q    Okay.  I'll rephrase it because I did say that badly.

8    A    Okay.

9    Q    Back on July 21, 2007, were you with Mr. Powell in the area

10        of 6890 Rutland in the City of Detroit?

11   A    Yes.

12   Q    Okay.  Do you remember the first time you went over to that

13        area that particular day?

14   A    It was earlier that day like around maybe 2:30, 3:00 o'clock,

15        I think.

16   Q    In the afternoon?

17   A    Yes.

18   Q    Okay.  You can hold that higher so you don't have to lean up.

19   A    Okay.

20   Q    And when you went over there, did you go over alone or did

21        you go over with Mr. Powell?

22   A    I went over with him.  With him.

23   Q    Who was driving?

24   A    I was.

25   Q    And what type of vehicle were you driving?

1    A    A Escalade.

2    Q    And who does it belong to?

3    A    My father.

4    Q    Okay.  And why were you going over to that area?

5    A    Because he want to stop by.

6    Q    Okay.  And by he you mean, Mr. Powell?

7    A    Yes.

8    Q    Okay.  Had you ever been over there before?

9    A    No.

10   Q    So how did you know where to go?

11   A    Because he told me.

12   Q    When you got over to the area on Rutland, what happened when

13        you got there?

14   A    I left him over there.

15   Q    Okay.  So what did you do with the car, did you stop some

16        place?

17   A    No, well I went home.

18   Q    Okay.  When you got over to the area of 6890 Rutland, did he

19        point out a house to you?

20   A    Yeah, he said pull up right here.

21   Q    Okay.  And when you stopped there, did you see anyone else

22        outside at that particular time?

23   A    Yes.  A bunch of guys.

24   Q    All right.  And did you know any of those guys?

25   A    No.

11

1    Q   Could you describe them and tell us what they looked

2        physically?

3    A   One, the one guy just short, Arabic guy.

4    Q   Okay.  And were there any other guys with him?

5    A   It was a couple of other guys but I don't know who they were.

6    Q   Did you notice whether or not they were also appeared to be

7        Arabic as well?

8    A   Yes, they were Arabic.

9    Q   So when you got there and you got to that area, Mr. Powell,

10       did he get out of the Escalade?

11   A   Yes.

12   Q   All right.  And did he give you any further directions at

13       that particular time about what to do?

14   A   No.

15   Q   Did he say what he was going to do there?

16   A   No.

17   Q   Okay.  So what did you do?

18   A   I left.

19   Q   And where did you go?

20   A   I went home.

21   Q   When did you next see or hear from Mr. Powell?

22   A   About a couple hours later, he had called me and told me to

23       come back.

24   Q   Okay.  And so, what did you do after he called and told you

25       that?

| | | |
|---|---|---|
| 1 | A | I went over to his aunt's house. |
| 2 | Q | Okay.  So you didn't go back to that -- |
| 3 | A | Uh huh. |
| 4 | Q | -- the spot where you dropped him off? |
| 5 | A | No. |
| 6 | Q | You went back to his aunt's house? |
| 7 | A | Yes. |
| 8 | Q | Where is his aunt's house? |
| 9 | A | On Grandmont. |
| 10 | Q | And how close or far away is that from the Rutland location? |
| 11 | A | Maybe about three or four blocks. |
| 12 | Q | And about what time was it about that you got to Grandmont? |
| 13 | A | About 5:30, 6:00 o'clock. |
| 14 | Q | In the evening? |
| 15 | A | Yes. |
| 16 | Q | All right.  And what happened once you got to Grandmont? |
| 17 | A | He called and had me come around the corner on Rutland. |
| 18 | Q | Okay.  So you went to Grandmont, he wasn't there? |
| 19 | A | No. |
| 20 | Q | Okay.  When you got to Grandmont, did you get out of the car? |
| 21 | A | No. |
| 22 | Q | So when you arrived at Grandmont, you said he called you |
| 23 | | again on the cell phone? |
| 24 | A | Yes. |
| 25 | Q | He said come around the corner? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | So where did you drive then? |
| 3 | A | I drove around to Rutland. |
| 4 | Q | Okay.  To the same place that you had dropped him off? |
| 5 | A | No.  He was -- there were in the middle of the street. |
| 6 | Q | Okay.  When you say they, so who was in the middle of the |
| 7 | | street? |
| 8 | A | It was him and the Arabic guys. |
| 9 | Q | And by him you mean Mr. Powell? |
| 10 | A | Yes. |
| 11 | Q | And about where were they in relationship to where the house |
| 12 | | was where you dropped him off at? |
| 13 | A | They were down a little bit from the house. |
| 14 | Q | Okay. |
| 15 | A | On the other side of the street. |
| 16 | Q | All right.  So, what happened when you pulled onto Rutland |
| 17 | | and you saw Mr. Powell in the street with these other |
| 18 | | gentleman? |
| 19 | A | He had me follow him back over to Grandmont. |
| 20 | Q | Okay.  Mr. Powell had you follow him? |
| 21 | A | Yes. |
| 22 | Q | Was he in a vehicle? |
| 23 | A | Yes. |
| 24 | Q | All right.  What type of vehicle was he in? |
| 25 | A | A Sebring. |

14

| | | |
|---|---|---|
| 1 | Q | Okay.  Did you recognize that vehicle? |
| 2 | A | Yes. |
| 3 | Q | Who's vehicle did you recognize it to be? |
| 4 | A | His aunt's. |
| 5 | Q | Okay.  So when you see him back onto Rutland, you saw the |
| 6 | | Sebring? |
| 7 | A | Yes. |
| 8 | Q | On the street? |
| 9 | A | Yes.  Parked, yes. |
| 10 | Q | Okay.  Did you talk to Mr. Powell in person or how did you |
| 11 | | know to follow him? |
| 12 | A | I rolled down my window and we were conversating. |
| 13 | Q | Okay.  And he said follow me? |
| 14 | A | Yes. |
| 15 | Q | Okay.  Was he in the car that time -- |
| 16 | A | No. |
| 17 | Q | -- in the Sebring or was he outside the car? |
| 18 | A | He was outside the car. |
| 19 | Q | Okay.  And he was, where was the Arabic men when he was |
| 20 | | outside the car? |
| 21 | A | They were like leaning on the car. |
| 22 | Q | Okay.  So after Mr. Powell spoke with you and told you to |
| 23 | | follow him, did he get back in the Sebring? |
| 24 | A | Yes. |
| 25 | Q | Did he drive off? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Did any of the Arabic men get in the Sebring with him? |
| 3 | A | No. |
| 4 | Q | All right.  And what did you do after Mr. Powell drove off? |
| 5 | A | I followed him back over to his aunt's house. |
| 6 | Q | Okay.  What happened once you got back to the aunt's house? |
| 7 | A | I went back to his aunt's house, went in the house, he said |
| 8 | | he'd be back in a minute. |
| 9 | Q | Okay.  So, you parked the Escalade? |
| 10 | A | Yes. |
| 11 | Q | On Grandmont? |
| 12 | A | Yes. |
| 13 | Q | Did Mr. Powell park the Sebring? |
| 14 | A | Yes. |
| 15 | Q | Okay.  Did he get out of the Sebring at all? |
| 16 | A | Yes. |
| 17 | Q | All right.  And where were you guys when he said to you I'll |
| 18 | | be back -- |
| 19 | A | We were in the house. |
| 20 | Q | Okay.  And he said I'll be -- what did he say again? |
| 21 | A | He said he'll be back in a minute. |
| 22 | Q | Okay.  And did you see him leave? |
| 23 | A | No. |
| 24 | Q | What was he still with you after he said that to you? |
| 25 | A | He went upstairs. |

16

1    Q    Okay.  And what happened after he went upstairs?

2    A    He left.

3    Q    Okay.  Where were you --

4    A    I was in the basement still.

5    Q    Okay.  So when he left you were in the basement after he said

6         I'll be back in a minute?

7    A    Um hmm.

8    Q    You have to answer with words.

9    A    Yes.

10   Q    Okay.  And he -- did you see him go upstairs?

11   A    Yes.

12   Q    All right.  When did you next see or have contact with him

13        after that?

14   A    Maybe a couple of hours later, he came back.

15   Q    Okay.  And where had you been during that particular time?

16   A    I was down in the basement sleep.

17   Q    Okay.  What happened after he came back?

18   A    When he came back he had me take him back around the corner.

19   Q    All right.  Back over to --

20   A    To Rutland.

21   Q    Okay.  What did he say to you specifically?

22   A    When?

23   Q    When he came back after that couple of hours after you had

24        been asleep.  What words did he use when he asked you to take

25        him back to Rutland?

1    A    He just asked me to take him back to Rutland.

2    Q    Okay.  And how did you take him back to Rutland?

3    A    I drove back over there.

4    Q    In the Escalade?

5    A    Yes.

6    Q    Okay.  When you got back onto Rutland, do you know

7         approximately what time it was?

8    A    Not really.  It might have been, I don't know, like 8:00

9         o'clock maybe 8:30, I'm not sure.

10   Q    In the evening?

11   A    Yes.

12   Q    All right.  And where on Rutland did you go?

13   A    I went back to the house where I dropped him off earlier.

14   Q    Okay.  And when you got back to that house, did you see

15        anyone in the area?

16   A    Yes.

17   Q    Now who did you see?

18   A    The Arabic guys that I saw earlier.

19   Q    Okay.  Did it appear to be the same Arabic guys?

20   A    Yes.

21   Q    Do you remember how many there were?

22   A    About four or five, I'm not sure.

23   Q    And where did you see them?

24   A    They were at the house.

25   Q    Do you remember where at the house were they?

1  A  They were, some were on the porch and some were leaning on

2     the car.

3  Q  Okay.  And which car were they leaning on?

4  A  I don't know.

5  Q  Where was the car that they were leaning on?  Where was it

6     parked?

7  A  Parked in the driveway.

8  Q  Okay.  So when you got back there, did Mr. Powell got out of

9     the Escalade?

10  A  Yes.

11  Q  Did he say anything to you before he got out?

12  A  He was going to talk to a buddy of his.

13  Q  Okay.  That's what he told you?

14  A  Yes.

15  Q  Okay.  Did he give you any directions or tell you what to do?

16  A  No.

17  Q  Did you stay in the Escalade?

18  A  Yes.

19  Q  Did you see where he went?

20  A  Yes.

21  Q  Where did he go?

22  A  He went to the house where the Arabic guys were.

23  Q  Okay.  And did he go in the house or where did you see him go

24     when --

25  A  I'm not sure because I didn't look back after that.

1    Q    Okay.   What happened then?

2    A    I sat in the car maybe about 30 minutes to an hour waiting on

3         him.

4    Q    Just outside on Rutland?

5    A    Um hmm.

6    Q    Remember you have to use words for the court reporter.

7    A    Yes.

8    Q    Okay.   Then what happened?

9    A    Then he came back to the car, he said he'd only be a few more

10        minutes and he went back to the house.

11   Q    Okay.   Did you see where he went when he went back to the

12        house?

13   A    I just seen he went back to the house.

14   Q    Okay.   Were the -- did you see the Arabic guys at this time?

15   A    Yes, they were still outside.

16   Q    Okay.   Did it appear to you that Mr. Powell had gone inside

17        the house or had simply been outside the house the whole

18        time?

19   A    I don't know.

20   Q    Were you parked directly in front of the house?

21   A    No, I was not.

22   Q    Where were you parked in relationship to the house?

23   A    Maybe a house in front, I mean a house over from the other

24        house.

25   Q    Passed the house?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Okay.  On the same side of the street? |
| 3 | A | Yes. |
| 4 | Q | Okay.  So what happened after Mr. Powell said he'd be just a |
| 5 | | few more minutes and he headed back towards the house? |
| 6 | A | Well maybe about 20 minutes later he came back to the car. |
| 7 | Q | And what happened when he came back to the car? |
| 8 | A | He had me drive around on Grandmont. |
| 9 | Q | Okay.  What did he say to you, try to use the exact words |
| 10 | | that he said? |
| 11 | A | Go around the corner and get something. |
| 12 | Q | Okay.  Did he tell you -- were those the best -- |
| 13 | A | That's the best of my ability what I can tell you he said. |
| 14 | Q | All right.  Go around the corner and get something? |
| 15 | A | Um hmm. |
| 16 | Q | Remember you have to use words. |
| 17 | A | Yes, that's it. |
| 18 | Q | Did he tell you who to get the something from? |
| 19 | A | Yes. |
| 20 | Q | All right.  What did he say then? |
| 21 | A | Go around the corner and get something from my cousin. |
| 22 | Q | Okay.  Did you know who his cousin was? |
| 23 | A | Yes. |
| 24 | Q | All right.  Who was his cousin? |
| 25 | A | Los. |

| | | |
|---|---|---|
| 1 | Q | Okay.  Los like in L-o-s? |
| 2 | A | Yes.  Like in, yeah. |
| 3 | Q | And did you ask him what it was you wanted -- he wanted you |
| 4 | | to go get? |
| 5 | A | No. |
| 6 | Q | So, after he told you that, did you see what he did? |
| 7 | A | Who? |
| 8 | Q | Mr. Powell? |
| 9 | A | He walked back away. |
| 10 | Q | All right.  In what direction did he walk? |
| 11 | A | Back to the house. |
| 12 | Q | Okay.  And what did you do? |
| 13 | A | I went over on Grandmont. |
| 14 | Q | Okay.  And you drove the Escalade over on Grandmont? |
| 15 | A | Yes. |
| 16 | Q | Okay.  When you drove the Escalade over on Grandmont did you |
| 17 | | see anyone? |
| 18 | A | Yes. |
| 19 | Q | Who did you see? |
| 20 | A | His cousin. |
| 21 | Q | Los? |
| 22 | A | Yes. |
| 23 | Q | Where was Los when you saw him? |
| 24 | A | On the curb. |
| 25 | Q | Okay.  What did you do when you saw Los on the curb? |

1    A    I pulled up.

2    Q    And what happened once you pulled up?

3    A    Los tossed a gun. Well he didn't toss but set the gun in my

4         truck.

5    Q    Okay. Who opened the door to the truck? Who opened the door

6         to the truck?

7    A    Rolled down the window. The window.

8    Q    All right. Which window did you roll down?

9    A    I rolled down the passenger window.

10   Q    Front passenger window?

11   A    Yes.

12   Q    Okay. What did you see Los do then?

13   A    He said the gun in my truck, in the passenger seat.

14   Q    Okay. Can you describe for us what the gun looked like?

15   A    It was small, silver.

16   Q    Okay. Do you know the difference between a revolver and a

17        semi-automatic?

18   A    No, I don't.

19             MR. TALON: One second.

20   Q    Do you know what the old cowboy guns looked like?

21   A    The long ones?

22   Q    You know -- did it look like a boxy gun or something --

23   A    No it didn't look boxy.

24   Q    Okay. All right. Did Los say anything to you when he put

25        the gun in the car?

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Okay.  What did you do after Los put the gun on the seat in |
| 3 | | the car? |
| 4 | A | I drove back around to Rutland. |
| 5 | Q | Okay.  When you got back around to Rutland, where did you go? |
| 6 | A | I pulled back in the same place I was at before. |
| 7 | Q | Okay.  And did you stop the Escalade? |
| 8 | A | Yes.  I parked. |
| 9 | Q | What happened after you stopped the Escalade? |
| 10 | A | James got back, he got back to the truck, he got in the |
| 11 | | vehicle and put the gun on his hip. |
| 12 | Q | Where in the truck did he go, in the Escalade did he go? |
| 13 | A | Passenger seat. |
| 14 | Q | And what did you see him do with the gun? |
| 15 | A | He put the gun on his hip. |
| 16 | Q | All right.  Did he say anything to you at that time? |
| 17 | A | He said he'll be right back. |
| 18 | Q | Did you say anything to him? |
| 19 | A | No. |
| 20 | Q | What happened then? |
| 21 | A | Around maybe 20, 25 minutes later -- |
| 22 | | MR. TALON:  Hold on one second. |
| 23 | Q | After he said that to you, did he stay in the truck or did he |
| 24 | | get out? |
| 25 | A | He got out of the truck. |

| | | |
|---|---|---|
| 1 | Q | And when I say truck I'm referring to the Escalade.  Is it an |
| 2 | | SUV or is it a pickup? |
| 3 | A | It's a SUV. |
| 4 | Q | Okay.  You said he got out of the truck? |
| 5 | A | Yes. |
| 6 | Q | Did you see where he went toward? |
| 7 | A | He went back toward where -- to the house. |
| 8 | Q | Okay.  And what did you do when he went back toward the |
| 9 | | house? |
| 10 | A | I sat where I was at before. |
| 11 | Q | Okay.  And what did you do while you were sitting there? |
| 12 | A | I was just listening to the music, leaned back in my chair. |
| 13 | Q | Okay.  And then what happened? |
| 14 | A | Then maybe 20, 25 minutes later I heard a couple of little |
| 15 | | shots. |
| 16 | Q | Okay.  And what happened after you heard the shots? |
| 17 | A | James came back to the car. |
| 18 | Q | And what did he do when he came back to the car? |
| 19 | A | He banged on the window for me to let him in. |
| 20 | Q | Which window did he bang on? |
| 21 | A | The passenger. |
| 22 | Q | And what did you do when he banged on the window? |
| 23 | A | I let him in. |
| 24 | Q | And where in the SUV did he go? |
| 25 | A | He was in the passenger seat. |

1    Q    And what, if anything, did he say at that time?

2    A    Just drive.

3    Q    Can you describe what his demeanor was like to you?  And you

4         know what I mean by demeanor don't you?

5    A    Yes.  He was panicky, scare even.

6    Q    And he just said drive?

7    A    Yes.

8    Q    All right.  Did you see anything with him at that time?

9    A    No sir.

10   Q    Did he tell you where to drive?

11   A    Yes.

12   Q    Where did he tell you to drive?

13   A    To his mom's house.

14   Q    And did you do that?

15   A    Yes.

16   Q    Did he say anything to you on the way?

17   A    No.

18   Q    What happened once you got to his mom's house?

19   A    Once I got to his mom's house we were in the house and that

20        was it.  We basically went to sleep.

21   Q    Did he say anything more?

22   A    No he wouldn't speak to me.  He was very like panicky, he

23        wouldn't talk.

24   Q    Did you ever see him talk on the telephone?

25   A    Not in front of me.

| | | |
|---|---|---|
| 1 | Q | Do you know whether or not he spoke on the telephone? |
| 2 | A | Yes. |
| 3 | Q | How do you know that he spoke on the telephone? |
| 4 | A | Because he would pick up his phone in front of me but he |
| 5 | | would have conversations in front of me. |
| 6 | Q | Okay.  And you're referring to a cell phone? |
| 7 | A | Yes. |
| 8 | Q | So he'd pick up the cell phone and would he stay there or |
| 9 | | what would he do with it? |
| 10 | A | He would walk away. |
| 11 | Q | And could you tell whether or not he was talking on it? |
| 12 | A | Yeah, he was talking. |
| 13 | Q | But not where you could hear? |
| 14 | A | Exactly. |
| 15 | Q | Did you ever ask him what happened on Rutland? |
| 16 | A | No. |
| 17 | Q | Did he ever tell you what happened on Rutland? |
| 18 | A | No. |
| 19 | Q | You said you spent the night there? |
| 20 | A | Yes. |
| 21 | Q | What happened the following morning? |
| 22 | A | Went home. |
| 23 | Q | Okay.  Did you see him after that? |
| 24 | A | I spoke to him after that, yes. |
| 25 | Q | Okay.  And on the telephone? |

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What, if anything, did he tell you at that time? |
| 3 | A | Nothing, it was just a regular conversation, it wasn't -- |
| 4 | Q | Okay.  Did you see him after that or -- |
| 5 | A | No. |
| 6 | Q | When was the next time that you saw him after the morning |
| 7 | | after the incident, however? |
| 8 | A | In this courtroom. |
| 9 | Q | That was the first time you had seen him since back in July |
| 10 | | of 2007? |
| 11 | A | Yes. |
| 12 | Q | Had you spoken with him at all during that period of time? |
| 13 | A | No. |
| 14 | Q | Now when this happened were you pregnant? |
| 15 | A | No. |
| 16 | Q | You had already given birth to the baby? |
| 17 | A | Yes. |
| 18 | Q | Was the baby with you? |
| 19 | A | No. |
| 20 | Q | When I say with you, were you raising the baby? |
| 21 | A | Yes. |
| 22 | Q | Okay.  And did you continue to raise the baby after that? |
| 23 | A | Yes. |
| 24 | Q | He knows he's the father? |
| 25 | A | Yes. |

| | | |
|---|---|---|
| 1 | Q | Did you receive any communications from him at all from July |
| 2 | | 27 until you saw him in this courtroom? |
| 3 | A | No. |
| 4 | Q | And was last Friday the first time you had seen him, that's |
| 5 | | the time -- |
| 6 | A | Not last Friday.  Our first court date here, I don't remember |
| 7 | | the exact date. |
| 8 | Q | Okay.  In April, 2008? |
| 9 | A | Yes. |
| 10 | Q | Okay.  No letters? |
| 11 | A | No. |
| 12 | Q | No phone calls? |
| 13 | A | Well, I got a letter when he was in Kalamazoo.  From when he |
| 14 | | was in Kalamazoo. |
| 15 | Q | Okay.  Did you keep those letters? |
| 16 | A | Yes. |
| 17 | Q | Do you still have them? |
| 18 | A | Yes. |
| 19 | Q | Okay.  Will you give those letters to Sergeant Drew? |
| 20 | A | Yes. |
| 21 | Q | Do you remember what he said in those letters? |
| 22 | A | No, sir. |
| 23 | Q | What name would you call him by? |
| 24 | A | James. |
| 25 | Q | All right.  Had you ever anyone call him Jimmy Bush? |

| | | |
|---|---|---|
| 1 | A | Jimmy Bush, no. |
| 2 | Q | All right.  Had you ever heard of someone call him Jimmy? |
| 3 | A | Yes. |
| 4 | Q | All right.  Now you gave a statement to police after this |
| 5 | | happened; is that correct? |
| 6 | A | Yes. |
| 7 | Q | Were you entirely truthful in that statement? |
| 8 | A | No, I was not. |
| 9 | Q | You also testified under oath at an investigative subpoena; |
| 10 | | is that correct? |
| 11 | A | Yes. |
| 12 | Q | That was after you took an oath to tell the truth, right? |
| 13 | A | Yes. |
| 14 | Q | All right.  Were you entirely truthful in that statement? |
| 15 | A | No, I was not. |
| 16 | Q | In those statement, the statement you gave to police and when |
| 17 | | you testified under oath, did you omit the part where James |
| 18 | | told you to go back over to Grand-- |
| 19 | | MR. HAMPTON:  Objection, Your Honor, if he's going |
| 20 | | to ask what she admitted to, she can obviously testify to |
| 21 | | that or the Court can take notice of what she's testifying to |
| 22 | | today as to what's in the statement that was brought up |
| 23 | | before. |
| 24 | | MR. MCDUFFIE:  But him leading her and saying well |
| 25 | | did you admit certain facts certainly is not a question that |

```
 1            he needs to ask.  That's absolutely leading.  She can talk
 2            about what she admitted from her statement.
 3                     MR. TALON:  I don't think it's leading.  But if you
 4            don't want you me to go into -- simply because it doesn't
 5            suggest, you know, if I said, isn't it true that you did
 6            this, that might be leading.  But nonetheless, Judge, I think
 7            it's a direct question, but if you want me to go on --
 8                     THE COURT:  I do.
 9                     MR. TALON:  Okay, that's fine, Judge.  Okay.  I
10            don't have any further questions.
11                     THE COURT:  Cross examination?
12                          CROSS-EXAMINATION
13      BY MR. HAMPTON:
14      Q    Ms. Donald?
15      A    Yes.
16      Q    Ebony?  On July 21, 2007, you indicated that you had taken
17            James over to the house at 6890 Rutland, correct?
18      A    Yes.
19      Q    Now, at least from the testimony, and I'm not sure because
20            this sounds you were over there a number of times that day;
21            is that correct?
22      A    Yes, that day.
23      Q    And as a matter of fact that day you took him over there as
24            early as 2:30 in the morning, correct?
25      A    2:30 in the afternoon.
```

1    Q    2:30 in the afternoon, correct?

2    A    Yes.

3    Q    Okay.  And he was there at this particular house, correct?

4    A    Yes.

5    Q    And you saw him talking to these Arabic gentlemen that you

6         were describing at that time, correct?

7    A    Yes.

8    Q    And then that was some time between 2:30 and 3:00 in the

9         afternoon.  Did you leave him there?

10   A    Yes.

11   Q    Okay.  You left him there, so you left him there for about

12        how long?

13   A    Maybe about three hours.

14   Q    Okay.  And did you go back and pick him up at that time?

15   A    No.

16   Q    Okay.  The next time that you saw him after that three hours,

17        he showed up at your house, how did that work?  How was the

18        next time that you saw him after you had dropped him off over

19        there between 2:30 and 3:00 o'clock?

20   A    He didn't show up at my house.

21   Q    Okay.  You dropped him out at 2:30 or 3:00 o'clock, correct?

22   A    Yes.

23   Q    You just said that you picked him up or saw him around three

24        hours later.

25   A    Yes.

1    Q    Okay.  Where did you see him?

2    A    Back on Rutland.

3    Q    Back on Rutland?

4    A    Yes.

5    Q    At the same house?

6    A    Yes.

7    Q    So at least he was at the same place that you dropped him off

8         at 2:30, so we're talking about 5:30, 6:00 o'clock that you

9         saw him again at the same location, correct?

10   A    Yes.

11   Q    With the same guys, correct?

12   A    Yes.

13   Q    Okay.  And then at that point when you saw him at 5:30, 6:00

14        o'clock, then what did you do?

15   A    Well, he had asked me to follow him back over to his aunt's

16        house on Grandmont.

17   Q    Okay.  So you all left together and went to the aunt's house

18        on Grandmont?

19   A    Well, I followed him.

20   Q    You followed him?

21   A    Yes.

22   Q    From that house on Rutland, correct?

23   A    Yes.

24   Q    Okay.  Then at some point did you take him back over to the

25        house on Rutland?

1   A   Yes.

2   Q   About what time was that?

3   A   Maybe like around 8:00, 8:30 --

4   Q   About -

5   A   -- I wasn't positively sure.

6   Q   Did you drop him off at that time or did you stick around for

7       a little while, how did that work?

8   A   I stuck around for awhile.

9   Q   Okay.  And this was around 8:30?

10  A   Yes.

11  Q   And during that entire time, you were -- you waited how long

12      would you say?

13  A   I don't know, 30 minutes to an hour.

14  Q   Thirty minutes to an hour you're sitting in the truck?

15  A   Yes.

16  Q   He's conversating with these gentlemen?

17  A   Yes.

18  Q   Is that correct?

19  A   Yes.

20  Q   Okay.  Did you see them conversating over there or you just

21      knew that he was at the house because they were all outside?

22  A   I just knew he was at the house because they were all

23      outside.

24  Q   Okay.  But he was at least with them for how long would you

25      say this particular time?

---

34

1    A    About maybe an hour, hour and a half.

2    Q    Okay.  So we're talking about -- so so far we have from 2:30

3         to 5:00, 5:30, that's around three hours.  Then you came

4         back, that's another hour, hour and a half that you sat

5         outside and he was actually with these gentlemen at the

6         house, correct?

7    A    Yes.

8    Q    Okay.  8:00, 8:30, hour and a half.  What did you do after

9         that?  You went back home?

10   A    I went back home after I dropped him off at 2:30.

11   Q    Okay.  That was the 2:30 but you said that you brought him

12        back over there at around, what time?

13   A    I said I brought him back over there maybe like around 8:00,

14        8:30.

15   Q    Right.  And then was that the time that you stayed outside --

16   A    Yes.

17   Q    -- the place for about an hour, hour and a half?

18   A    Yes.

19   Q    And he's at the location that entire time?

20   A    Yes.

21   Q    At the end of that hour, hour and a half time, then what, did

22        you all leave at that point together?

23   A    Well, that when I went around the corner that's his aunt's

24        house.

25   Q    Okay.  You went back to his aunt's house?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Approximately what time would you say, maybe around 10:00 |
| 3 | | o'clock? |
| 4 | A | I'm not sure. |
| 5 | Q | If you were there, you got there around 8:30, correct? |
| 6 | A | I said about 8:00, 8:30. |
| 7 | Q | Okay.  And you said you were there about an hour, hour and a |
| 8 | | half, correct? |
| 9 | A | Yes. |
| 10 | Q | So 9:30, 10:00 o'clock you went back to the aunt's house, |
| 11 | | correct? |
| 12 | A | Possibly. |
| 13 | Q | Okay.  Why is that different than the answers that you gave |
| 14 | | earlier? |
| 15 | A | Because I'm not sure of the time and you're asking me and I'm |
| 16 | | not sure of it. |
| 17 | Q | But between that time, I'm not asking for the exact time, but |
| 18 | | between the 9:30, 10:00 o'clock range, correct? |
| 19 | A | Okay.  Yes. |
| 20 | Q | Is that correct? |
| 21 | A | Yes. |
| 22 | Q | Don't let me put words in your mouth.  If it's not then tell |
| 23 | | me. |
| 24 | A | Cause I don't know the time.  And I'm telling you I don't |
| 25 | | know the time. |

1    Q    But approximately, it wasn't midnight, right?

2    A    No, it was not.

3    Q    It was not 11:00 o'clock yet, correct?

4    A    No, it was not.

5    Q    Okay.  It was after 9:00, correct?

6    A    Yeah.

7    Q    Probably after 9:30, correct?

8    A    Yes.

9    Q    Okay.  So some time between 9:30 and 10:30, right?

10   A    Yes.

11   Q    Okay.  You went back to his aunt's house, correct?

12   A    Yes.

13   Q    And what did you do at his aunt's house?

14   A    That's when I went to go pick up the gun.

15   Q    Okay.  You went to pick up the gun at his aunt's house,

16        correct?

17   A    Yes.

18   Q    Then you came back --

19   A    Yes.

20   Q    -- and you drove up and you rolled down the window, I think

21        is what your testimony was, right?

22   A    I did not roll down the window, he got into the vehicle.

23   Q    He got into the vehicle?

24   A    Yes.

25   Q    And he picked up this gun?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | And I believe you testified that he put it in his waist? |
| 3 | A | Yes. |
| 4 | Q | And you saw him walk away? |
| 5 | A | Yes. |
| 6 | Q | Did you watch him as he walked away with the gun? |
| 7 | A | Yes. |
| 8 | Q | Okay. Where did he go? |
| 9 | A | Back to the house he was at the house he was at before. |
| 10 | Q | Okay. And when you saw him walk back to the house, what did |
| 11 | | you see him do? |
| 12 | A | I just seen him walk back to the house and I turned back |
| 13 | | around. |
| 14 | Q | Okay. He walked back to the house and you turned back |
| 15 | | around? |
| 16 | A | Yes. |
| 17 | Q | Okay. And then you did not see him about until he came up to |
| 18 | | the house -- till he came back to the truck, right? |
| 19 | A | Yes. |
| 20 | Q | So, you don't know what happened when he went back to the |
| 21 | | house, right? |
| 22 | A | No, I do not. |
| 23 | Q | You don't know, I believe you testified that you heard some |
| 24 | | shots, correct? |
| 25 | A | Yes. |

1   Q   But you don't know how those shots took place, correct?

2   A   Yes.

3   Q   You do know?

4   A   I mean correct, I'm sorry.

5   Q   You don't know how those shots took place?

6   A   No, I don't.

7   Q   In fact you don't know whether or not all the shots that you

8       heard were from James, from James and the gun?

9           MR. TALON:  Well, Judge, I'm going to object to

10      that because all she's been able to testify, she heard shots.

11          MR. HAMPTON:  Well --

12          MR. TALON:  Anything beyond that is -- he's asking

13      her to speculate.  You don't know whether all of the shots

14      came from his gun or -- that's all speculation.  If she

15      didn't see, she's already testified that she doesn't know

16      anything other than the shots are -- the rest is argument,

17      Judge, for the Court and I think it's improper questioning.

18          MR. HAMPTON:  Judge, it's absolutely not argument.

19      I'm trying to make sure that she heard something, she didn't

20      turn around, she looked, if she's going to state on the

21      record, because I'm going to need the transcript that she

22      didn't see what transpired.  She heard shots, she doesn't

23      know if it came from the gun that she said that he picked up

24      from the seat from some other gun or anything else.  That's

25      all I'm establishing.

1          THE COURT:  Right.  I think you're taking the long

2     route but I'll allow it.

3          MR. HAMPTON:  Thank you, Judge.

4     MR. HAMPTON CONTINUED:

5     Q    So you don't know where those shots came from, correct?

6     A    No, I don't.

7     Q    Okay.  And you don't know what could have started those shots

8          or anything like that, correct?

9     A    No, I don't.

10    Q    The next thing that you know is that James showed back up at

11         the Escalade, correct?

12    A    Yes.

13    Q    And I believe you testified that he was panicky, correct?

14    A    Yes.

15    Q    And he appeared scared, correct?

16    A    Yes.

17    Q    In fact he got in the truck and he said, let's go, let's go,

18         correct?

19    A    Yes.

20    Q    And you went --

21    A    Just drive.

22    Q    Just drive.  And you went back to the house, correct?

23    A    Yes.

24    Q    And he was still panicky and scared at that time, correct?

25    A    Yes.

1   Q   Okay.  In fact he didn't even want to talk to you about it;

2       is that correct?

3   A   Yes.

4   Q   And then I believe the next thing that you testified is that

5       you went to sleep, right?

6   A   Yes.

7   Q   Okay.  You went to sleep or you both went to sleep?

8   A   We both went to sleep.

9   Q   Together, correct?

10  A   Yes.

11  Q   All right.  I believe the Prosecutor asked you about after

12      that period of time when was the next time that you saw

13      James; is that correct?

14  A   Yes.

15  Q   Okay.  And then I believe you testified that the next time

16      that you actually saw him was when he was sitting in court;

17      is that correct?

18  A   Yes.

19  Q   Okay.  And then I believe you also testified that you hadn't

20      talked to him ever since that particular incident, correct?

21  A   Yes.

22  Q   No phone calls, no nothing except some letters that he sent

23      you, correct?

24  A   Correct.

25  Q   And there's no other communication either by yourself or no

1          communication verbally between the two of you; is that

2          correct?

3      A   Correct.

4      Q   Not by phone or any other way, correct?

5      A   Correct.

6      Q   Okay.  And you're under oath, correct?

7      A   Yes.

8      Q   And I believe that when you walked up you swore to tell the

9          truth, correct?

10     A   Correct.

11     Q   You understand what that means, correct?

12     A   Correct.

13     Q   Okay.  And when you take that oath and you understand that

14         there's a person that's taking down everything that you say,

15         correct?

16     A   Correct.

17     Q   And so your intention is to tell the Court the entire truth

18         today, correct?

19     A   Correct.

20     Q   You recall doing the same exact thing on Wednesday, July 25,

21         2007, correct?  You were put under oath and you put up your

22         hand and you swore to tell the truth, correct?

23     A   Correct.

24     Q   And you gave a statement where they asked you specific

25         questions about what happened.  And then after that they also

1       asked you, is that statement correct?

2   A   Correct.

3   Q   And you said yes all the way through, correct?

4   A   Correct.

5   Q   Now during that statement there's no mention, whatsoever of

6       James having a gun, correct?

7   A   Correct.

8   Q   During that statement there's no mention of whatsoever of you

9       going to pick up a gun and take it back to James, correct?

10  A   Correct.

11  Q   Okay.  Matter of fact, there's no mention in that statement

12      at all of your involvement at all in this; is that correct?

13  A   Correct.

14  Q   You also gave an officer a statement after this particular

15      incident on July 24, 2007, correct?

16  A   Correct.

17  Q   And I believe that there were questions and answers that were

18      written down in that statement, correct?

19  A   Correct.

20  Q   Okay.  And on that particular day you made no mention of

21      James picking up a gun out of the truck from you, correct?

22  A   Correct.

23  Q   Matter of fact, you also omitted the fact that you went and

24      got this gun allegedly, correct, and brought it back to this

25      scene where this incident occurred, correct?

1    A    Correct.

2    Q    No statement about that at all, correct?

3    A    Correct.

4    Q    And again, you were under oath on July 25, 2007, correct?

5    A    Correct.

6    Q    And you gave that statement, the same way you're under oath

7         today, correct?

8    A    Correct.

9    Q    And you're also spoke to a police officer where they asked

10        you questions.  You actually had to sign at the bottom to the

11        truthfulness of those statements, correct?

12   A    Correct.

13   Q    And there's no mention of any of that in that statement as

14        well, correct?

15   A    Correct.

16   Q    So today under oath is the first time that you're ever making

17        a statement that my client came and got a gun from you in a

18        truck and took it back to the scene, correct?

19   A    Correct.

20   Q    You saw James with these Arabs on at least three separate

21        occasions, correct?

22   A    That day.

23   Q    On that particular day?

24   A    Yes, sir.

25   Q    Okay.  From what you were looking at, did it seem to be that

44

1      they were arguing or that there were any type of fights or

2      dissension going on.  From what you saw --

3              MR. TALON:  Well, Judge, I'm going to object.

4      There are compound questions and maybe cause when I stood up.

5      I think she can testify to what she saw, I think he started

6      by saying did it appear to you.  I think, I think -- so I

7      just  don't want her to speculate.  I think she can describe

8      as to what she saw.

9              MR. HAMPTON:  Judge, that's semantics.  What it

10     appears to you and what you saw is exactly the same thing.

11             MR. TALON:  Well, whether --

12             MR. HAMPTON:  Semantics.

13             THE COURT:  I'll allow the witness to testify to

14     what she saw.

15             MR. HAMPTON:  Thank you, Your Honor.

16             WITNESS:  Can you repeat that please?

17     MR. HAMPTON CONTINUED:

18     Q    You saw -- and you're right Larry, I'll break it down.  You

19          saw him with her with these individuals at approximately

20          2:30, 3:00 o'clock, correct?

21     A    Yes.

22     Q    All right.  During that time, did you see them in any type of

23          arguments or seem to be adversarial at all?

24     A    No.

25     Q    Okay.  You also saw them again later on that evening at

45

1        approximately 8:00 o'clock, I think you said, correct?

2    A   Yes, sir.

3    Q   And all these individuals are outside leaning on the cars,

4        some are out, I believe you said, in the street or on the

5        grass area; is that correct?

6    A   They were leaning on a car in the street.

7    Q   Okay.  And during that time did they seem to be anything

8        adversarial or arguing or anything of that nature?

9    A   No.

10   Q   Okay.  And then later that night, at 10:00 when you drove up,

11       correct, I think you said that you saw them out there again;

12       is that correct?

13   A   Yes.

14   Q   Okay.  And did it seem to be anything adversarial from your

15       vantage point that you could see?

16   A   No.

17               MR. HAMPTON:  Thank you very much.  Thank you

18       Ebony.  I have nothing further, Your Honor.

19               MR. TALON:  Just a few questions.

20               THE COURT:  Okay.

21                       REDIRECT EXAMINATION

22   BY MR. TALON:

23   Q   Are you wearing a watch today?

24   A   No.

25   Q   Were you wearing a watch on the date that you've been

46

1           testifying about?

2      A    No.

3      Q    Do you see Los here today?

4      A    Yes.

5      Q    Could you tell us where he is?

6      A    He's right there (indicating).

7      Q    And describe what he's wearing?

8      A    A gray tee shirt.

9      Q    Leaning forward?

10     A    (No audible response)

11     Q    Is he the gentleman with the braids in the hair or the one

12          with the --

13     A    With the braids.

14     Q    Okay.

15               MR. TALON:   Indicating for the record, the witness

16          has identified a individual sitting in the second row with

17          the gray tee shirt and braids in his hair as being Carlos.

18               THE COURT:   The record will reflect.

19               MR. TALON:   Judge, may be have that individual

20          identify himself for the record with his first name and last

21          and last name and date of birth, so we know who he is?

22               THE COURT:   Sure.  Sir, stand up and tell the Court

23          you name and date of birth.

24               MR. ARMOUR:   My name is Carlos Armour, date of

25          birth, January 10, 1982.

1          THE COURT:  What was your last name?

2          MR. ARMOUR:  Armour.

3          THE COURT:  Armour?

4          MR. ARMOUR:  Yep.

5          MR. TALON:  Could you spell it for us please?

6          MR. ARMOUR:  A-r-m-o-u-r.

7          MR. TALON:  A-r-m-o-u-r?

8          MR. ARMOUR:  Yes.

9          MR. TALON:  Thank you very much, sir.

10         THE COURT:  Now, Counsel, now I have to ask a

11    question.  I suppose to defense counsel, well, I mean he set

12    in here all the time.  Is he a witness on anybody's witness

13    list?

14         MR. TALON:  It's hard to tell Judge.

15         MR. HAMPTON:  Well, Judge, I guess that's the point

16    that I'm making.  I didn't know any of this.  We were given

17    discovery by the People, this statement that she's given

18    today is brand new to anything that I've ever heard.  I'm

19    completely surprised by it.  I've never heard the name Los or

20    what, Carlos or anything else.

21         Your Honor, this is the first that I've heard any of

22    this information before.

23         MR. TALON:  Well, I've never spoken with the

24    individual, Judge, so.

25         THE COURT:  Okay.

1          MR. HAMPTON:  But certainly this is information

2     that the Prosecutor knew before he asked the question, Judge,

3     and that wasn't tendered to me.  This is the first I'm

4     hearing about it.  I couldn't even prepare for a cross

5     examination on this Los individual or any information

6     regarding him or if he's ever been over the aunt's house,

7     does he live in the neighborhood --

8          THE COURT:  Okay.  Well, don't tell them the

9     questions now, but what I am going to do is Mr. -- I'm sorry?

10         MR. TALON:  Armour.

11         THE COURT:  Armour.  I'm going to ask you to leave

12    the courtroom.

13     All right.  Anything else from this witness?

14         MR. TALON:  No Judge.

15         THE COURT:  Okay.

16         MR. HAMPTON:  Nothing, Your Honor.

17         THE COURT:  All right.  Thank you, ma'am.  And you

18    also have to remain outside of the courtroom.  I mean you're

19    free to go I suppose, you just can't come back in here.

20         MR. MCDUFFIE:  May my client be excused, Judge?

21         THE COURT:  Yes, she may.

22         MR. TALON:  Yes.

23         MR. MCDUFFIE:  Thank you.

24         MR. TALON:  Okay.

25         THE COURT:  Counsel, this is on the record.  I'm

1          going to have everybody stand up and tell me who they are

2          again today because I don't know -- I'm not comfortable.

3          Sir, stand up and tell me your name?

4                    MR. WILLIAMS:  Alonzo Williams

5                    THE COURT:  Alonzo Williams?

6                    MR. WILLIAMS:  Yes.

7                    THE COURT:  All right, ma'am.

8                    MS. WILLIAMS:  Tanisha Williams.

9                    THE COURT:  Okay, ma'am.

10                   WOMAN:  Mao (ph) --

11                   THE COURT:  Ma'am, in the back.

12                   MS. POWELL:  Tamika Powell.

13                   THE COURT:  Okay sir, I remember you were here last

14         time.  You're the --

15                   MR. AL-GANZAWI:  Nathan.

16                   THE COURT:  -- right, the brother of the victim.

17                   MR. AL-GANZAWI:  Yes.

18                   THE COURT:  And who is this?

19                   MS. AL-ASADLE:  --

20                   THE COURT:  I'm sorry, speak up.

21                   MS. AL-ASADLE:  --

22                   THE COURT:  Can you spell your last name for me?

23                   MS. AL-ASADLE:  Al-Asadle.

24                   THE COURT:  All right.

25                   MR. TALON:  I'm sorry, Judge, is she just a sister

50

1    or just a visitor?

2             THE COURT:  Oh, I don't know.  How are you

3    affiliated with this case, ma'am?

4             MR. ALGANZAWI:  She my wife.

5             THE COURT:  Okay.  All right.  Okay.  You may

6    proceed.

7             MS. RAHAL:  Good afternoon, Your Honor, I'm Samerah

8    Rahal interpreting Arabic for the Court.

9             THE COURT:  Okay.

10            THE CLERK:  Do you solemnly swear to interpret

11   English into Arabic and from Arabic to English to the best of

12   your ability?

13            MS. RAHAL:  Yes, I do.

14            THE COURT:  Okay.  Does the court reporter have his

15   name?  Raise your right hand sir?  Stop right there.

16        Do you solemnly swear or affirm that the testimony that

17   you are about to give is the truth so help you God?

18            MR. ALGANZAWI:  I swear to God I will tell the

19   truth.

20            THE COURT:  You may be seated.

21            MR. HAMPTON:  Your Honor, I'm not sure which

22   individual Defendant this is?

23            THE COURT:  I'm not sure either.

24            MR. HAMPTTON:  Larry, which one is it from the

25   statement?

1     MR. TALON:  I believe that this is --

2     MR. HAMPTON:  Is this Yasser?

3     MR. TALON:  Al-Ganzawi.  Ali Kudeir Al-Ganzawi?

4     WITNESS:  Yes.  Ali Kudeir Al-Ganzawi.

5     MR. TALON:  Okay.  Thank you.

6     MR. HAMPTON:  One second, Your Honor, before they

7  start.

8     THE COURT:  Okay.  I'm going to have you -- you

9  don't need the mic, she speaks pretty loud.  So today this is

10  how we're going to do it.  We're going to, I want it all

11  interpreted.  It was a little difficult last time.  So when

12  you're asked a question, you know, then she'll ask it and

13  then he'll answer.  And I know it's going to take a little

14  longer, but it's better for me.

15     MR. TALON:  That's fine, Judge.

16     THE COURT:  Okay.

17     (Samerah Rahal sworn by the Court to interpret

18     English into Arabic and Arabic into English)

19          A-L-I   A-L-G-A-N-Z-A-W-I

20  After having been first duly sworn to tell the truth, the whole

21  truth, and nothing but the truth, testified as follows:

22               DIRECT  EXAMINATION

23  BY MR. TALON:

24  Q     Tell us your name, please?

25  A     Ali Kudeir Al-Ganzawi.

1   Q   Okay.  Did you know Haider Al-Ganzawi?

2   A   He's my brother.

3   Q   Were you there the day he was shot?

4   A   Yes.

5   Q   What street?

6   A   I didn't memorize the name of the street.

7   Q   Okay.  Do you see someone in court today that you saw there

8       when your brother was shot?

9   A   What person are you talking about?

10  Q   Okay.  Did you see your brother get shot?

11  A   Yes, I saw him get shot.

12  Q   Did you see who shot your brother?

13  A   Yes, that person.

14  Q   Okay.  Point to the person that you saw shoot your brother?

15  A   (Inaudible) (Spoken in Arabic)

16  Q   What did he say?

17  A   Would you repeat what you just said?

18  Q   Okay.

19  A   I didn't understand that.

20  Q   Okay.  Do you see the person in this room who shot you

21      brother?

22  A   Yes.

23  Q   Point to him?

24  A   Him (Indicating) that person.

25              MR. TALON:   Indicating for the record the witness

1   has pointed to and stood up and pointed to the Defendant

2   James Andrew Powell.

3                THE COURT:  The record will reflect that the

4   witness has identified Mr. Powell.

5                MR. TALON:  Okay.

6   MR. TALON CONTINUED:

7   Q   Whose house was this at?

8   A   Haider's home.

9   Q   Where were you when you first saw the man?

10  A   I was sitting by the door that goes outside.

11  Q   On the porch?

12  A   The porch with the hood.

13  Q   All right.  Did you see where the man came from?

14  A   Who?

15  Q   All right.  Did you know the name of the man that shot your

16      brother?

17  A   I have not seen him in the past.  Honest to God I don't know

18      this person.  The only time I saw him for the first time was

19      when he shot my brother.

20  Q   Okay.  Where, the man who shot your brother, where was he

21      when you first saw him on that day?

22  A   He started walking in the street and then he came.  He came

23      he said he wanted money but my brother was leaning on the

24      car.

25  Q   What happened then?

1    A    He didn't give him money so he shoot him.

2              MR. TALON:   And just for the record the word shoot

3         him, the witness stated in English but the rest was in

4         Arabic.

5    Q    What did he shoot him with?

6    A    First he shot two right here.   And then he shot up and then

7         he shot my car.   The two windows.

8    Q    What happened then?

9    A    Then he started coming, he was walking backward and he was

10        still shooting at us.   So I went to save my life, then I went

11        into the basement.

12   Q    Why did you go into the basement?

13   A    Because I didn't have anything to defend myself with.

14   Q    Okay.   Did you see where the man who shot your brother went

15        after he shot your brother?

16   A    He went towards the street in front of the tree.   But he was

17        still shooting.   Then a lady came, a friend.   She came in

18        this car just like a -- the lady took off in this -- like an

19        express car.

20   Q    Okay.   Big car?

21   A    Yeah.   Big car.

22   Q    Okay.   The lady was she driving?

23   A    Yes.   And he sat in front.   Passenger.

24   Q    Did the man who shot your brother take anything from your

25        brother?

1    A    No, he didn't take anything from him.

2    Q    The man who shot your brother, did you see how he got there?

3    A    He came he wanted money and he didn't get money so he shot

4         him.

5    Q    Okay.

6              THE COURT:  Counsel, hold on.

7              MR. TALON:  Sure.

8              THE COURT:  I think there, even though we have the

9         interpreter, there may still be some language barrier in

10        terms of what something means in English.  Without --

11             MR. TALON:  May we approach on this, Your Honor?

12             THE COURT:  You may.

13             (Bench Conference on the record)

14             (Bench Conference concluded)

15   MR. TALON CONTINUED:

16   Q    Did the man who shot your brother, did he come, did you see

17        him come in the same car?

18   A    No.

19   Q    Okay.

20   A    He came walking.

21   Q    All right.  What did the gun look like?

22   A    Old one.  I know exactly what it looked like.  I don't know

23        because I don't have guns.

24   Q    Not too much long.  Just small size, you know.  Just old, you

25        know.

1    MR. TALON:  Indicating for the record that the last

2    answer was in English.  And that he had apparently understood

3    the question that I asked.

4    Q    Was it a rifle?

5    A    No.

6    Q    A handgun?

7    A    Handgun, but I don't know what kind of handgun because I

8    don't have any experience with that.

9    Q    Okay.  What did you hear the man who shot your brother say?

10   A    He said I want money.  See like he said, I need money and he

11   said what do you mean you need money and he never gave him

12   the money.

13   Q    Okay.  So the man said I need money; is that correct?

14   A    Yes.

15   Q    Did your brother say anything to the man?

16   A    No, he just said I'm not giving you money at all.

17   Q    The windows that were shot -- let me phrase that over.  The

18   windows that were broken were they by the porch?

19   A    He kept shooting at the glass.  He kept shooting at the

20   people so he could separate the people and then it hit the

21   glass.

22   Q    Okay.

23                 MR. TALON:  All right.  I don't have any other

24   questions, Judge.

25                 THE COURT:  Cross examination?

---

CROSS-EXAMINATION

BY MR. HAMPTON:

Q   Can I call you Ali?

A   Yes.

Q   Okay.  Thank you.  The first time --let's not even get there -- you remember the day of July 21, 2007, the day that your brother was shot?

A   (Inaudible)

THE COURT:  No, stop.  You talk and she will translate for me.  I don't understand what you're saying.

MR. HAMPTON:  That's what I was doing.

THE COURT:  Right.  I want you to --

(Interpreter interprets previous question)

A   I remember the incident that this person did.

Q   So you don't remember the day?

A   I don't remember the day.  I did give an affidavit, statement.  And the date is on there.

Q   Okay.  And that statement that he -- he remembers giving the statement?

A   Yes, the same thing I'm saying.

Q   Okay.  And the statement that he gave that was a true statement?

A   That's correct.

Q   And does he remember giving this --

THE COURT:  Counsel --

1    MR. HAMPTON:  I'm sorry?

2    THE COURT:  Don't say it as if you're asking her.

3    MR. HAMPTON:  Oh, talk to her.

4    THE COURT:  Right.

5    MR. HAMPTON:  Don't look at him, I mean, look at

6    her?

7    THE COURT:  No, no, no.  When you're asking your

8    questions you're saying does he remember --

9    MR. HAMPTON:  Oh, I got you.  I got you.

10   THE COURT:  -- just say do you remember --

11   MR. HAMPTON:  Okay.

12   THE COURT:  -- and then she'll translate.

13   MR. TALON:  And I don't -- this is interesting for

14   both of us.

15   THE COURT:  It is.

16   MR. TALON:  I found it easier when I looked at the

17   interpreter simply because I think it made it more likely

18   that the witness would wait for the interpreter to interpret.

19   THE COURT:  Right.

20   MR. HAMPTON:  We can give that a shot.

21   THE COURT:  Okay.  But I don't want her to -- when

22   she's interpreting, I want her to be as close to what you're

23   saying as possible.  So I don't want you to say, you know,

24   he--

25   MR. HAMPTON:  Him, right, right.

1      THE COURT:  -- cause it'll be a little different.

2      MR. HAMPTON:  Right, right, I got you.

3      THE COURT:  Okay.

4      MR. HAMPTON:  Thank you.

5   MR. HAMPTON CONTINUED:

6   Q   Do you remember taking -- writing out the statement for the

7       police the same day your brother was shot or the day after?

8   A   No, the same day that the police came.

9   Q   Okay.  So when you gave that statement to the police, the

10      event was fresh in your mind, correct?

11  A   Yes, the same thing that I've given to the police before,

12      there's no difference.

13  Q   Okay.  Do you live at the house on -- is it Rosemont (sic)?

14      Rutland, on Rutland.  Do you live at the house on Rutland at

15      6890 Rutland?

16  A   I didn't live with my brother but I was coming to visit him.

17  Q   Okay.  That day what time did you come to visit him?

18  A   Honest to God, five minutes before the incident happened.

19  Q   Five minutes before the incident happened?

20  A   Five minutes and this happened.  I haven't sat for five

21      minutes and I saw the incident.

22  Q   Okay.  Do you visit your brother at his house on Rutland

23      often?

24  A   Yes, he's my brother and I like to visit my brother.

25  Q   Did you know that your brother, Haider, and James Powell were

| | | |
|---|---|---|
| 1 | | friends? |
| 2 | A | No. |
| 3 | Q | Okay. |
| 4 | A | He's not his friend.  I know my brother he doesn't have many |
| 5 | | friends.  The most of his friends are Arabs from his same |
| 6 | | people that are from his country, Iraq. |
| 7 | Q | Okay.  What you're saying that you don't know whether or not |
| 8 | | Haider and James Powell were friends? |
| 9 | A | No, he's not his friend -- |
| 10 | Q | Okay. |
| 11 | A | -- first of all. |
| 12 | Q | And you are sure about that? |
| 13 | A | I am sure. |
| 14 | Q | Okay. |
| 15 | A | He is a friend of that guy called Raad, R-a-a-d.  Raad was |
| 16 | | living with Haider. |
| 17 | Q | And James Powell and Raad were friends; is that correct? |
| 18 | A | Possible.  Honest to God, I'm not sure. |
| 19 | Q | You saw James Powell walk in the street and then walk up to |
| 20 | | the house? |
| 21 | A | He came from the street like that (indicating) and then he |
| 22 | | asked for the money. |
| 23 | Q | Okay.  When he asked for the money was he angry when he asked |
| 24 | | for the money? |
| 25 | A | Yes, he was. |

1    Q    He was angry?

2    A    Nervous.

3    Q    Okay.  When he asked for the money did he have a gun in his

4         hand?

5    A    In the beginning, no.  I didn't see it.  But later he pulled

6         it out.  In the beginning he didn't.  Then he put his hand in

7         here like that (indicating).  I didn't know he had his hand

8         on a gun.

9                   THE COURT:  Can you say for the record what he was

10        doing?

11                  MR. HAMPTON:  Oh, for the record, the witness is

12        placing his left hand next to his left side in the side of

13        his pants.

14                  WITNESS:  (Inaudible)

15   MR. HAMPTON CONTINUED:

16   Q    Inside of the waistband.

17   A    Inside, yes.

18   Q    Inside of the waistband.

19   A    I didn't know he had his hand on a gun.  But he put his hand

20        there.

21   Q    Okay.

22                  MR. HAMPTON:  Would the record reflect that he

23        stuck his hand inside the waistband of his blue jeans.

24                  THE COURT:  Okay.

25                  WITNESS:  (Inaudible)

1    THE COURT:  Hold on.  Tell him to hold on.  Hold

2    on.  Okay.  Let him ask another question.

3    MR. HAMPTON:  That's fair.

4  MR. HAMPTON CONTINUED:

5  Q   Mr. Powell had his hand inside of the waistband of his pants

6     but he did not pull anything out yet, correct?

7  A   Well, would he asked for the money and then Haider didn't

8     give it to him and then the end he pulled it out.

9  Q   Okay.  Did Haider and Mr. Powell get into an argument?

10  A   No, he just told him leave with his hand.  You're coming

11     after money.  This is my money and I'm not giving you money.

12  Q   Okay.  And at any point -- was Haider standing or sitting?

13  A   No, he's standing and he's leaning like that on the car like

14     that.

15  Q   Okay.

16    THE COURT:  The record will reflect that the

17    witness leaned towards the Judge's bench with his back to the

18    bench.  Okay.

19  MR. HAMPTON CONTINUED:

20  Q   Did Haider push Mr. Powell?

21  A   No, He didn't push him.  He just went like that -- was just

22     go out of here, go out of here (indicating).

23    MR. TALON:  And he just -- indicating for the

24    record he made a motion with his hand --

25    THE COURT:  Hold on.  Tell him no.

---

```
 1            MR. TALON:  -- with his palms out and about
 2       shoulder height pushing back.
 3            THE COURT:  The record will reflect.
 4   MR. HAMPTON CONTINUED:
 5   Q    Is your statement today that Haider did not push -- put his
 6       hand on Mr. Powell and push him?
 7   A    No, he didn't touch his chest.  He just went -- just get away
 8       from here (indicating).
 9   Q    Do you recall telling the police that Haider stood up and
10       pushed Mr. Powell?
11   A    I don't remember saying that.  It could be whoever translated
12       thought that and then they, it end up being transferred like
13       that.
14   Q    But you signed you name to a statement at the bottom saying
15       that everything that was on the statement was true, correct?
16   A    I did sign but that translator that was standing there is not
17       strong with translating.  He was or he or she was weak.
18   Q    So is your statements that were given by the witnesses may
19       not be correct because the translator they used did not know
20       good Arabic for lack of a better word?
21   A    Well, like what you just said that that it's written there
22       was a push but I didn't say.  Well, maybe the translator
23       just, that was their limit, didn't understand.  Cause I
24       explained.  That's all, that's all I explained.  Just like
25       that he did (indicating).  Maybe he wrote it differently.
```

1   Q   Okay.  There were four shots, right?

2   A   It could be four or five but what I saw was two at my

3       brother, two at the glass and one up in the air.

4   Q   Okay.  So, there were two shots that were fired at Haider?

5   A   Two on Haider.

6   Q   There was a shot that was fired at the car that Haider was

7       leaning on, right?  What was that?

8   A   His door.

9   Q   The door of Haider's car, right?

10  A   The door of the car.

11  Q   Where Haider was standing, correct?

12  A   Yes, standing by the door like that.

13  Q   Okay.  Would that be a yes, Your Honor?

14          THE COURT:  Yes, the witness stood up and put his

15      arm on the bench indicating that the victim was leaning on

16      the door?

17          MR. HAMPTON:  Okay.

18  MR. HAMPTON CONTINUED:

19  Q   And there was also a shot in the window, correct, the window

20      of the house?

21  A   One over there and one over there (indicating).

22  Q   In the windows?

23  A   The windows and the glass.

24  Q   Okay.  And then there was a shot in the air?

25  A   Truly I don't know exactly.  Two on Haider and two other

1    there and one at the door and one up.

2    Q    And one up in the air?

3    A    In the air.

4    Q    So that would be a yes?

5    A    Yes, he's doing this so the people could spread apart.

6         MR. HAMPTON:  Well, objection to that statement,

7    Judge, that's speculation.  I'm just asking him where the

8    bullets went, not what he was doing that for.

9         THE COURT:  Sustained.

10   MR. HAMPTON CONTINUED:

11   Q    So that is -- let me count, two at Haider, two in the glass,

12        one in the air.  That's five shots, correct?

13   A    True.

14   Q    And that's it, that's all you can recall, correct?

15   A    That's what I can recall.

16   Q    Thank you.

17        MR. HAMPTON:  Nothing further for this witness,

18   Your Honor.

19                        REDIRECT EXAMINATION

20   BY MR. TALON:

21   Q    Did you write the statement to the police?

22   A    No.

23   Q    There was a translator there?

24   A    I remember there was a weak translator.

25   Q    Did you sign the statement?

1    A    Well one of the police who was dressed in civilian clothes,

2         he told me to sign so I signed.

3    Q    Can you read the statement?

4    A    English?

5    Q    Could you read the English?

6    A    No.

7    Q    How many shots hit the house?

8    A    Two on the windows on the glass, two in Haider's stomach and

9         one -- and went like (indicating).  One he shot up and one at

10        the door.

11   Q    Okay.

12   A    At the --

13   Q    The door --

14   A    Car -- excuse me, the car.

15   Q    The windows, the glass is the windows glass of the house?

16   A    Yes.

17   Q    Was there anyone else on the porch with you when this

18        happened?

19   A    Me, I ran to the basement.

20   Q    Okay.

21                    MR. TALON:  Thank you.

22               THE COURT:  Anything, counsel?

23               MR. HAMPTON:  Just a quick question?

24                         RE-CROSS EXAMINATION

25        BY MR. HAMPTON:

1    Q    Did you tell the police officers that were taking the

2         statement that you couldn't read English?

3    A    I told them I don't know English, I just know Arabic.

4    Q    And they wrote out the statement in English and just told him

5         to sign it?

6    A    Being that I -- yes, they told me to sign and I signed.  But

7         I gave my statement, but I don't know how that person

8         translated it.

9                   MR. TALON:  Thank you, Your Honor.

10                  THE COURT:  Okay.  Thank you, you may step down.

11                  WITNESS:  Thank you.  Bye, bye.

12                  THE COURT:  Thank you.  Tell him he has to stay out

13        of the courtroom.  Okay.

14            We're going to just take a three minute -- I'm telling a

15        story cause it's going to take three minutes for me to wait

16        at the elevator.  We're going to take a short break and I'm

17        going to be right back.

18                  MR. TALON:  Thank you, Judge.

19                  (Court recessed)

20                  (Court reconvened)

21                  THE COURT:  Is this the last witness that needs an

22        interpreter?

23                  MR. TALON:  Yes.

24                  MR. HAMPTON:  We don't need him Judge.

25                  THE COURT:  I think the People think they do.

1      MR. HAMPTON:  They do.

2              THE COURT:  Tell him to give his name.  Oh, okay.

3      Thank you.  Right here.  Come back this way.

4              Raise your right hand.  Do you solemnly swear or affirm

5      that the testimony you are about to give is the truth so help

6      you God?

7              MR. AL-GANZAWI:  Honest to God, I'll tell the

8      truth.

9              THE COURT:  You may be seated.

10             Y-A-S-S-E-R   A-L-G-A-N-Z-A-W-I

11     After having been first duly sworn to tell the truth, the whole

12     truth, and nothing but the truth, testified as follows:

13                     DIRECT   EXAMINATION

14     BY MR. TALON:

15     Q    What is your name?

16     A    Yasser Al-Ganzawi.

17     Q    Did you know Haider Al-Ganzawi?

18     A    My brother.

19     Q    Were you there the day he was shot?

20     A    Yes, I was there.

21     Q    Okay.  Where were you when he was shot?

22     A    You know, I was standing right under, you know, the covered

23          porch where by the door.

24     Q    Okay.  Of Haider's house?

25     A    Haider's house.

1    Q    Where was Haider?

2    A    He was standing against the car.

3    Q    Where was the car?

4    A    It was on the driveway near the door.

5    Q    The man that shot him, do you see him in this room?

6    A    Yes, this is the first time I saw him, yes.

7    Q    Is he --

8    A    Didn't see him before.

9    Q    All right.  Is he here today?

10   A    Yes, he's here.  Over there.

11   Q    Point to him, please?

12   A    There, him there.  (Indicating)

13              MR. TALON:  Indicating for the record, the witness

14   pointed to and identified the Defendant, James Andrew Powell.

15              THE COURT:  The record will reflect the

16   identification of Mr. Powell.

17              MR. TALON:  Okay.

18   MR. TALON CONTINUED:

19   Q    The man who shot Mr. Powell (sic) -- I'm sorry.  I'll start

20   over, thank you.  She was correct.

21              How did the man get there?

22   A    I don't know.  I just see him, he came walking.

23   Q    Okay.  What happened when you saw him walking?

24   A    Haider was standing by the car and he came walking, he said

25   give me money.  He told him I don't have money, I'm not

70

| | | |
|---|---|---|
| 1 | | giving you money. |
| 2 | Q | Who said I don't have money, I'm not giving you money? |
| 3 | A | Haider. |
| 4 | Q | Okay.  What happened after Haider said that? |
| 5 | A | He shot him. |
| 6 | Q | Okay.  Who shot who? |
| 7 | A | Him, him, he shot my brother Haider. |
| 8 | Q | Okay.  The man in the green that you see in court? |
| 9 | A | Um. |
| 10 | Q | You have to answer with words. |
| 11 | A | Yes.  Him, he's the one that shot him. |
| 12 | Q | Did you see the gun before, during or after the man asked |
| 13 | | Haider for money? |
| 14 | A | When he asked Haider for money and Haider told him I don't |
| 15 | | have money, I just seen him put his hand in his pocket. |
| 16 | Q | And what did you see happen then? |
| 17 | A | I just heard the bullets, the shots. |
| 18 | Q | How many shots did you hear? |
| 19 | A | Between four and five.  Two struck my brother and two struck |
| 20 | | the window and one -- between the sky and the window, up. |
| 21 | Q | Okay.  Did the man take anything from Haider? |
| 22 | A | No, we didn't see.  I just know that my brother, Haider, got |
| 23 | | shot. |
| 24 | Q | Did you see where the man went after he shot Haider? |
| 25 | A | He called and then that car came and took him. |

1 Q Okay.  Big car or little car?

2 A A big car.  One of those cars that you call Escalade.

3 Q Escalade?

4 A Escalade.  Yes.

5 Q Did you see what the gun looked like?

6 A No, I wouldn't see what the gun looked like, I just heard the

7  shot.

8 Q Okay.  Did Haider push the man?

9 A No he didn't push him.  He just told him go, go.  He just

10  told him go.  And then he shot him.  He told him go and then

11  he shot him.

12 Q He told him go and then the man shot Haider?

13 A He told him to go and then he aimed at him and he didn't push

14  him.

15 Q When Haider said to go, did he motion with his hand?

16 A He just told him like that, go (indicating).

17    MR. HAMPTON:  Let the record reflect that he lifted

18  up his right hand and waved it like go.  Is that correct?

19    MR. TALON:  That's correct.

20    THE COURT:  That's correct.  The record will

21  reflect the hand movement.

22    MR. TALON:  I don't have any further questions.

23  Thank you.

24    THE COURT:  Cross examination?

25    MR. HAMPTON:  Thank you.

CROSS-EXAMINATION

1

2    BY MR. HAMPTON:

3    Q    Did you live with Haider?

4    A    I lived with Haider.

5    Q    Right.  You lived at the 6890 Rutland address?

6    A    Yes, that was our street.

7    Q    Okay.  Had you ever seen Mr. Powell before?

8    A    I've never seen him before.  I just go to work and come home

9         and come home and go to work.

10             MR. HAMPTON:  I don't need to know where he works.

11   We don't need to know that.

12             INTERPRETER:  And my brother -- I need to show him

13   the card.

14             MR. HAMPTON:  Right.

15             INTERPRETER:  Okay.  Works with the army.

16   MR. HAMPTON CONTINUED:

17   Q    Were you working the day that your brother was shot?

18   A    I just finished working out and I came home.

19   Q    Okay.  How long before your brother was shot did you get home

20        from work?

21   A    I am off of work between 4:00 and 5:00 in the afternoon.

22   Q    Okay.  And on this day after you got off work, did you come

23        straight home?

24   A    I finished my work, I come home, I take a shower and I eat

25        and then I sit in the house.

1    Q    Okay.  That's normally.  On this day that your brother was

2         shot, what time did you get home?

3    A    The day my brother got shot?  My brother was shot 9:30.

4    Q    What time did you get home from work?

5    A    Didn't I tell you by 5:00 o'clock I'm home.

6    Q    Okay.

7    A    And I didn't leave the house.

8    Q    Good.  Now, at 5:00 o'clock who was at the house with you,

9         Haider, yourself and who else?

10   A    My brother, Haider and me and my brother Ali came to visit.

11   Q    Okay.  So there were only three of you at the house?

12   A    Yes, just my brother and I and Ali.

13   Q    So are you sure there were only three people at the house?

14   A    It was my brother, Haider, and I and Ali came to visit.

15   Q    Haider's your brother?

16   A    Yes, Haider's my brother.

17   Q    Okay.  So is he saying Haider my brother or there's a

18        brother, Haider and then another person?

19        INTERPRETER:  No, he's saying Haider, my brother.

20        MR. HAMPTON:  Haider, my brother as in the same

21        person.

22        INTERPRETER:  Yes.

23        MR. HAMPTON:  Okay.

24   MR. HAMPTON CONTINUED:

25   Q    So there's three people at the house, correct?

1    A    Yes.

2    Q    Okay.

3    A    Me, my brother, Ali and my brother, Haider.

4    Q    Okay.  And when Haider was shot -- oh he's shaking his head

5    he must be --

6         MR. HAMPTON:  Can you instruct the witnesses Judge,

7    that they can't make any movements or anything or shake their

8    heads while people are testifying?

9         WITNESS:  (Speaking in Arabic -- inaudible)

10        THE COURT:  Hold on.  Sir.  Yes, I think they know.

11   He gets a little -- it was his brother.

12        MR. HAMPTON:  No, I know.

13        THE COURT:  You know, but the people in the

14   audience just don't make any head movements, answer questions

15   from the seat.

16        MR. TALON:  Judge, I did talk about that before we

17   started the exam and I don't know where the witness was

18   looking during the time, but at least now his seat's pointed

19   right towards the interpreter.

20        THE COURT:  Right.

21        MR. HAMPTON:  No, and just for the record, Judge, I

22   thought he was actually looking at me.  I didn't realize

23   something was going on until brother counsel looked over.

24        THE COURT:  Yes, it's okay.  It's not as big a deal

25   as it was last week.

1      WITNESS:  I'm not looking at my brother, I'm

2  looking at you.

3      THE COURT:  Okay.

4      MR. TALON:  And he's pointing to the interpreter

5  when he says you.

6      MR. HAMPTON:  Okay.

7      THE COURT:  Right.  Thank you, counsel.

8  MR. HAMPTON CONTINUED:

9   Q    Now, just so the record is clear, you said when you came home

10       at around 5:00 o'clock it was three people.  At the time that

11       your brother was shot, how many people were at the house?

12  A    Raad came.  Just Raad and my brother, Ali came.

13  Q    So now there's four people at the house?

14  A    Raad came afterwards.  Just before Haider got shot, Raad

15       arrived.

16  Q    Just before?

17  A    Before Haider was shot, Raad arrived.

18  Q    Okay.  So there's four people there?  Which is the question I

19       asked.

20  A    We were three and then Haider -- Raad --

21  Q    Raad.

22  A    -- came.  Just before my brother Haider got shot.

23  Q    Do you know who Ali Ahmeed is?

24  A    He's in another state.

25  Q    So the answer is yes.  You do know who Ali Ahmeed is?

1    A    Ali went to another state because he came and he said I will

2         testify.

3                   THE COURT:  Interpreter, tell him I said, do he

4         know who he is?  It's yes or no.

5                   WITNESS:  Do I know who's who?

6              MR. HAMPTON:  Ali Al-a -- do you want it, Judge?

7         THE COURT:  What's the name?

8              MR. HAMPTON:  Ali Ahmeed.  A-h-m-e-e-d.

9              THE COURT:  Do you know Ali Ahmeed, yes or no?

10                 WITNESS:  Yes, I know Ali Ahmeed.

11                 THE COURT:  Okay.

12   MR. HAMPTON CONTINUED:

13   Q    Was Ali Ahmeed at the house with you that day?

14   A    He came with Raad.  Okay.  I was sitting with Haider and my

15        brother Ali and I and then he came with Raad.

16   Q    Okay.  Do you remember when I asked you earlier who was at

17        the house at the time of the shooting?  And you told me first

18        just three people and then you added a fourth Raad and now

19        you're telling me that Ali Ahmeed was there as well; is that

20        correct?

21   A    You see, I was -- I just lost it when my brother got shot.

22        We were just three of us.

23   Q    Is your testimony today that there were only three people at

24        the house when your brother was shot?

25   A    It was just us three in the house and then -- there was just

77

1    the three of us and then Raad came with the other one and

2    then after that my brother got shot and I lost it.  And I

3    don't know what happened.  I told my brother but he couldn't

4    see anything after that.

5              MR. TALON:  Indicating, you know, what he was doing

6    he was holding his side --

7              MR. HAMPTON:  Fair.

8              MR. TALON:  -- which --

9              MR. HAMPTON:  His abdomen.

10             MR. TALON:  -- his abdomen which I think is

11   consistent with where he testified that night his brother had

12   been shot.

13             THE COURT:  Okay.  The record will reflect the

14   witnesses hand movement.

15   MR. HAMPTON CONTINUED:

16   Q    And after your brother was shot, you couldn't remember -- you

17        didn't see anything?

18   A    I didn't see anything after that.  I -- I -- after my brother

19        got shot, I really lost it and then I saw the windows and the

20        two bullets --

21   Q    Okay.  Okay.

22             THE COURT:  Okay?

23             MR. HAMPTON:  Okay.  Almost done, Judge, I promise.

24   MR. HAMPTON CONTINUED:

25   Q    After your brother was shot, you said that Mr. Powell called

1        for the car and the car came and picked him up, what did you

2        mean by that?

3   A   Well, he just went to the car and my brother -- he called and

4        the car came immediately and then my brother's saying help

5        me, help me.

6   Q   Okay.  He called on a telephone for the car to come pick him

7        up?  I'm sorry, cellular phone for the car to come pick him

8        up?

9   A   He called.  I don't know.  I don't know.

10   Q   You --

11   A   I saw him calling.

12   Q   Okay.  You -- that was my question, thank you, you saw him on

13        the phone after he shot your brother, Haider?

14   A   I took my brother, I got busy with my brother, I saw him on a

15        phone and a car came.

16   Q   Okay.  Just so the record is clear, after your brother was

17        shot, you saw Mr. Powell on his cell phone, correct?

18   A   I was lost.  I just saw him on the phone.

19   Q   Okay.  So that's a yes, I saw him on the phone.

20   A   Yes, he was talking on the phone.

21   Q   Thank you.  And lastly, do you remember telling the police

22        that Haider pushed James Powell and then James Powell raised

23        his gun and started shooting?

24   A   No, he didn't push him, before I translated.

25   Q   Well, can you still translate my question?

1    A    I said in the statement that Haider was (inaudible) but

2         Haider didn't push him.

3    Q    Can I --

4              THE COURT:  Well, I think you should ask him can he

5         read English.

6    Q    Wait, can you read English?

7    A    No I don't read English.

8    Q    Do you remember the police having you sign a document as

9         being your statement?

10   A    When you see your brother in the hospital --

11   Q    No, let's not -- okay let's --

12             THE COURT:  She has to repeat what he said.

13             MR. HAMPTON:  Oh, I'm sorry.  Okay.

14   A    -- and the police came to the hospital -- what do you think

15        when you're in the hospital --

16   Q    Is he asking a question?

17   A    -- your brother's dead in front of you and the police come?

18   Q    Okay.

19             THE COURT:  Now, counsel, what was your question?

20             MR. HAMPTON:  Oh, sorry Judge, I almost lost it.

21             THE COURT:  That's okay.

22   MR. HAMPTON CONTINUED:

23   Q    When you signed the statement was the statement in English,

24        let's ask that first?

25             THE COURT:  Yes, or no?

1       MR. HAMPTON:  Yes or no.

2       WITNESS:  Yes, it was just in English.  And I

3   didn't know I was lost.

4   Q   So when the police gave you this statement to sign, you

5       didn't know what was on that statement, correct?

6   A   When I signed, they just told me to sign, I was busy.

7   Q   Okay.  So the statement wrote for you is incorrect?

8   A   What's wrong.  I said when he wanted money from my brother

9       and my brother said he's not going to give him?

10  Q   And so if the statement that you're giving today is different

11      from the statement that you signed and the statement that the

12      police gave you would be incorrect?

13      MR. TALON:  Well Judge, my objection to that, first

14  of all, he said he doesn't read English.  Second of all, we

15  haven't read the statement so we can't ask him whether the

16  statement is incorrect unless we want to go through the whole

17  thing and ask him step by step, otherwise, you know, there's

18  no way that he can answer the question.

19      MR. HAMPTON:  I'll just make it real simple then

20  Judge, I'll --

21      THE COURT:  Right.  But for the record --

22  sustaining his objection.

23  MR. HAMPTON CONTINUED:

24  Q   You do not read English, correct sir?

25  A   Yes, I don't know how to read and write English.

1    Q    So the statement that you signed that was in English you

2         didn't know what the statement was that you were signing,

3         correct?

4    A    I didn't know and I was in the hospital --

5    Q    Okay,

6    A    -- just ease (ph) out.  They asked me how did your brother

7         get killed, I said this, this, this, this and that's it.

8    Q    Okay.  Fair enough.  So the statement that you're giving

9         today is your statement, correct?

10   A    Yes.

11   Q    All right.

12             MR. HAMPTON:  Just had to make sure that was clear

13        for the record, Judge --

14             THE COURT:  Sure, no problem.

15             MR. HAMPTON:  -- so we're coming back on it later

16        on.  Thank you very much.

17             THE COURT:  I'm sure you will.

18             MR. HAMPTON:  Nothing further.  Thank you.

19             THE COURT:  Okay.  Tell him thank him, he can go.

20        And can the interpreter go?  Is that the last --

21             MR. TALON:  Yes.

22             THE COURT:  -- okay.  Thank you so much.

23             MR. TALON:  All though I did want to say to her off

24        the record, that I speak, you know, I'm Jewish so I had

25        Hebrew lessons.  I'm not fluent, but I noticed that abock

1      (ph) is four in Hebrew.

2              INTERPRETER:  Yes.

3              MR. TALON:  Abates, house.

4              INTERPRETER:  House.

5              MR. TALON:  I can't remember what else I heard.

6              INTERPRETER:  Lots, lots.

7              MR. TALON:  Yes.  It was very interesting, I

8      enjoyed that.

9              INTERPRETER:  A lot --

10             MR. TALON:  Yes, and I thought you did a great job

11     since we're throwing the accolades around.

12             INTERPRETER:  Oh, thank you.

13             THE COURT:  Especially since she didn't know she

14     was doing an exam.  They told her it was an arraignment.

15             INTERPRETER:  No idea.

16             THE COURT:  Right.

17             INTERPRETER:  Honestly.

18             THE COURT:  Right.

19             MR. TALON:  Okay.  Are we ready, Judge?

20             THE COURT:  Yes.  Okay.  Thank you.  Okay.

21             MR. TALON:  All right.  First of all Judge, I'd

22     like to move to bind over as charged in Count I, First degree

23     Premeditated Murder.  People believe that in particular, the

24     statement, the testimony of Ebony Donald, that the Defendant

25     asked her to go back and get something.  She goes back and

1    Los brings a gun and puts it in the front seat.  She drives

2    back, the Defendant gets in the car and the Escalade.  Puts

3    the gun in his waistband and gets out.  Whether he fired the

4    gun immediately or within 20 minutes or an half an hour,

5    that's still sufficient probable cause for a trier of fact to

6    find probable cause for here for Premeditation, Deliberation.

7         As to the Felony Murder, we believe that the testimony

8    that the Defendant asked for money is sufficient probable

9    cause to send it to the trier of fact.  It's certainly raises

10   a question of fact.  Your Honor, I certainly think that's a

11   common sense interpretation, that when you go up to someone

12   you ask for money and then the person says no and then you

13   take out a gun and shoot them that it's in the perpetration

14   or attempted perpetration of a larceny.

15        Now granted Ebony Donald's testimony was that they were

16   there back and forth all day long.  And I suppose there could

17   be an argument made somewhere along the lines that the

18   Defendant was trying to get back money that he felt was

19   rightfully his.  That's a question of fact for the trier of

20   fact.  I think that, you know, that's what I think that is

21   right there.

22        As far as the counts of Assault with Intent to Murder,

23   there's two counts.  Judge, I think that the testimony of the

24   witnesses about how that the shots went to the windows they

25   talked about scattering.  I think that there could be cause

84

1    for Assault With Intent to Murder, but I think that it's

2    probably more likely that what the Defendant was doing at

3    that particular time was that he was making Assault with a

4    Dangerous Weapon with the intent to frighten them, to prevent

5    them from chasing him.

6         And so I think if the Court finds that it's not

7    sufficient probable cause for Assault With Intent to Murder

8    the Court should instead bind over on Count III and Count IV,

9    with Felonious Assault pursuant to 750.82.

10         We believe that there's probable cause for Count V,

11   being a felon in possession of a firearm, there having been a

12   stipulation that the Defendant has a prior felony conviction

13   and was not eligible to possess a firearm on that date.  And

14   certainly there was probable cause for Count VI for Felony

15   Firearm.

16              THE COURT:  Response?

17              MR. HAMPTON:  Yes, Judge.  I'll address the two

18   Assault With Intent to Murder.  I think the Prosecutor's

19   almost back tracking on that, Judge, by offering you of the

20   Assault With Intent to Scare which I'm not sure where that is

21   in the statute.

22         I ask the question specifically of each individual

23   Judge, there were a couple of shots that were done.  Two

24   shots we know were at Haider, he's on a car leaning away from

25   him, at Haider and into the door.

1   The other shot that he said was in the window up on the

2   porch and then another shot was actually fired in the air.

3   There was no shot that was actually specifically pointed at

4   any of these individuals and none of them said that; it's not

5   on the record at all.

6       Secondly, I think even one of them even indicated Judge

7   that he believed that he was shooting for them to scatter,

8   but that's not an Assault With Intent to Murder.  It has to

9   be specific to that individual.

10      Now let's switch to the felonious assault.  If a person

11  pulls out a gun and from the testimony that you heard from

12  each of these witnesses, even the witness last week, and he

13  shoots at Haider just for the mere fact that he shooting at

14  this individual unless they can articulate that he took the

15  gun and pointed it at them specifically and they feared that

16  he was going to shoot them, there is no felonious assault.

17  If that was the case, Judge, anybody that pulls out a gun

18  where there is anybody else around can be charged for each

19  individual person that's around that area.  If he does not

20  point the gun specifically at that person or take a shot at

21  them, which neither one of those came out in the testimony, I

22  don't think we can even back track on those two AWIMs Judge

23  even down to Felonious Assault.

24      Discharging a weapon at a building, arguably from the

25  testimony, I can understand that.  Discharging a weapon in

86

1  public, arguably, I can understand that.  But the Assault

2  With the Intent to Murder or the Assault With the Intent to

3  Scare, which I don't know if I've ever heard of before,

4  Judge--

5          MR. TALON:  I misspoke.  I meant -- I didn't mean

6  it with intent -- I meant to --

7          MR. HAMPTON:  Frighten.

8          MR. TALON:  -- I meant it to be as to Felonious

9  Assault --

10          MR. HAMPTON:  Oh, okay.

11          MR. TALON:  -- whether it be interpreted as to

12  that.

13          MR. HAMPTON:  Okay.  Okay, well, right.  Either

14  way, Judge, I just made the argument with respect to those

15  charges.  So I think those charges go away quickly.

16      The Felony Firearm, that's a question of fact.  The

17  Possession by a Felon, for purposes of the exam, we

18  stipulated to the prior charge that he had that was a felony.

19  That's obviously a question of fact.

20      Now as for the Premeditated Murder and the Homicide

21  Murder, Judge, there's testimony from a number of the

22  witnesses that he had been there all day.  Back and forth all

23  day.  He had had a conversation with them.  If you recall

24  last Friday Mr. Raad got on the stand and said they were

25  going back and forth, they were talking.  As a matter of

1   fact, the argument got heated and then Haider actually got up

2   and pushed Mr. Powell and then Mr. Powell pulled out his gun

3   and shot Haider.  And you probably have that in your notes.

4       Now these individuals each of them who right in their

5   statement, which we asked them that you saw Haider push this

6   individual, I mean pushed Mr. Powell and then Mr. Powell

7   pulls out his gun.  Now today they're telling me oh, well the

8   police don't know; it was in English, I didn't know what I

9   was writing; and he didn't push.  One individual says that he

10  pushed with his hands, but his hands didn't make contact.

11  The other individual says that he pushed with a wave and that

12  wave didn't make contact.

13      Now I understand that that sounds like argument as far

14  as question of fact Judge, but what it does go to is the

15  premeditation nature of this.  They would have you believe

16  that he walks in off the street, walks up to this individual,

17  asks for money and shoots at him.  That's not what we have

18  here.  And you've heard that from the testimony of the first

19  person that came in on last Friday, Mr. Raad, and from Ebony

20  Donald that came in.

21      And then even these individuals, he did not walk up with

22  a gun, ask for money, Judge, he asked when they were going

23  back and forth and then he said he pulled out a gun and

24  shoots him.  That's if you want to and the Court can look

25  into the credibility of the witnesses if you want to believe

1  that now that they're saying he didn't touch with his hands,

2  he just waved with his hands first.  Obviously trying to

3  preserve their brother.

4      Under those standards, Your Honor, I don't believe that

5  we have a felony murder in this matter.  I'm not going to

6  concede to it and I'll object to it but because of the

7  testimony of Ebony Donald, even though she testified under

8  oath before and even in her police report before saying

9  something totally different.  She testified today that my

10  client called for her to go pick up a gun.  She went and

11  picked it up and she brought it to the scene.  That is a

12  question of fact if the Court will believe that Judge, and I

13  will reserve that argument.  I'm not going to stipulate to it

14  but I can see where that is a question of fact.

15      As for the Felony Murder, Your Honor, that is not there,

16  that's a Murder Two.  As for the Assault With Intent to

17  Murders, we have heard any testimony regarding those and I've

18  already articulated as to Count V and VI, the Felon in

19  Possession and the Felony Firearm.

20      MR. TALON:  Just a couple of things, Judge.

21      THE COURT:  Yes.

22      MR. TALON:  Is that the tenant was there before.

23  Let's say arguably there must -- let's say there was arguably

24  a conversation about money beforehand.  I think there's an

25  argument made he wasn't getting what he wanted.  So he calls,

1    tells Ebony Donald, go get -- go pick up something.  And lo

2    and behold, Los is waiting to put the gun in the car.  So

3    that shows forethought ahead of time by the Defendant.  Ebony

4    Donald goes, Defendant gets in the car, gets the gun, he goes

5    back out there because he wants arguably the money that he

6    thinks he's entitled to.

7         Now whether it's his money or not, it's a claim of

8    rights, the question of fact for the trier of fact, you know.

9    Haider says no and, you know, there's a question of fact as

10   to whether or not the Defendant had the gun out at that time.

11        But a reasonable interpretation of why he would have

12   made -- and he told them to go, whether he actually

13   physically pushed him or put his hands out, it's a reasonable

14   thing that we would argue -- that someone might do if they --

15   if money's being demanded of them and they are afraid and

16   that they see that the person who's demanding the money is

17   the one that has the gun.

18        So Judge, we feel -- certainly think that there are

19   questions of fact there.  And that we certainly have shown

20   probable cause consistent with the theory of our case.  An

21   Assault With a Dangerous Weapon is individual to each person

22   that's put in fear.  There were at least two witnesses who

23   testified they were on the porch when the Defendant fired at

24   the porch.  They scattered, they ran into the house.

25        I think it's reasonable that the Defendant after he shot

90

1    Haider and knows that there's other people there that are

2    friends of Haider, that in order to make good his get away,

3    he wants to make sure that they don't chase him.  So he shot

4    at the house, at the very least to put them in fear of being

5    shot so that they wouldn't come after him.  So I think that's

6    certainly a Felonious Assault.

7          MR. HAMPTON:  Judge, that's a great argument, but

8    that's not necessarily what was testified to.  If I discharge

9    a firearm and someone is over here and they are made afraid

10   by my discharge of firearm, that doesn't necessarily mean

11   Felonious Assault as to this person.

12        Not one of those people got up there and said that he

13   specifically pointed at me or shot at me.  They said two into

14   the car, two up into the glass, which they testified to and

15   then one actually a shot in the air.

16        Now I know that that's a credibility argument or that

17   may even be a circumstantial argument that I'm going to use

18   later on of no intent to actually shoot at anybody.  But

19   those things have to be taken into account, Your Honor, and

20   the fact that they're there and he shot at a house or shot in

21   the air is not enough to impute a Felonious Assault on to my

22   client with respect to those shots.

23        THE COURT:  All right.  Court having heard the

24   testimony of all the witnesses, having accepted the

25   stipulations of the parties, being otherwise advised as to

1    charges against Mr. Powell, Court makes the following ruling.

2        As to Count I, Homicide, Murder, First Degree,

3    Premeditated, the Court finds there is probable cause to

4    believe that that crime was committed, that is was committed

5    in the City of Detroit.  That it was committed by Mr. Powell.

6        As to Count II, Homicide, Felony Murder.  The Court

7    finds that there is probable cause to believe that that crime

8    was committed, that it was committed in the City of Detroit

9    and that it was committed by Mr. Powell.

10       As to Count II, Assault With Intent to Murder, as to Ali

11   Khudeir Al-Ganzawi and Count IV, Assault With Intent to

12   Murder as to Yasser Khudeir Al-Ganzawi, the Court is not

13   satisfied that the proofs there are Assault With Intent to

14   Murder as to those individuals.

15       MR. TALON:  What about a lesser Felonious Assault,

16   Judge --

17       MR. HAMPTON:  Judge, this --

18       MR. TALON:  -- a Dangerous Weapon as I argued as an

19   alternative?

20       MR. HAMPTON:  Judge, this is not let's make a deal.

21   Go ahead, Your Honor, I'll wait to hear what --

22       THE COURT:  Yes, let me finish my ruling.

23       MR. HAMPTON:  Go ahead, Your Honor.

24       THE COURT:  No, it's not let's make a deal,

25   however, the Court having heard the testimony of the

1    witnesses and counsel's request after the proofs had been set

2    forth to this Court to amend the information to Felonious

3    Assault, the court in People v Johnson, 407 Mich 196

4    indicates that the intent required of a defendant for

5    felonious assault is an intent to injure or an intent to put

6    the victim in reasonable fear or apprehension of an immediate

7    battery.

8       Court is satisfied that if Mr. Powell did in fact shoot

9    the victim, Hadeir Al-Ganzawi, and then point a gun towards a

10   house where there are other individuals on a porch and shoots

11   at the house.

12      Let's say he's not shooting directly at the people, but

13   if I've just witnessed by brother get shot and now you're

14   shooting at the house that I'm standing on the porch, I

15   believe that the evidence has shown that there's probable

16   cause that such action would -- it could have an intent to

17   put the victim in reasonable fear or apprehension of an

18   immediate battery.

19      Court is going to amend the Information as to Count III

20   and IV and bind over as to Felonious Assault as opposed to

21   Assault With Intent to Murder.

22      As to Counts V and VI, the weapons charges, based upon

23   stipulation of the parties with respect to Count V, Court

24   finds probable cause and with respect to Count VI, based upon

25   the testimony of the witnesses that there was a weapon.   The

1    only issue as to Count VI is that the Information will be

2    amended as to Murder First Degree and the Felonious Assault

3    not as to Assault With Intent to Murder.

4            MR. TALON:  You mean it would be amended to be say,

5    Murder, First Degree and it would say, Felonious Assault as

6    oppose to Assault With Intent to Murder.

7            THE COURT:  Yes.

8            MR. TALON:  Okay.  I'll take care of that Your

9    Honor.

10           THE COURT:  Okay.  That being the ruling of the

11   Court, Mr. Powell stands bound over as indicated by the Court

12   to Wayne County Circuit Court for further proceedings on the

13   Information.

14           Arraignment on the Information will be May 30, 2008,

15   8:30 a.m.

16           And actually counsel maybe it would be easier if the

17   Court would dismiss Count III and IV?  How would it be, how

18   would it --

19           MR. TALON:  I think it's simply easier for you to

20   indicate Judge that, just as you did, that Counts III and IV

21   are amended to --

22           THE COURT:  Amended?

23           MR. TALON:  -- to Felonious Assault pursuant to

24   750.82.

25           THE COURT:  Okay.

1    MR. HAMPTON:  Your Honor, I got to go across the

2  street to get that date changed don't I?

3    THE COURT:  Yes.

4    MR. HAMPTON:  The 30th?

5    THE COURT:  Yes, I can't do anything with it.

6    MR. HAMPTON:  Okay.

7    THE COURT:  All right.  Point, that's 750.82?

8    MR. TALON:  Yes.

9    THE COURT:  Okay.

10    MR. TALON:  750, Judge.  Is that what I said Judge?

11    THE COURT:  Yes, I think so.

12    MR. TALON:  I'll double check it.

13    THE COURT:  I just took my book upstairs, I'm

14  sorry.  All right.  Let's make sure.

15    MR. HAMPTON:  Thank you, Your Honor.

16    THE COURT:  You're welcome.

17         (Whereupon this matter concluded)

18         ********************************

19

20

21

22

23

24

25

1

2

3

4                                **CERTIFICATE**

5

6    STATE OF MICHIGAN )

7                        )ss

8    COUNTY OF WAYNE   )

9

10

11          I, Shari Morton, Certified Court Reporter, do

12    hereby certify that the foregoing pages 1 through 96,

13    inclusive, comprise a complete, true and correct transcript

14    of the testimony and proceedings taken in this matter on

15    Friday, May 23, 2008.

16

17    _____

18    Shari Morton
19    421 Madison
20    Detroit, Michigan 48226
21

22

23

24