STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE
OF MICHIGAN,
                   Plaintiff,                      CASE NO. 08-6961

VS                                                 HON. TIMOTHY M. KENNY

JAMES ANDREW POWELL,
                   Defendant._____/

## MOTION FOR RELIEF FROM JUDGMENT

Now comes Defendant, James A. Powell, in propria persons, pursuant to MCR

6.501 et seq., seeking relief from judgment of conviction and sentence.

Defendant further states:

1. Defendant James A. Powell [537041] resides at Bellamy Creek

Correctional Facility, 1727 W. Bluewater Hwy, Ionia, MI  48846.

2. Defendant was convicted by guilty plea to second degree murder,

Assault with a dangerous weapon, felony firearm, and habitual offender –

–second, before Judge Timothy M. Kenny, and sentenced concurrently to 25-40

years, 2-5 years, 2-5 years, and consecutively to 2 years for felony firearm.

3. Defendant was denied relief on appeal of right, on 10/7/09, wherein,

through appointed counsel, the following issue was raised:

> MR. POWELL WAS DEPRIVED OF DUE PROCESS OF LAW WHERE THE
> COURT SENTENCED HIM BASED ON ALLEGED ACTS NOT SUPPORTED
> BY THE RECORD, NOR FOUND BY A JURY, NOR ADMITTED TO BY
> PETITIONER, NOR INDIVIDUALIZED

4. Defendant sought leave to appeal in the Michigan Supreme Court based

on the same issue, and was denied leave on 7/26/10.

5. Defendant presents the following grounds for relief herein:

> I.
>
> MR. POWELL WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF
> COUNSEL AND DUE PROCESS WHERE THE PLEA BARGAIN WAS
> ILLUSORY AND THE PLEA WAS NEITHER INTELLIGENT NOR
> VOLUNTARY, WHERE (1) MR. POWELL PLED GUILTY TO 2ND
> DEGREE MURDER IN EXCHANGE FOR DISMISSAL OF EXCESSIVE
> CHARGES AND A SENTENCE OF 27-40 YEARS WHEN PROPERLY-
> SCORED GUIDELINES CALLED FOR A SUBSTANTIALLY LOWER

COURT ADMINISTRATOR, 301
FMHJ
11 SEP -7 PM 3: 08

SENTENCE, AND (2) WHERE THE ADMISSION IS INSUFFICIENT TO
ESTABLISH MALICE FOR 2ND DEGREE MURDER OR TO ESTABLISH
ASSAULT WITH A DANGEROUS WEAPON

II.

THE FELONY MURDER STATUTE IS UNCONSTITUTIONAL AS
APPLIED: LARCENY UNDER $1,000 IS A MISDEMEANOR, AND
CANNOT SUPPORT A FELONY MURDER CHARGE

III.

MR. POWELL WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF
COUNSEL WHERE COUNSEL FAILED TO RAISE SPECIFIC
SENTENCE-SCORING ERRORS BASED ON CONSTITUTIONALLY
INACCURATE INFORMATION NOT ADMITTED TO BY MR. POWELL

IV.

PRIOR RECORD VARIABLE (PRV) 7, WHICH ENHANCES THE
SENTENCE BASED ON SUBSEQUENT OR CONCURRENT FELONY
CONVICTIONS, IS UNCONSTITUTIONAL ON ITS FACE AND AS
APPLIED, IN THAT IT VIOLATES THE DOUBLE JEOPARDY AND
TITLE-OBJECT CLAUSES OF THE FEDERAL AND MICHIGAN
CONSTITUTIONS

6. Defendant is entitled to an evidentiary hearing to make a record of
Defendant's claims of ineffective assistance of counsel and actual innocence
claims to support his claims of cause and prejudice for procedural default.
MCR 6.508(C). Where non-record evidence forms the bases of the issues to be
decided, an evidentiary hearing should be ordered. See Motion, attached
herewith

7. Defendant asserts that cause and prejudice is established by his
showing of ineffective assistance of counsel, and actual innocence

Wherefore, Defendant James Andrew Powell requests that this court order
an evidentiary hearing so that he may make a record in support of his claims,
and vacate Defendant's conviction and sentence.

Respectfully Submitted,

James Powell [537041]
Bellamy Creek Corr. Facility
1727 W Bluewater Hwy
Ionia, MI 48846

Date:

-2-

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE
OF MICHIGAN,

CASE NO. 08-6961-CZ

VS

HON. TIMOTHY M. KENNY

JAMES ANDREW POWELL,
_____/

BRIEF IN SUPPORT OF MOTION FOR RELIEF FROM JUDGMENT

## STATEMENT OF FACTS

On or about 7/21/07, Haider Al-Ganzawi was shot by Defendant James Powell near in the lower abdomen after an argument and physical altercation. Defendant fled the scene and was later arrested and charged with first degree murder, felony murder, assault with intent to murder (2 counts), felon in possession of firearm, felony firearm, and habitual offender - second.

On May 15, 2008, a preliminary examination was held in the 36th District court before Judge Lydia Dryant-Woken. Assistant Prosecutor Lawrence Talon appeared on behalf of the People. Attorney Douglas Hampton appeared on behalf of the Defendant James Powell.

Bsed Aljmalawi testified at the preliminary exam. Mr. Aljmalawi testified that the decedent Haider Al-Ganzawi was his friend, and that he was present the night the decedent was shot. Preliminary Exam Transcript, 5/15/08, pp 14-15 (Hereinafter, P.E.) Mr. Aljmalawi testified that he knew Mr. Powell from the neighborhood - P.T., Vol. I, p 15.

Witness Aljmalawi testified that Mr. Powell "asked Haider [decedent] about money." P.T., Vol. I, pp 20,24. Aljmalawi mimicked "And he tell Haider like 'fuck you.' And Haider was like 'fuck you bitch' and Haider pushed him." P.T., Vol. I, pp 20, 40-41. The witness saw Haider Al-Ganzawi push Mr. Powell in the chest. P.T., Vol. I, p 24.

Aljmalawi hears Mr. Powell use the words "motherfucker" toward the decedent, and hears the decedent use the words in return to Mr. Powell. P.T., Vol. I, pp 24, 40.

The witness testified that he sometimes played basketball with Mr. Powell and "smoke[d] weed" with Mr. Powell at [the house on] Bailout." P.T., Vol. I, p 30. The witness did not know whether Mr. Alganzawi owed Mr. Powell money. P.T., Vol. I, p 40

Mr. Aljamdani admitted to calling Mr. Powell on the telephone. P.T., p 47. He also admitted that Mr. Powell "was a friend for Haider and Haider doesn't have any problem with him." P.T., Vol. I, pp 48,49

Attorney Roger McDuffie appeared on behalf of Ebony Donald -- driver of the truck and Mr. Powell's girlfriend. McDuffie informed the court that Ms. Donald would be asserting her rights under the Fifth Amendment. P.T., Vol. I, p 55. After questioning began, Ms. Donald did so. P.T., Vol I., p 62.

The exam was postponed until May 23, 2008. Ms. Donald testified that she dropped Mr. Powell off at the Rutland address and left Mr. Powell there. P.T., Vol. II (5/23/08), p 11. Ms. Donald saw a "bunch of guys." P.T., Vol. II, p 11. A couple of hours later, Mr. Powell called Ms. Donald and told her to come back. P.T., Vol II, p 12. Mr. Powell called and had her come from Mr. Powell's uncle's house on Broadmoor to the house on Rutland at about 5:30 or 6:00 that evening. P.T., Vol. II, p 13. Ms. Donald testified that she followed Mr. Powell, who drove his aunt's white Sebring, over to Broadmoor from the Rutland address. pp 14-15. Mr. Powell left Ms. Donald at the Broadmoor address. p 17. A couple hours later, Mr. Powell returned there. p 7. Ms. Donald then drove Mr. Powell back to the Rutland address at about 8:30 pm. pp 17-18. She saw the same guys she saw earlier. p 18. She sat in the car about 30 minutes to an hour waiting on Mr. Powell, who was at the Rutland address. p 20. Another 20 minutes passed before Mr. Powell returned to his car. p 21. Mr. Powell then had Ms. Donald drive back to the Broadmoor address to "get something" from his cousin, "Los. p 21. Mr. Powell returned to the Rutland address. p 22. After arriving at Broadmoor, 'Los gave a gun to Mr. Donald. p 23. Ms. Donald returned to 5890 Rutland and parked in the same place she was before. p 24. Ms. Donald saw Mr. Powell put the gun in his waistband and get out of the truck. p 24. About 20, 25 minutes later, Ms.

Donald heard a couple of little shots. p 25. Mr. Powell then returned to the truck and banged on the window and was let in. p 25. Ms. Donald drove off with Mr. Powell to Mr. Powell's mother's house. p 26. Ms. Donald didn't know what happened to cause the shots she heard. pp 38-39. Ms. Donald did not know what gun the shots came from. p 39.

Ali Khaleic Al Ganzami -- the brother of the deceased -- testified that he was sitting on the porch of his brother's home on Rutland, when Mr. Powell "started walking in from the street and then he came. He came he said he wanted money but my brother was leaning on the car." p 54. Ali Khaleic Al Ganzami said that his brother "didn't give him money so he shoot him." p 55. He Al Ganzamia testified that Mr. Powell took nothing from the deceased. pp 55-56. Ali Khaleic stated that Mr. Powell said to him, "I need money" and "I need money." p 57. Ali Al Ganzamic testified that he arrived "five minutes before the incident happened." p 60. Ali testified that Mr. Powell was not a friend of his brother, Haider, but that Mr. Powell was a friend of Raid, who lived with Haider. p 61. When asked whether Mr. Powell had a gun in his hand when he arrived, Ali stated that Mr. Powell did not, but that he pulled it out later. p 62. Ali denied that there was any argument prior to the shooting. p 63. Ali denied that Haider pushed Mr. Powell prior to the shooting. p 63. When asked whether he remembered telling the police that Haider shot up and pushed Mr. Powell, Ali stated that he did not remember, and that whoever translated that must have thought that. p 64.

Yasser Al Ganzamic -- also a brother of the decedent, Haider Al Ganzamic -- stated that he was on the porch when his brother was shot. p 69. Yasser denied knowing Mr. Powell. p 70. Yasser testified that, "Mr. Powell came walking, he said give me money. He told him I don't have no money, I'm not giving you money. p 71. After saying that he had no money, Mr. Powell shot

him    p 71.  Yassse stated that "[w]hen he asked Haider for money and Haider told him I don't have, sorry, I just come him out his hand in his pocket."  p 71.  Yassse denied that Haider pushed Mr. Powell   p 72.  Yassse stated that he had never seen Mr. Powell before the day of the shooting   p 73   The court addressed the people in the audience to cease hand gestures   See, e.g., p 75   Yassse stated that Reed did not arrive until "[j]ust before . . . Haider was shot."  p 76   When asked whether Haider pushed Mr. Powell, Yassse denied it.   p 80   Yassse, like his brother, Ali, claimed the translator must have mistaken his answer given to the police after the incident.   p 80.

The Prosecutor then moved to bind Defendant Powell over on felony murder, first degree murder, assault with a dangerous weapon, felon in possession of a weapon, felony firearm, and habitual — second, after dropping the assault with intent to murder counts.

Prior to trial, Mr. Powell was offered a plea bargain — Plead guilty to 2nd degree murder, felon in possession, felony firearm, assault with a dangerous weapon, and felony firearm, and the Prosecutor would recommend a sentence of 27-40 years, and dismiss felony murder and first degree murder charges.   This was a horrible deal entered into without any knowledge of the weight of the state's case.   Counsel did not advise Defendant about the advantages or disadvantages of taking the plea.   Counsel failed to explain that there were complete defenses to larceny which was used to support felony murder, and there was little or no evidence to support a premeditated killing.   Counsel erroneously led Defendant Powell to believe that bringing the gun could suffice for first degree.   In other words, counsel did not explain that bringing the gun did not necessarily, in and of itself, equate to intent to kill.  No explanation on malice was given, and nothing was ever said about the proof needed for second degree murder either.   Finally, counsel did not put in

4

[illegible] that the intent to commit the larceny could not qualify for the showing of malice. Mr. Powell believed that when he had admitted to such murder, notwithstanding the provocation testified to at the preliminary exam. Counsel never bargained for a manslaughter plea, and Mr. Powell is convinced that he is innocent of murder, and at the most, he is only guilty of manslaughter. But for [illegible] advice, Mr. Powell would not have plead guilty to murder. In fact, after a close examination of the record, Mr. Powell asserts that the admission he gave does not establish murder at all. Armed with a proper understanding of the charges and the elements needed to prove them, Mr. Powell is prepared to either plead guilty to manslaughter or be tried on all murder counts.

With respect to assault with a dangerous weapon, Defendant contends that he is innocent of these charges based on the fact that he really did believe he was in danger and that shooting in the air to end the pursuit of four men was not unreasonable and that it was self defense. Mr. Powell seeks relief from the judgment and sentence based on the reasons in the brief attached.

ARGUMENT I

MR. PURNELL WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF
COUNSEL AND DUE PROCESS WHERE THE PLEA BARGAIN WAS
ILLUSORY AND THE PLEA WAS NEITHER INTELLIGENT NOR
VOLUNTARY, WHERE (1) MR. PURNELL PLED GUILTY TO SECOND
DEGREE MURDER IN EXCHANGE FOR DISMISSAL OF EXCESSIVE
CHARGES AND A SENTENCE OF 27-40 YEARS WHEN PROPERLY-
SCORED GUIDELINES CALLED FOR A SUBSTANTIALLY LOWER
SENTENCE, AND (2) WHERE THE ADMISSION IS INSUFFICIENT
TO ESTABLISH MALICE FOR 2ND DEGREE MURDER OR TO
ESTABLISH ASSAULT WITH A DANGEROUS WEAPON

STANDARD

### Voluntary Plea

The question of whether a plea is voluntary for purposes of the federal
constitution is a question of federal law, and not a question of fact.
MARSHALL V LONNBERGER, 459 U.S. 422,431 (1985). Constitutional issues are
issues of law that are reviewed de novo. PEOPLE V PITTS, 224 Mich App 298,263
(1977)

### Ineffective Assistance

A claim of ineffective assistance of counsel is a Constitutional issue
which is reviewed de novo. PEOPLE V LEBLANC, 465 Mich 575,579 (2002); PEOPLE
V PICKENS, 446 Mich 298,359 (1994). The performance and prejudice components
are mixed questions of law and fact. STRICKLAND V WASHINGTON, 466 U.S.
668,698 (1984).

Defendant must show that counsel's performance was deficient. This
requires a showing that counsel's performance was deficient. This requires a
showing that counsel made errors so serious that counsel was not functioning
as the "counsel" guaranteed the defense by the Sixth Amendment. The Defense
must also show that the deficient performance prejudiced the defense.
STRICKLAND, 466 U.S. at 687.

### Sufficiency of the Evidence

Questions regarding the sufficiency of the evidence are reviewed de

determine, on the basis of all the evidence viewed in a light most favorable to the prosecution, if a reasonable trier of fact could conclude that all required elements of the crime were proven beyond a reasonable doubt. PEOPLE V RAINES, 223 Mich App 230,237 (1997), citing PEOPLE V HAMPTON, 407 Mich 354 (1979). Factual findings are reviewed for clear error. See, e.g., ALAN CUSTOM HOMES, INC V KROL, 256 Mich App 505,512 (2003).

### Cause and Prejudice

In PEOPLE V REED, 449 Mich 375 (1995), the Michigan Supreme Court reaffirmed the staff commentary to the court rule and held that Michigan courts follow Federal standards when interpreting provisions in MCR 6.500 et seq., which were patterned after the federal habeas corpus statutes. The standards of good cause and prejudice are "based on several decisions of the United States Supreme Court." See WAINWRIGHT V SYKES, 433 U.S. 72 (1977)(state prisoner habeas corpus action); UNITED STATES V FRADY, 456 U.S. 152 (1982).

A procedural bar, i.e., failure to previously raise an a claim, may be overcome, allowing a court to review the merits, "only upon a showing of cause for the loss of fault and prejudice to the petitioner," WAINWRIGHT, supra, 433 U.S. at 87, or upon a showing that a failure to consider the claim will result in a fundamental miscarriage of justice. See HARRIS V REED, 489 U.S. 255, 262-63 (1989)(quoting MURRAY V CARRIER, 477 U.S. 478,495 (1986)); COLEMAN V THOMPSON, 501 U.S. 722,750 (1991)

Cause may be established by showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by state officials made compliance impracticable, or that the procedural default is the result of ineffective assistance of counsel. MURRAY V CARRIER, supra, 477 U.S. at 488. Actual prejudice must be demonstrated by showing that the

7

seemed at trial acutely geared to Defendants' actual and substantial disadvantage, infecting the entire trial with errors of Constitutional dimension.  UNITED STATES V FRADY, supra, 456 U.S. at 152,170.

DISCUSSION

Defendant James Powell pled guilty to second degree murder, two counts of assault with a dangerous weapon, felon in possession of a weapon, felony firearm, and habitual offender second, in exchange for the dismissal of felony murder and first degree murder charges, and a sentence of 27-40 years [sic].

Defendant Powell argues that (1) for a person similarly situated (convicted of 2nd degree murder), the dismissal of felony and first degree murder charges, for which there was no evidence of an intent to kill or to commit an enumerated felony whatsoever — especially an alleged misdemeanor larceny to support a felony murder — and a sentence of 27-40 years was not a bargain at all; and (2) the admissions by Mr. Powell does not establish murder in any degree.  Defendant contends that in either case, that he would have received a sentence substantially less than 27-40 years — if any, either because properly scored 2nd degree murder guidelines would have placed him in a less severe class, or because at most, Mr. Powell is guilty of no more than manslaughter.

In a light most favorable to the prosecution, Mr. Powell attempted to commit a larcenous taking from the deceased.  By all witness accounts, Mr. Powell demanded $100 or 200 dollars which they claim was owed to him for a "Pit Bull" puppy.  See Statement of Ali Al-Hamad   Ex. 4; and Statement of Riad Al Jamhari.  Ex. 2.  If this was the case, as the state alleges, then no color has been established except for a misdemeanor.  The state now says that this MISDEMEANOR can support a FELONY MURDER charge.  Mr. Powell contends that this is an absurd result and the statute, as the Fact and as applied in

unconstitutional.  See Argument II, infra.

Again, in the light most favorable to the prosecution, Defendant Powell contend that Chony Donald being a gun in the Holland residence.  The state charged that Mr. Powell intended to assault and murder the three witnesses, yet claims that there was a misdemeanor situation.  Mr. Powell contend that this, too, is absurd.  Nowhere does the evidence suggest why this gun was brought to the scene, although it is charged that Mr. Powell brought it to kill Mr. Heider Al-Guzzani, in an alleged first degree murder theory.  Mr. Powell contends that the bringing of the gun, alone, may establish premeditation for something, but not to kill Al-Guzzani.  In fact, the state's own overwhelming evidence shows that a forceful, but not unlawful demand was made for the money owed, and that no gun comes out until Mr. Powell is pushed by the decedent, and after hostile words are exchanged between the two, Mr. Powell said only that even if he was the initial aggressor, there was more than enough that blood to make this homicide manslaughter rather than a murder.

Mr. Powell never admitted having motive for killing Mr. Al-Guzzani.  Mr. Powell never planned on the present jury reasoning for the act from which action could be construed.  Theoretically, if this was a fist fist between two parties, Mr. Powell would reluctly admit to a felony murder or first degree murder, and then the Prosecutor would dismiss the felony murder and first degree murder charges and accept a plea of guilty to the lesser charge of 2nd degree murder.  That would be a bargain — a man guilty, or likely guilty of first degree murder pleads guilty to 2nd degree.  This did not happen.  The Prosecutor charged the biggest crime he could find based on the totality of evidence and the most contradictory theories to reach the guilt of Defendant and force a plea.  See Prelim. Exam. Transcript where Assault With Intent to

9

[text illegible] ... the Prosecutor would not have the leverage to force such a poor and non-beneficial deal. In other words, the state never had a legal argument that could survive a trial at all. It is this kind of bargaining that is inherently unfair and Mr. Powell contends that with proper representation, and just a bit of exploration and examination of his options by counsel, Mr. Powell would not have pled. Thus, Mr. Powell asserts that he did not intelligently and voluntarily plead guilty to the armed robbery, murder and assault charges.

## ARGUMENT

A plea agreement is a contract. UNITED STATES V ROBISON, 924 F2d 612,613-14 (6th Cir 1991). A plea agreement is interpreted and enforced pursuant to traditional contract law principles. Id. As a matter of Federal Constitutional law, "[a]he requirement that a plea of guilty must be intelligent and voluntary to be valid has long been recognized." BRADY V UNITED STATES, 397 U.S. 742,747 Fn 4 (1970). There is no illusory plea bargain when Defendant believed the deal to have one value which in fact is of another lesser value. PEOPLE V PETER WILLIAMS, 153 Mich App 346 (1986); UNITED STATES V RANDOLPH, 250 F3d 253 (6th Cir 2000).

The court must ascertain whether the plea is voluntary and not which support for a finding that defendant is guilty of the offense to which he pleads guilty. MCR 6 502(b)(1). The Prosecutor did no more than bluff with excessive charges which in all likelihood could not sustain a defense by an attorney prepared to fight. The Prosecutor's duty is to seek justice. BERGER V UNITED STATES, 295 U.S. 78 (1935). He may not use "improper methods to produce a wrongful conviction." Id, 295 U.S. at 88. He has the burden of proving each and every element of the charge. PEOPLE V GAINES, 223 Mich App

230,235 (1997)(citing PEOPLE V TAYLOR, 176 Mich App 374,376 (1989))

## A. The Plea is Illusory

If the Defendant in good faith believed that the money was his own and he was entitled to its possession, he is not guilty of robbery or larceny PEOPLE V HOLCOMB, 395 Mich 326 (1975); PEOPLE V SHAUNDING, 268 Mich 218 (1934); PEOPLE V MCCANN, 42 Mich App 47 (1972). Fraudulent intent is an essential and indispensable ingredient to every larceny, and a person who takes property under a claim of right, has not committed larceny. There was never any "taking" or attempt to "take" any property from the decedent except for what Defendant Powell demanded as rightfully his. A larcenous taking is complete when there has been asportation of property. See, e.g. PEOPLE V RANDOLPH, 466 Mich 532 (2002)(taking accomplished when defendant placed merchandise under his clothing without force). Larceny requires that there be a "STEALING" of property. PEOPLE V STEVENS, 9 Mich App 531 (1968). There was absolutely no evidence that Defendant ever stole or attempted to "steal" anything. Pre-arrest evidence taken by police reflects the following:

### WITNESS RAAD AL JAMLAWI
[Statement taken by Officer Ed Williams    Ex. 2]

Q.   Mr. Aljamlawi, what can you tell me about the fatal shooting that occurred in front of 5000 Rutland late last night (7/21/07)?

A.   I was standing in front of my house along with my brother, Haidera [Al Ranzawi], Yaz (sir), & Ali. While we were outside a guy named Jimmy pulled up ... Jimmy got out the passenger side of the truck and walked up to Haidera. He asked Haidera if he had $100 for him. Haidera told Jimmy no. Jimmy started walking away and saying "Oh it's like that?" The next thing I knew Jimmy pulled a gun from his waistband and just started shooting at Haidera. When he stopped shooting the other guys tried to grab Jimmy so he started shooting at them. Jimmy ran and jumped back in the Escalade and drove North on Rutland.

*       *       *       *       *

Q.   Was Jimmy and Haidera having any problems?

A    No.

Q    How do you know Jimmy?
A    I have known him for about 1 yr.  Me use to live on
Mettni st.   So me and Jimmy smoking weed & playing
basketball.

#### WITNESS ALI KHUDEIR AL GANZAWI
[Statement taken by Sgt. K. Gardner   Ex. 3]

Q    Can you tell me how Haider was shot tonight?

A    We were sitting on the porch and we were just
talking.  It was me, Haider, Ali, Vass (sic), Rau (sic)
and another Ali.   Matthew came walking a black auto
came walking up.  He walked up and he pulled out a gun
and started pointing it and saying, Money, Money.
Haider stood up and he pushed him and said no money.
That is when he started shooting.  The first had hit
Haider, then the other shots went back and forth.

*       *       *       *       *

Q    Did he get any money?

A    Yes

#### WITNESS ALI A. HAMEED
[Statement taken by Inv. Mario Muniz, Ex. 4]

Q    What can you tell me about the fatal shooting of
Haider Al-Ganzawi.

A    I was here, we were all sitting on the porch,
talking laughing

Q    Who is we

A    My uncle Haider, his two brothers Ali Ganzawi, Vass
Ganzawi, Mahmoud si (sic) and is a friend.

Q    What time was this

A    Sometime after 10:00

Q    Then what happened

A    A guy name Jimmy Rush ... came over some time
before 11pm.  He had been dropped off by his girl
**Jimmy ask my uncle for $100 that was owed.**  My uncle
argued that he didn't owe it and he never his
property.  I then saw Jimmy on his cell phone.  He was
calling his girl to go get when to get his gun.  Approx

> The moment after his seat returned, Jimmy walked over to the vehicle and got into the passenger side. He got out pulling from his back and said to my uncle "Oh, it's like that" and fired a shot.

Defendant was asked whether he had any "legal" reason for the shooting, to which, he replied, "No." The state was in no position to earn a conviction, if Mr. Powell had been given any meaningful explanation of all about the weight of the state's case, and the available defenses. Counsel failed to consult with Defendant about any "legal" reason of the case which the judge inquired about. "Consult" means to advise the advantages and disadvantages ... and to make a reasonable effort to discover the Defendant's wishes." ROE V FLORES-ORTEGA, 528 U.S. 470 (2000). Counsel did not.

In POWELL V ALABAMA, 287 U.S. 45,68-69 (1932), the U.S. Supreme Court explained the obvious about counsel's vital role in the criminal Defendant's Sixth Amendment right:

> The right to be heard would be of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with a crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of competent counsel, he may be put on trial without a proper charge .... He lacks both the skill and knowledge to adequately prepare his defense even though he may have a perfect one .... He requires the guiding hand of counsel at every step in the proceedings against him.

Counsel did not consult with Defendant Powell about what charges were backed by solid evidence and which ones were not after hearing Defendant's claim that the argument caused the shooting, not premeditation. In other words, where there was evidence of bad blood, evidence of a dispute over money owed to Defendant, and evidence of a physical assault and battery by the deceased, counsel had a duty to put in layman's terms the real possibility of a plea deal or trial with an instruction on manslaughter, the possible defenses of

[illegible faded text]

## B. Plea Insufficent

[illegible faded text]

> [MR. HAMPTON]: Your Honor, today is the date and time
> for the pretrial, the offer is made by the People
> [illegible] discussed this offer at length with my client he
> has indicated that he would like to accept the offer of
> the People.
>
> [THE COURT]: Is that correct, sir?
>
> MR. POWELL: Yes.
>
> THE COURT: What's the offer, Mr. Walker?

14

MS. WALKER: The offer is if the Defendant pleads guilty to Second Degree Murder, two counts of Felonious Assault, Felon in Possession of a Firearm, and Felony Firearm as well as the Habitual Offender, Second Offense. We will dismiss the First Degree Premeditated Murder and we will dismiss the First Degree Felony Murder which is Count One and Count Two in this case.

In addition, the Defendant agrees to serve a sentence of 25 to 40 years on the murder two, plus two years for Felony Firearm and whatever the court chooses to impose on the two Felonious Assault Counts and the Felon In Possession Count. p3-4.

*       *       *       *       *

THE COURT: And did you, in fact, shoot Mr. Alquazamie (sp)?

MR. POWELL: Yes, sir.

THE COURT: And as a result of your shooting him you learned that Mr. Alquazamie (sp) died, is that correct?

MR. POWELL: Yes, sir.

THE COURT: How many times was he shot?

MR. POWELL: Once.

THE COURT: And you certainly didn't have any legal basis to shoot him or kill him did you?

MR. POWELL: No, Sir. p 8

There is no factual basis for a murder. There is no record of malice, no wanton and willful behavior that the result was likely to cause death. There is no such admission made by Defendant Powell. At most, the record established a homicide. Whether Defendant had a legal basis for the shooting is beyond the Defendant's knowledge at this point. His attorney had not provided him with any understanding of the distinction between murder and manslaughter to enable Mr. Powell to make an intelligible decision about whether he was getting a fair deal.

A factual basis is sufficient if an inculpatory inference can be drawn

from what the defendant has admitted despite the fact that an exculpatory inference can be drawn from the same facts. GUILTY PLEA CASES, 395 Mich 96, 128-132 (1975). The cognizable inquiry is whether the trier of fact could properly convict on the facts as elicited by Defendant. PEOPLE V FRAZIER, 100 Mich App 776, 779 (1980). Michigan Courts have not hesitated in cases where sufficient basis for the plea is lacking, despite the intent of the parties to enter into an agreement:

> Cf., PEOPLE V RICHARDS, 95 Mich App 433 (1980)(admissible corpus where after receiving and concealing stolen property may admit to receiving property);
>
> PEOPLE V NICKERSON, 96 Mich App 604 (1980)(insufficient factual basis for conspiracy where admission established that accused was a customer in another supplier, but not accused agreed to aid in delivery of heroin to third party);
>
> PEOPLE V SEDA-RUIZ, 87 Mich App 100, 102 (1978)(mere recitation that defendant drew checks and did not have money in the bank insufficient plea);
>
> PEOPLE V HENRY ANDERSON, 111 Mich App 667 (1981)(factual basis insufficient where defendant denied knowledge that the checks were intended to mislead)

In PEOPLE V BRADFORD, 144 Mich App 416 (1985), Bradford was convicted on his plea of guilty, of drawing checks and that the account contained insufficient funds to cover the checks, but specifically denied knowing that the account contained insufficient funds at the time the checks were drawn. The court held that the factual basis was insufficient, and that the specific intent to defraud was necessary to commit the crime of drawing insufficient funds. The same rule should apply.

The holding that in which Defendant admitted to second degree murder in the instant case. Mr. Powell contends that he has not admitted to any murder — only a homicide. Again, Defendant Powell asserts that due to poor advice or the lack of any advice, at all, material to Mr. Powell's plea decision to

plead guilty to murder as the evidence of but intent is strong. The only evidence which the state claims supports murder supports manslaughter.

"Malice requires an intent to cause the very harm that results or some harm of the same general nature, or in wanton or willful disregard of the state and strong likelihood that such harm will result." PEOPLE V AARON, 409 Mich 672, 676 (1980). Under the direction of JACKSON V VIRGINIA, 443 U.S. 307 (1979), which holds that due process is satisfied if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the plea in this case is lacking the elements to sustain a murder of any kind. There is no more an admission to murder than there is to manslaughter by the plea. A killing "without legal basis" can be murder or manslaughter or lesser offenses where homicide is concerned. As such, this court should grant relief by reducing a conviction for manslaughter and resentencing Mr. Powell, or in the alternative, grant a trial on the merits on all original charges.

ARGUMENT II
THE FELONY MURDER STATUTE IS UNCONSTITUTIONAL ON ITS
FACE AND AS APPLIED: LARCENY UNDER $1,000 IS A
MISDEMEANOR AND CANNOT SUPPORT A FELONY MURDER

STANDARD

Questions of statutory interpretation are reviewed de novo. PEOPLE V
BUEHLER, 477 Mich 18,23 (2007). Constitutional claims include those regarding
statutes, and are reviewed de novo. PEOPLE V RODRIGUEZ, 251 Mich App 10, 25
(2002)

DISCUSSION

Defendant contends that the felony murder statute applies to murder
committed during the commission of a felony. PEOPLE V AARON, 409 Mich 672
(1980). In addition, Mr. Powell contends that the statute violates the Title
Object Clause of the Michigan Constitution.

ARGUMENT

A. Facial Unconstitutionality

On its face, the statute is unconstitutional because it includes conduct
that is not a felony. "Larceny of any kind" includes misdemeanors, and this
is simply not what the historical use of the felony murder doctrine was
designed to address. For centuries, the felony murder rule has applied to
felonies, hence, the name. Michigan has seen fit to incorporate a misdemeanor
larceny from a person to elevate it to felony murder entirely. PEOPLE V
AARON, supra, made it clear that the intent to commit a felony cannot be
equated with malice necessary to convict for murder. To include misdemeanor
behavior is to disregard the elements required to convict of murder. A
misdemeanor cannot be said to be committed as an act committed with the intent to
cause the very harm that results or the reckless disregard for the likelihood
that great bodily harm would result from the act. According to the World

Almanac and Book of Facts, 2009, homicide occurs in only 2% of armed robberies, nationwide. It can hardly be said that death would be the likely or probable result of a misdemeanor larceny, which requires that no force be used. At best, a homicide could occur only after the attempt or taking was complete. It could not be a misdemeanor larceny any other way. Defendant Powell can find no one in prison for such crime.

Even if the premise of misdemeanor larceny in the felony murder statute was logical, the Title-Object Clause prevents the statute from embracing the misdemeanor act. If there was such an Act which elevated misdemeanors to felonies or made them proper as the foundation for life without parole when committed in conjunction with a murder, there would still have to be a statute that addressed misdemeanors that were eligible for such treatment. Michigan Const. 1963, Article IV § 24 provides that:

> No law shall embrace more than one object, which shall be expressed in its title. No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title.

Defendant Powell contends that the statute was in fact amended to include the misdemeanor. This was not the original purpose of the statute.

As applied to Defendant Powell, there was never any evidence to support stealing necessary for larceny and there was no showing of force used unless the demand for money is force. If this is so, then misdemeanor larceny is not an appropriate charge. If, there was no force, then there was no crime, because a demand for money is not illegal. If, as some witnesses say, that the gun was out before he asked for the money, there is no larceny here. That is sufficient force. The application of the felony murder statute to Defendant's alleged conduct is inherently unfair. This statute was abused in Defendant's case, and can easily be repeated. For these reasons, the language "Larceny of any Kind" should be stricken as unconstitutionally vague and violative of the Title-Object and Double Jeopardy Clauses.

ARGUMENT III.

MR. POWELL WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO RAISE SPECIFIC SENTENCE-SCORING ERRORS BASED ON CONSTITUTIONALLY INACCURATE INFORMATION NOT ADMITTED TO BY MR. POWELL

STANDARD

Ineffective assistance of counsel is a constitutional issue reviewed de novo. PEOPLE V PICKENS, 446 Mich 298, 350 (1994).

DISCUSSION

Defendant was charged with felony murder, first degree murder, two counts of assault with intent to murder, felon in possession of a weapon, felony firearm, and habitual second. The assault with intent to murder was dismissed at preliminary exam. Defendant pled guilty to second degree murder, assault with a dangerous weapon, felon in possession, and felony firearm in exchange for dismissal of first degree murder and felony murder charges, and agreed to serve a sentence of 25-40 years plus an additional two years consecutively for the felony firearm. The Plea Transcript, 7/30/08, pg 8-9 reflects:

> THE COURT: Back on July 21st of last 2007 were you in front of 6098 Rutland in the city of Detroit?
>
> MR. POWELL: Yes.
>
> THE COURT: Did you in fact come in contact with an individual that you know or later knew was an individual by the name of Hoydee Algonzowie [sic]?
>
> MR. POWELL: Yes.
>
> THE COURT: And, did you in fact shoot Mr. Algonzowie (sp)?
>
> MR. POWELL: Yes, sir.
>
> THE COURT: And as a result of your shooting him you learned that Mr. Algonzowie (sp) died; is that correct?
>
> MR. POWELL: Yes, sir.
>
> THE COURT: How many times was he shot?
>
> MR. POWELL: Once.

THE COURT: And you certainly didn't have any legal basis to shoot him or kill him did you?

MR. POWELL: No, sir.

THE COURT: Am I correct that there were two other individuals Ali Kagar Algonzowia (sp) and a Yash Kagar Algonzowia (sp) two other individuals that were there at the same location on that same date; is that true?

MR. POWELL: Yes, sir.

THE COURT: And did you point the gun that you shot Mr. Heyder Algonzowia (sp), did you point that gun at those individuals --

MR. HAMPTON: Your Honor, can I have one second?

THE COURT: Yeah, sure.

MR. HAMPTON: Your Honor, just for clarification even at the preliminary exam it was not established that the gun was actually pointed at these individuals, but the gun was used to put them in apprehension which I think still qualifies as a felonious assault.

THE COURT: All right.

MS. WALKER: I believe that's true.

THE COURT: All right. They certainly were present and nearby, and certainly had reason to believe that they might also be shot by you; is that correct?

MR. POWELL: Yes, sir.

THE COURT: And you certainly didn't have any legal right or justification in putting those two men in fear of their lives either; true?

MR. POWELL: Yes.

Michigan adopted statutory guidelines in 1999, which have the force of law. MCL 769.34(1)(2); PEOPLE V LEVERSEE, 243 Mich App 337, 348 (2000). Defendant asserts that the trial court sentenced him on the basis of materially inaccurate information which led to unjustified scores in at least three Offense Variable (OV) categories, totalling 85 points.

The Michigan Sentencing Guidelines and the sentencing scheme requires the

Court to find additional facts which allow the increase of the sentence. These factual findings are neither admitted to by the Defendant, nor found by the court. These factual findings result in scores which placed Defendant Powell in Grids A-F for Prior Record Variable (PRV) scores, and from Grids I-III for various Offense Variables (OV) based on conduct or lack thereof during the commission of the offense. These variables are aggravating circumstances which are not necessary to commit the crime itself, but which are facts above and beyond the commission of the crime to justify increasing the sentence.

Defendant contends that the facts found by the court used to increase his score from Grid I to Grid III. The Michigan courts have ruled that BLAKELY V WASHINGTON does not apply to Michigan Indeterminate Sentencing scheme. For exhaustion purposes, it is raised here

### 1. OV 1 -- Aggravated Use of a Weapon

The "victim" is deceased. Defendant pled guilty to 2nd degree murder and felony firearm. As it applies to felony firearm, the statute allows 25 points to be assessed when "[a] firearm was discharged at or toward a human being or a victim was cut or stabbed ... " MCL 777.3(1)(a). Defendant raised the issue in the trial court explaining the court that no shots were discharged at or toward anyone. This is verified by the Preliminary Exam Transcript. See also, Sent. Trans., 9/20/08, pp 3-4. Both counts of AWIM were dismissed. In fact, the witness/relatives of the deceased stated that Defendant shot in the air and "not near" them. Id.

### 2. OV 3 -- Degree of Physical Injury

By its own terms, this offense variable is not to be scored where the death is the result of homicide. MCL 777.33(2)(b). The death of a person is an element of 2nd degree murder, and is not to be scored. MCL 777.3(c). This score must result in zero. Defendant asserts that he was scored 25 points

mainly contrary to the evidence.

### 3. OV 6 -- Intent to Kill or Injure Another

Defendant asserts that he was unlawfully assessed 25 points for possessing the unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or harm while knowing that death or great bodily harm was the probable result. See MCL 777.36(1)(b). This offense variable by its own terms applies to homicide and AWIM offenses, but does not apply to any offense to which Defendant pled guilty. The AWIM charges were dismissed. Defendant never admitted to any intent or attempt to kill or injure anyone **other than** the deceased. The record does not support a score of 25 points or a finding that Defendant intended to kill or created a high risk of death (knowing that death or great bodily harm was the likely result) to anyone **OTHER THAN** the deceased.

ARGUMENT

### A. The Sentence is Based on Inaccurate Information

Defendant was scored 85 points based on materially inaccurate information. But for this error, Defendant would have received a substantially lesser sentence. While it is true that habeas relief cannot be granted simply "on the basis of perceived error of state law," PULLEY V HARRIS, 465 U.S. 37,41 (1984), when the error rises to the level of depriving the defendant of fundamental fairness in the trial process, the claim is cognizable on a petition for writ of habeas corpus relief. MATLOCK V ROSE, 751 F2d 1236,1242 (6th Cir 1984); ESTELLE V MCGUIRE, 502 U.S. 62,67-68 (1991); CLEMONS V MISSISSIPPI, 494 U.S. 738,746 (1990)(in certain circumstances state procedural laws may create liberty interests that cannot be denied without violating due process).

It is well settled that Defendant has the right to be sentenced on the

basis of complete and accurate information. UNITED STATES V TUCKER, 404 U.S. 443, 447-49 (1972); TOWNSEND V BURKE, 334 U.S. 735 (1948).

The misscoring of offense variables 1,3, and 6 result in a substantially different sentence guideline to which Defendant was subjected to. A single deduction of 25 points places Defendant in OV Grid II instead of III, which, when intersected with PRV Grid D, results in a minimum sentence of 18.75 years (225 mos) and a range of 225 to 468 months. A deduction of all three scores (75 points) would place Defendant in OV Grid I instead of III, and would result in a minimum sentence of 15 years (180 mos) or a range of 180 months to 300 months (25 yrs). A difference of two grids (III down to I) or in other words, a difference of a minimum of 270 months compared to a minimum of 180 months, is a significant error reaching Constitutional dimension, which cannot be considered harmless. TUCKER, supra; TOWNSEND, supra; UNITED STATES V ANDREWS, 246 F Supp 2d 636,638 (ED Mich, 2003).

## B. Facts Found By Court Not Admitted

In BLAKELY V WASHINGTON, 542 U.S. 296 (2004), the United States Supreme Court reiterated its earlier holding that with the exception of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." APPRENDI V NEW JERSEY, 530 U.S. 466,490 (2000). Michigan has held that BLAKELY does not apply to its "Indeterminate Sentences." See PEOPLE V HARPER, 479 Mich 599 (2007); PEOPLE V MCCULLER, 479 Mich 672 (2007) These cases overruled PEOPLE V UPHAUS, 275 Mich App 158 (2007), which reached the opposite conclusion.

In CUNNINGHAM V CALIFORNIA, 549 U.S. 270 (2007), the United States Supreme Court re-affirmed the holding in APPRENDI, and held that California's Determinate Sentencing Law, which authorized a judge rather than a jury to

24

that facts exposing defendant to elevated upper term sentence violated the
defendant's right to trial by jury.   CUNNINGHAM explained on a BLAKELY and
APPRENDI.

> [T]he relevant statutory "maximum," is not the maximum
> sentence a judge may impose after finding additional
> facts, but the maximum he may impose WITHOUT any
> additional findings.  BLAKELY, 542 U.S. at 303-304, 124
> S.Ct 2531 (emphasis in original).

In every case, the Supreme Court discusses "maximum ranges" not the
absolute maximum sentence possible.   In Cunningham's case, the jury verdict
alone limited the permissible sentence to 12 years.   Additional fact-finding by
the trial judge resulted in an "upper term" sentence of 16 years.   Id, 549
U.S. at 275.   That four-year elevation was held to violate the 6th Amendment.
In BLAKELY, the maximum penalty for his offense, under the Washington Reform
Act, was ten years, if no facts beyond those reflected in the jury's verdict
were added.   Blakely could not receive a sentence greater than ten years
UNLESS the judge found "deliberate cruelty."  It did not even matter that
Blakely's sentence, though outside the "standard range", was within the ten
year maximum.   The court held that the top of the sentencing range (53 mos)
was the "relevant statutory maximum."

In Mr. Powell's case, before any admission was given, the court was
limited to a maximum range of 138 months - 304 months.   This includes the
consideration for prior convictions (PRV).   It is not until the Sentencing
Guidelines call for the judge to make "additional" factual findings, that
Defendant Powell's sentence increases from Grid I to Grid III.   BLAKELY
clearly covers Defendant's case no matter what label Michigan puts on its
sentencing scheme.

Counsel failed Defendant here as well.   At the time of Defendant's
conviction, PEOPLE V UPHAUS, 275 Mich App 158 (2007) was the law in the state.
This case held that BLAKELY and its progeny did apply to Michigan.   Thus,
counsel had a duty to raise that issue.   Counsel failed to do so.

ASSIGNED IV.
PRIOR RECORD VARIABLE (PRV) 7, WHICH ENHANCES THE
SENTENCE BASED ON SUBSEQUENT OR CONCURRENT FELONY
CONVICTIONS, IS UNCONSTITUTIONAL ON ITS FACE AND AS
APPLIED, IN THAT IT VIOLATES THE DOUBLE JEOPARDY AND
TITLE-OBJECT CLAUSES OF THE FEDERAL AND MICHIGAN
CONSTITUTIONS

STANDARD

Constitutional issues are reviewed de novo.  PEOPLE V RODRIGUEZ, 251
Mich App 10, 25 (2002).

DISCUSSION

Defendant was convicted  and punished for his prior crimes.  Defendant
Pled guilty to the instant charges in exchange for a specific sentence, which
he believed was within the guidelines and correctly scored.  After giving the
plea, the state used the PRV 7 to enhance the 2nd Degree Murder guideline
score for the concurrent felony convictions.

Literally speaking, Prior Record Variables covers "prior" crimes.  BLAKELY V
WASHINGTON, 542 U.S. 296 (2004) and APPRENDI V NEW JERSEY, 530 U.S. 466 (2000)
understood the term "prior conviction" as within.  If a concurrent sentence
can be used to enhance the larger sentence which concurrent it, then they
appears to be on point to run them concurrently.

This scheme conflicts with the concurrent sentence doctrine, void for and
nullifies the  consecutive sentence doctrine, and violates the prohibition
against multiple punishments, and violates the title-object clause.

Defendant was not made aware of this PRV when he made the plea.  To is a
significant omission by counsel.  KIMMELMAN V MORRISON, 477 U.S. 365, 365
(1986)(A "single, serious error may support a claim for ineffective
assistance of counsel").  What the state giveth with one hand, it taketh away
with the left.  The whole point of a concurrent sentence is to avoid  a
multiple punishment.  This is not a knowing, voluntary, intelligent or

beneficial bargain.  See Argument I.  This scheme does nothing but encourage a
prosecutor to dig up and charge every crime he can think of.  As such,
Defendant's score should be reduced or the entire case overthrown and set for
trial, and the statute declared unconstitutional.

## RELIEF REQUESTED

Wherefore, Defendant asks that the court grant his evidentiary hearing,
vacate his convictions, and enter judgment of guilty of manslaughter, or grant
a trial by jury.

Respectfully Submitted,

James Andrew Powell 537041
Bellamy Creek Facility
1727 W Bluewater Hwy
Ionia, MI  48846

27

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE
OF MICHIGAN,                                    CASE NO. 08-6961-CZ

                                                HON. TIMOTHY M. KENNY
VS

JAMES ANDREW POWELL,
_____/

BRIEF IN SUPPORT OF MOTION FOR EVIDENTIARY HEARING

## STATEMENT OF THE CASE

Defendant James Andrew Powell, in propria persona, was convicted by plea of guilty to 2nd degree murder, assault with a dangerous weapon, felon in possession, and felony firearm -- second.  Defendant was sentenced to 25-40 years, plus 2.  All other lesser sentences are served concurrently.

After conviction, Defendant realized that what he admitted to was not murder, and that the weight of the Prosecution's case was not great enough to sustain a first degree murder or felony murder conviction.  Defendant also believes that the conviction and sentence bargain was illusory, and that non-record evidence supports his claim that he was given poor advice by counsel. Ultimately, Defendant contends that there was no meeting of the minds with respect to the plea deal.

## ARGUMENT

Where non-record evidence forms the bases of the claims made by Defendant, and a record is necessary to evaluate those claims, a hearing is required.  PEOPLE V GINTHER, 390 Mich 436 (1973).

Wherefore, Defendant respectfully requests that this court enter an order for him to appear at a hearing and make a record of the evidence supporting his claims, and any other relief this court deems just.

Respectfully Submitted,

James A. Powell 537041
Bellamy Creek Correctional Facility
1727 W Bluewater Hwy
Ionia, MI  48846

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE
OF MICHIGAN,                                    CASE NO. 08-6961
                    Plaintiff,                  HON. TIMOTHY M. KENNY

VS

JAMES ANDREW POWELL,
            DEFENDANT. _____ /

### AFFIDAVIT OF ANDREW POWELL

I, James Powell, am competent and willing to testify under penalty of
perjury truthfully and accurately as follows:

1. All factual assertions in the Motion For Relief From Judgment and
Brief in Support are true and accurate.

2. I did not plan to shoot or kill Haider Al Ganzawie. I did intend to
keep him from shooting me or grabbing me so that all of the men at the home
could not harm me.

3. I shot Haider deliberately only after he refused to give me property
back and refused or failed to pay for it; and only after he repeatedly said
'fuck you bitch'; and finally after he pushed me.

4. I did not take a gun to the Rutland address with intent to shoot or
steal. I took the gun to Haider to see if he could fix it. Haider stated
that he would give me some weed for it if he could get it to work.

5. Haider said the money was coming -- that he was waiting for someone to
bring it by. I waited for many hours. I left and returned several times, and
no money came.

6. I gave Haider a Pit Bull puppy up front and waited on the money. When
it became obvious that Haider was not going to pay, I demanded my dog back. I
said that the deal was off. See Original Police Statements. Ex. 2,3, and 4.

7. When I arrived at the Rutland address with the gun, there were no

bullets and it was inoperable. Haider had a clip that fit, and fixed it.
Haider promised used if it was repairable. Haider took it into the basement,
fixed it, and fired it into cement mix bags and sod in his basement. This gun
had nothing to do with the puppy transaction.

8. When Haider returned outside, the gun was passed around and examined
by all of the men outside. Some of the guys got into the car with it and out
of the car. I lost track of who had it.

9. I brought my gun because I was outnumbered 4 to 1 and 5 to 1 at times,
and because I knew Haider and his brothers had access to guns. I was tired of
waiting for my money, and the dog was no longer at Haider's house.

10. I demanded the return of my dog and the argument started. When I
complained and stated that he was a shady Arab who wasted my time playing
games with my money, he began calling me bitches and motherfuckers, and then
pushed me.

11. I believed that because I had my girlfriend bring a gun that this
alone would suffice for first degree murder. My attorney did not adequately
explain it any other way even when I voiced my concern and posed questions.
My understanding of what little he explained was that it constituted first
degree murder without any other evidence.

12. I had no witnesses and was only aware that the brothers were all
saying that I arrived with a gun out demanding money. I was confused by the
first degree and felony murder charges.

13. To be clear, There were two guns. There was one that I shot Haider
with, and the one I gave to Haider for used hours earlier.

14. I was never aware that there was a defense to larceny and robbery
called Claim of Right which says that if I in good faith believed that the
property was mine rather than trying to take someone else's property, that

there is no crime. My attorney never brought this to my attention despite me telling him that all I did was demand my property back.

15. I never received any money from Haider.

16. I did not intend to shoot any of the other men at the house. I shot in the air because they tried to grab me and because I did not want to get shot. I did not know who had the gun, and they were all talking Arabic, and it appeared they were ordering someone to "shoot him, shoot him" followed by Arabic language.

I have read the foregoing and affirm under penalty of perjury that it is true and correct.

James A. Powell

Subscribed and sworn to before me on

this _____ day of _____, 2011.

_____
Notary Public

DETROIT
POLICE
DEPARTMENT

Ex'd

**WITNESS STATEMENT**

CASE PROGRESS

FILE/CASE NO.

| PRECINCT/SECTION | COMPLAINANT |
| --- | --- |
| Homicide | |

| DATE | TIME | PLACE | STATEMENT TAKEN BY |
| --- | --- | --- | --- |
| 7-22-07 | 1:20 Am | F/O 6890 Rutland | P.O. Ed Williams |

| WITNESS | RACE/SEX/AGE | D.O.B. | HGT. | WGT. |
| --- | --- | --- | --- | --- |
| Raad Aljinlawi | /M/ 27 | | 5'6" | 120 |

| SOC. SEC. NO. | RESIDENCE | PHONE BUS. RES. |
| --- | --- | --- |
| | | |

| EMPLOYER | DEPARTMENT | BADGE NO. | SHIFT |
| --- | --- | --- | --- |
| | | | |

| RESIDING WITH: | CHILDREN/SCHOOL: |
| --- | --- |
| | |

| RELATIVES/FRIENDS: | ADDRESS | PHONE |
| --- | --- | --- |
| Ali Algihize | | |

Q- Mr. Aljinlawi, what can you tell me about the fatal shooting that occurred in front of 6890 Rutland late last night (7-21-07)?

A- I was standing in front of my house along with my brother, Haidere Algihize, Muhamad, Yaz, + Ali, while we were outside a guy named Jimmy pulled up in a Two-tone Cadillac Escalade, I believe it was brown and silver with 22" chrome rims. Jimmy got out the passenger side of the truck and walked up to Haidere. He asked Haidere if he had $100. for him. Haidere told Jimmy NO. Jimmy started walking away and saying "Oh it's like that"? The next thing I know Jimmy pulled a gun from his waist band and just started shooting at Haidere. When he stopped shooting the other guys tried to grab Jimmy so he started shooting at them. Jimmy ran and jumped back in the Escalade and drove off North on Rutland. Muhamad + Yaz put Haidere in the car and drove him to the hospital.

Q- What is Jimmy full name and describe him?

A- Jimmy Bush! B/M/ 21-22 6'2" thin build, 170 lbs. DrK Complex, with a short hair cut with a thin mustache + beard.

Q- Do you know where Jimmy lives?

A- On Grandmont St. he lives in the 5th or 6th house South of Warren on the East side of the street.

Q- Was Jimmy + Haidere having any problems?

A- NO

Q- How do you know Jimmy?

A- I have known him for about 1yr. we use to live on mettal St. So we met Jimmy Smoking weed + playing basket ball.

Q- How many shots did Jimmy fire?

A- 4-5

R AL-JIMLAWIRAAD

Ex?

ID 103 (REV. 4-76)                                                    C of D-72-ST (4-76

Q - Was anyone Else in the Escalade with Jimmy?

A - yes, his girl friend was driving.

Q - Do you know her name?

A - No.

Q - Can you describe her?

A - B/F/ 21-24  5'6" - 5'7", heavy build 220-230 lbs. med complex with blond hair.

Q - Did she ever get out the truck?

A - No

Q - What type of gun did jimmy have?

A - I'm not sure, it was a black handgun.

Q - Did Haddere have a gun?

A - No.

[illegible text]

DETROIT
DEPARTMENT
POLICE     Ex. 3

**WITNESS   STATEMENT**

CASE PROGRESS

FILE/CASE NO.

| PRECINCT/SECTION HOMICIDE | | COMPLAINANT HAIDER AL-GAMZAWI | | |
|---|---|---|---|---|
| DATE 7/22/07 | TIME | PLACE | STATEMENT TAKEN BY SGT. K. GARDNER | |
| WITNESS    A97025238 KENTUKY Lic | | RACE/SEX/AGE N A/M | D.O.B. | HGT. 5'8  WGT. 190 |
| ALI AL GANZAWI ALI KHUDEIR | | | | |

SOC. SEC. _____    RESIDENCE _____    PHONE BUS. _____  RES. _____

EMPLOYER  NONE       DEPARTMENT       BADGE NO.    SHIFT

RESIDING WITH:  SELF

CHILDREN/SCHOOL:

RELATIVES/FRIENDS:  KARIM KASIM AL-KHAFAJI    ADDRESS _____   PHONE _____

Q CAN YOU TELL ME HOW HAIDER WAS shot tonight?

A THE WE Were sitting ON the Porch And we were Just TALKing IT Was ME, HAIDER, ALI, YEAS, Rod AND Another ALI. While We Were talking A black Male came walking UP. He Walked up And he pulled out A gun And Started pointing it AND SAYing, MONEY, MONEY. Haider Stood up and he pushed Him And said No Money. That is when he Started Shooting. THE FIRST TWO Hit Haider, then the others shots went back And Forth. When the black guy came walking UP he Came From A GRAY TRUCK Maybe A CAdillac I THink. After the Shooting the TRUCK pulled up AND A Female Was driving The Guy got into the TRUCK

X Haitam

↓ KARI

ALI ALGANZAWI

Q Describe the man that did the Shooting?

A BM 21; 5'11; SKINNY; Kind of Medium Complexion; sideburns Chin Hair; White T shirt; Blue Jeans; small gun MAybe 25 cAL.

Q Describe the Female?

A No I CAN't

Q Was the Female Driving?

A Yes

Q the man that did the Shooting, Did he get in the Front Seat or back SEAT?

A Front

Q Have you Ever Seen the man before?

A NO

Q Would you recognize him If you see Him Agpin?

A Yes

Q How many times did the man Fire the gun?

A 4   TWO And then TWO 4

Q Did he get Any money?

A Yes          X Hai Zlewl

(CONTINUED)   PAGE 2

Q Do you Know If Anyone that Was With you on the Porch Know the man that shot HAider?

A Only God Know the man

Q Was there Any Other Men or Women With the man that did the shooting?

A No one man, ONE Woman.


X Haitham

HAITAM SALEH AL. JUBURY
6432 Memorial
5/7/1978 ██████████ (Interpter)

KARIM ~~~~ (INTERPTER)

ALI AL GANZAWI

C of D- 72-ST (4-76)

DETROIT
POLICE DEPARTMENT

Ex-4(a)

WITNESS STATEMENT
CASE PROGRESS

FILE/CASE NO.

| PRECINCT/SECTION Homicide | COMPLAINANT Haider Khudeir AL-Ganzawi |
| DATE 07/22/07 | TIME 1:40 AM | PLACE 6890 Rutland | STATEMENT TAKEN BY INV. Monica Handy |
| WITNESS Ali A. HAMEED | RACE / SEX / AGE w/m/17 | D.O.B. | HGT 5"11 | WGT 165 |
| SOC. SEC. NO. | RESIDENCE Dearborn, MI 48126 |
| EMPLOYER Student | DEPARTMENT Henry Ford Community College | BADGE NO. | SHIFT |
| RESIDING WITH: MAIAHA LAHHOOD (MOTHER | CHILDREN/ SCHOOL: |
| RELATIVES/ FRIENDS | ADDRESS | PHONE |

Q - WHAT CAN YOU TELL ME ABOUT THE FATAL SHOOTING OF HAIDER AL-GANZAWI

A - I WAS HERE, WE WERE ALL Sitting on THE PORCH, TALKING Laughing

Q - WHO IS WE

A - MY UNCLE HAIDER, His TWO BROTHERS ALi GANZAWi, YASS GANZAWi, MAHAMMED WHO IS A FRIEND.

Q - WHAT TIME WAS THIS

A - SOME TIME AFTER 10:00PM

Q - THEN WHAT HAPPENED

A - A GUY NAME Jimmy BUSH B/M/21 CAME OVER SOME TIME BEFORE 11PM HE HAD BEEN DROPPED OFF BY His GIRL. Jimmy ASK MY UNCLE FOR $100.00 THAT WAS OWED. MY UNCLE STATED THAT HE didn't HAVE it AND TO LEAVE His Property. I THEN SAW Jimmy ON His CEll PHONE, HE WAS Telling His Girl TO Go UP STAIRS TO

X Ali A. Hameed

ID D 103 (REV. 4-7-6)

get his gun. Approx ten minutes later
his girl returned, Jimmy walked
over to the vehicle and got into the
passenger side. He got out pulling
a gun from his back and said
to my uncle "Oh it's like
that" and fired a shot.

Q - Where was your uncle standing

A - By his vehicle in the driveway

Q - Where was Jimmy

A - On the sidewalk, partially on
the grass.

Q - What did you do

A - I ran into the house to the
back door and out, I heard
three more shots.

Q - What did Haider owe Jimmy a
$100.00 for.

A - No, Jimmy wanted to borrow a
$100 from Haider

Q - Who conveyed Haider to the Hospital

A - Mahammed and his brother Yous.

Q - How long have you known Jimmy

A - About 1 week he comes around
and chill with my uncle.

X _____

Q - Describe Jimmy

A - 8/14/21  6"2  240 lbs.  Med Complex
Slight Facial Hair. He's Always
Hype up Like He's on Pills or
Something.

Q - Describe The Vehicle That Jimmy
Was In

A - 2004  2 Tone  Escalade  Beige/
Dark Beige  With  22" Rims.
He Resides At  6870  Grandmont.

X alt arthumul

DETROIT
POLICE
DEPARTMENT

EX-40

## WITNESS STATEMENT

### CASE PROGRESS

FILE/CASE NO. **07-209**

| PRECINCT/SECTION | COMPLAINANT |
|---|---|
| Homicide Section | Alganzi Haider |

| DATE | TIME | PLACE | STATEMENT TAKEN BY |
|---|---|---|---|
| 7-24-07 | 1:55P | F/O 6890 Rutland | P.O. K.D. Miller |

| WITNESS | RACE/SEX/AGE | D.O.B. | HGT. | WGT. |
|---|---|---|---|---|
| Ali Al-Hameed | W/M/17 | ▓▓▓▓▓ | 5-11 | 165 |

| SOC. SEC. NO. | RESIDENCE | PHONE BUS. RES. |
|---|---|---|

| EMPLOYER | DEPARTMENT | BADGE NO. | SHIFT |
|---|---|---|---|

RESIDING WITH: Maliha Lahhmod — mother

RELATIVES/FRIENDS:   ADDRESS:   PHONE:

---

**Q:** Ali on July 22 2007 Alganzi Haider was fatally shot in front of 6890 Rutland ?

**A:** Yes.

**Q:** Did You See The Person That Shot Alganzi ?

**A:** Yes.

**Q:** Are you Familiar with This Person or Are you Acquainted with The Shooter ?

**A:** Yes.

**Q:** How Long Have You Known The Shooter ?

**A:** For About A Week. He Would Come By Here At Rutland. The Forth Day I Saw Him He Came By Here At Rutland And Wanted To Sell Me A Little Mutt Pit Bull Puppy. He Tried To Charge Me $80.00 To Take His Puppy. I Told Him I Don't Want His Puppy. He Said Take My Cell Number Down And Call Me.

**Q:** What Cell Number Did He Give You ?

**A:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

DPD 103 (REV. 4-7 6)   C of D-72-ST(4-76)

Q: Did you ever call his number?

A: Yes. I called him after my uncle was shot so I could give you his name. I wanted you to know his name is Jimmy Bush. That's what was on his answering message.

Q: I am going to show you a photograph. Do you recognize this person?

A: Yeah. That's him. That's the guy that shot my uncle.

Q: How far away were you from the shooter?

A: About 10'. I was on the porch. He was behind the couch on the left side of the driveway.

Q: What time did this take place?

A: About 10:45 pm.

Q: How was the lighting at that time?

A: A street light and my front door was open with the lights on inside.

Q: Was the porch light on?

A: No. The lights inside were enough. He was at the house for about 10 minutes.

Q: Are you positive that the person in the photo is the person you saw shoot your uncle?

A: Yes.

X

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE
OF MICHIGAN,

CASE NO. 08-6961-CZ

VS

HON. TIMOTHY M. KENNY

JAMES ANDREW POWELL,
_____/

## MOTION FOR EVIDENTIARY HEARING

Now comes Defendant, James A. Powell, in propria personna, pursuant to MCR 6 508(A), and moves this court for an order requiring an evidentiary hearing in the above-entitled matter regarding allegations of ineffective assistance of counsel, and voluntariness of the plea, and innocence to excuse default.

Respectfully Submitted,

James A. Powell 537041
Bellamy Creek Correctional Facility
1727 W Bluewater Hwy
Ionia, MI  48846
Date: 9-1-11

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE
OF MICHIGAN,

CASE NO. 05-6961-CZ

VS

HON. TIMOTHY M. KENNY

JAMES ANDREW POWELL,
_____/

## BRIEF IN SUPPORT OF MOTION FOR EVIDENTIARY HEARING

### STATEMENT OF THE CASE

Defendant James Andrew Powell, in propria persona, was convicted by plea
of guilty to 2nd degree murder, assault with a dangerous weapon, felon in
possession, and felony firearm -- second.  Defendant was sentenced to 25-40
years, plus 2.  All other lesser sentences are served concurrently.

After conviction, Defendant realized that what he admitted to was not
murder, and that the weight of the Prosecution's case was not great enough to
sustain a first degree murder or felony murder conviction.  Defendant also
believes that the conviction and sentence bargain was illusory, and that non-
record evidence supports his claim that he was given poor advice by counsel.
Ultimately, Defendant contends that there was no meeting of the minds with
respect to the plea deal.

### ARGUMENT

Where non-record evidence forms the bases of the claims made by Defendant, and
a record is necessary to evaluate those claims, a hearing is required.  PEOPLE
V GINTHER, 390 Mich 436 (1973).

Wherefore, Defendant respectfully requests that this court enter an order
for him to appear at a hearing and make a record of the evidence supporting
his claims, and any other relief this court deems just.

Respectfully Submitted,

James A. Powell 537041
Bellamy Creek Correctional Facility
1727 W Bluewater Hwy
I
Ionia, MI  48846

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE
OF MICHIGAN,                                    CASE NO. 08-6961
                Plaintiff,                      HON. TIMOTHY M. KENNY

VS

JAMES ANDREW POWELL,
                DEFENDANT.                  /

## AFFIDAVIT OF ANDREW POWELL

I, James Powell, am competent and willing to testify under penalty of
perjury truthfully and accurately as follows:

1. All factual assertions in the Motion For Relief From Judgment and
Brief in Support are true and accurate.

2. I did not plan to shoot or kill Haider Al Ganzawie.  I did intend to
keep him from shooting me or grabbing me so that all of the men at the home
could not harm me.

3. I shot Haider deliberately only after he refused to give me property
back and refused or failed to pay for it; and only after he repeatadly said
'fuck you bitch'; and finally after he pushed me.

4. I did not take a gun to the Rutland address with intent to shoot or
steal.  I took the gun to Haider to see if he could fix it.  Haider stated
that he would give me some weed for it if he could get it to work.

5. Haider said the money was coming -- that he was waiting for someone to
bring it by.  I waited for many hours.  I left and returned several times, and
no money came.

6. I gave Haider a Pit Bull puppy up front and waited on the money.  When
it became obvious that Haider was not going to pay, I demanded my dog back.  I
said that the deal was off.  See Original Police Statements.  Ex. 2,3, and 4.

7. When I arrived at the Rutland address with the gun, there were no

bullets and it was inoperable.  Haider had a clip that fit, and fixed it. Haider promised weed if it was repairable.  Haider took it into the basement, fixed it, and fired it into cement mix bags and sod in his basement.  This gun had nothing to do with the puppy transaction.

8. When Haider returned outside, the gun was passed around and examined by all of the men outside.  Some of the guys got into the car with it and out of the car.  I lost track of who had it.

9. I brought my gun because I was outnumbered 4 to 1 and 5 to 1 at times, and because I knew Haider and his brothers had access to guns.  I was tired of waiting for my money, and the dog was no longer at Haider's house.

10. I demanded the return of my dog and the argument started.  When I complained and stated that he was a shady Arab who wasted my time playing games with my money, he began calling me bitches and motherfuckers, and then pushed me.

11. I believed that because I had my girlfriend bring a gun that this alone would suffice for first degree murder.  My attorney did not adequately explain it any other way even when I voiced my concern and posed questions. My understanding of what little he explained was that it constituted first degree murder without any other evidence.

12. I had no witnesses and was only aware that the brothers were all saying that I arrived with a gun out demanding money.  I was confused by the first degree and felony murder charges.

13. To be clear, There were two guns.  There was one that I shot Haider with, and the one I gave to Haider for weed hours earlier.

14. I was never aware that there was a defense to larceny and robbery called Claim of Right which says that if I in good faith believed that the property was mine rather than trying to take someone else's property, that

there is no crime. My attorney never brought this to my attention despite me telling him that all I did was demand my property back.

15. I never received any money from Haider.

16. I did not intend to shoot any of the other men at the house. I shot in the air because they tried to grab me and because I did not want to get shot. I did not know who had the gun, and they were all talking Arabic, and it appeared they were ordering someone to "shoot him, shoot him" followed by Arabic language.

I have read the foregoing and affirm under penalty of perjury that it is true and correct.

James A. Powell

Subscribed and sworn to before me on

this _____ day of _____, 2011.

_____
Notary Public

DETROIT
DEPARTMENT
POLICE

## WITNESS STATEMENT

### CASE PROGRESS

FILE/CASE NO.

| PRECINCT/SECTION | | COMPLAINANT | |
|---|---|---|---|
| Homicide | | | |

| DATE | TIME | PLACE | STATEMENT TAKEN BY |
|---|---|---|---|
| 7-22-07 | 1:30 Am | F/O 6890 Rutland | P.O. Ed Williams |

| WITNESS | RACE/SEX/AGE | D.O.B. | HGT. | WGT. |
|---|---|---|---|---|
| Raad Aljinlawi | /M/ 27 | | 5'6" | 120 |

| SOC. SEC. NO. | RESIDENCE | PHONE BUS. RES. |
|---|---|---|

| EMPLOYER | DEPARTMENT | BADGE NO. | SHIFT |
|---|---|---|---|

| RESIDING WITH: | CHILDREN/SCHOOL: |
|---|---|

| RELATIVES/FRIENDS: | ADDRESS | PHONE |
|---|---|---|
| Ali Algihize | | |

Q- Mr. Aljinlawi, what can you tell me about the fatal shooting that occurred in front of 6890 Rutland late last night (7-21-07)?

A- I was standing in front of my house along with my brother, Haidere Algihize, Muhamad, Yaz, & Ali. While we were outside a guy named Jimmy pulled up in a Two-tone Cadillac Escalade, I believe it was brown and silver with 22" chrome rims. Jimmy got out the passenger side of the truck and walked up to Haidere. He asked Haidere if he had $100. For him. Haidere told Jimmy no. Jimmy started walking away and saying, "Oh it's like that"? The next thing I know Jimmy pulled a gun from his waist band and just started shooting at Haidere. When he stopped shooting the other guys tried to grab Jimmy so he started shooting at them. Jimmy ran and jumped back in the Escalade and drove off North on Rutland. Muhamad & Yaz put Haidere in the car and drove him to the hospital.

Q- What is Jimmy full name and describe him?

A- Jimmy Bush! B/M/ 21-22 6'2" thin build, 170 lbs. Drk complex, with a short hair cut, with a thin mustache + beard.

Q- Do you know where Jimmy lives?

A- On Grandmont St. he lives in the 5th or 6th house south of Warren on the East side of the street.

Q- Was Jimmy + Haidere having any problems?

A- No

Q- How do you know Jimmy?

A- I have known him for about 1yr. We use to live on Mettal st. So we met Jimmy smoking weed + playing basket ball.

Q- How many shots did Jimmy fire?

A- 4-5

P. AL-JIMLAWI RAAD

PD 103 (REV. 4-76)                                                 C of D-72-ST (4-76)

Q - Was anyone Else in the Escalade with Jimmy?

A - Yes, his girlfriend was driving.

Q - Do you know her name?

A - No.

Q - Can you describe her?

A - B/F/ 21-24  5'6" - 5'7", heavy build 220-230 lbs. med complex with
    blond hair.

Q - Did she ever get out the truck?

A - No

Q - What type of gun did jimmy have?

A - I'm not sure, it was a black handgun

Q - Did Hardere have a gun?

A - No.

  AL (MEADIS ROAD)

DETROIT
DEPARTMENT
POLICE

**WITNESS STATEMENT**
CASE PROGRESS

FILE/CASE NO.

| PRECINCT/SECTION | COMPLAINANT |
| HOMICIDE | HAIDER AL-GAMZAWI |

| DATE 7/22/07 | TIME | PLACE | STATEMENT TAKEN BY SGT. K. GARDNER |

| WITNESS A 97025 238 KENTUCKY LIC | RACE / SEX / AGE | D.O.B. | HGT. 5'8 | WGT. 190 |
| ALI AL GANZAWI ALI KHUDEIR N A/M | | | | |

| SOC/CASE NO. | RESIDENCE | PHONE BUS. RES. |

| EMPLOYER NONE | DEPARTMENT | BADGE NO. | SHIFT |

RESIDING WITH: SELF

| RELATIVES/ FRIENDS: KARIM KASIM AL-KHAFAJI | ADDRESS | PHONE |

Q CAN YOU TELL ME HOW HAIDER WAS shot tonight?

A THE WE Were sitting on the porch And We were Just TALKing IT Was ME, HAIDER, ALI, YEAS, Red And Another ALI. While We Were talking A black Male came walking UP. He walked up And he pulled out A gun And started pointing it And saying, MONEY, MONEY. Haider stood up and he pushed Him And said No Money. That is When He started Shooting. THE FIRST TWO Hit Haider, then the others shots Went back And Forth. When the black guy came Walking UP he came From A GRAY TRUCK Maybe A Cadillac I Think. After the Shooting the Truck pulled Up And A Female Was driving The Guy got into the TRUCK

X Haitham

↓ KARI

ALI ALGANZAWI

Ex. 3

Q Describe the man that did the Shooting?

A B/m 21; 5'11; Skinny; Kind of Medium Complexion; Sideburns Chin Hair; White T shirt; Blue Jeans; Small gun Maybe 25cal.

Q Describe the Female?

A No I can't

Q Was the Female Driving?

A Yes

Q the man that did the Shooting, Did he get in the Front seat or back SEAT?

A Front

Q Have you ever Seen the man before?

A NO

Q Would you recognize him IF you see Him Again?

A Yes

Q How Many times did the man Fire the gun?

A 4 Two and then Two 4

Q Did he get Any money?

A Yes            X Hamilton

Q Do you Know if Anyone that was with you on the Porch Know the man that shot HAider?

A Only Bod Know the man

Q Was there Any Other Men or Women With the man that did the shooting?

A No one man, ONE Woman

X Haitham

HAITAM SALEH AL. JUBURY
6432 Memorial
5/7/1978 ████████ (INTERPTER)

KARIM _____ (INTERPTER)

ALIALGANZAWi

DETROIT
DEPARTMENT
POLICE

Ex 4 (R)

WITNESS STATEMENT
CASE PROGRESS

| PRECINCT/SECTION Homicide | | COMPLAINANT Haider Khudeir AL-Ganzawi |
|---|---|---|
| DATE 07/22/07 | TIME 1:40 AM | PLACE 6890 Rutland | STATEMENT TAKEN BY INV. Marie Handy |
| WITNESS Ali-A-HAMEED | RACE/SEX/AGE w/m/17 | D.O.B. | HGT 5"11 | WGT 165 |

SOC. SEC. NO.     RESIDENCE     Dearborn, MI 48126

EMPLOYER Student     DEPARTMENT Henry Ford Community College     BADGE NO.     SHIFT

RESIDING WITH: MAIAHA LAHMOD (mother

RELATIVES/FRIENDS     ADDRESS     PHONE

FILE/CASE NO.

---

Q- WHAT CAN YOU TELL ME ABOUT THE FATAL SHOOTING OF HAIDER AL-GANZAWI

A- I WAS HERE, WE WERE ALL SITTING ON THE PORCH, TALKING LAUGHING

Q- WHO IS WE

A- MY UNCLE HAIDER, HIS TWO BROTHERS ALI GANZAWI, YASS GANZAWI, MAHAMMED WHO IS A FRIEND.

Q- WHAT TIME WAS THIS

A- SOME TIME AFTER 10:00PM

Q- THEN WHAT HAPPENED

A- A GUY NAME JIMMY BUSH B/m/21 CAME OVER SOME TIME BEFORE 11PM HE HAD BEEN DROPPED OFF BY HIS GIRL. JIMMY ASK MY UNCLE FOR $100.00 THAT WAS OWED. MY UNCLE STATED THAT HE DIDN'T HAVE IT AND TO LEAVE HIS PROPERTY. I THEN SAW JIMMY ON HIS CELL PHONE, HE WAS TELLING HIS GIRL TO GO UP STAIRS TO

X Ali A Hameed

4 (R)

DD D 10 3 (REV. 4-7 6)

get his gun. Approx ten minutes later his girl returned. Jimmy walked over to the vehicle and got into the passenger side. He got out pulling a gun from his back and said to my uncle "Oh it's like that" and fired a shot.

Q - Where was your uncle standing

A - By his vehicle in the driveway

Q - Where was Jimmy

A - On the sidewalk, partially on the grass.

Q - What did you do

A - I ran into the house to the back door and out, I heard three more shots.

Q - What did Hader owe Jimmy a $100.00 for.

A - No, Jimmy wanted to borrow a $100 from Hader

Q - Who conveyed Hader to the hospital

A - Mahammed and his brother Joas.

Q - How long have you known Jimmy

A - About 1 week He comes around and chill with my uncle.

X _____

Q - Describe Jimmy

A - 8/14/21   6'2   240 lbs.   Med Complex
Slight Facial Hair.  He's Always
Hype up Like He's on Pills or
Something.

Q - Describe The Vehicle That Jimmy
Was In

A - 2004  2 Tone  Escalade  Beige/
Dark Beige  With 22" Rims.
He Resides At 6870 Grandmont.

X [signature]

DETROIT
DEPARTMENT
POLICE

**WITNESS STATEMENT**

CASE PROGRESS

FILE/CASE NO.
07-209

| PRECINCT/SECTION | COMPLAINANT |
|---|---|
| Homicide Section | Alganzi Haider |

| DATE | TIME | PLACE | STATEMENT TAKEN BY |
|---|---|---|---|
| 7-24-07 | 1:55P | F/O 6890 Rutland | P.O. K.D. Miller |

| WITNESS | RACE / SEX / AGE | D.O.B. | HGT. | WGT. |
|---|---|---|---|---|
| Ali Al-Hameed | W/M/17 | | 5-11 | 165 |

| SOC. SEC. NO. | RESIDENCE | BUS. RES. |
|---|---|---|

| EMPLOYER | DEPARTMENT | BADGE NO. | SHIFT |
|---|---|---|---|

| RESIDING WITH: | CHILDREN/ SCHOOL: |
|---|---|
| Malitia Lahhmod - mother | |

| RELATIVES/ FRIENDS | ADDRESS | PHONE |
|---|---|---|

---

**Q:** Ali on July 22 2007 Alganzi Haider was fatally shot in front of 6890 Rutland?

**A:** Yes.

**Q:** Did you see the person that shot Alganzi?

**A:** Yes.

**Q:** Are you familiar with this person or are you acquainted with the shooter?

**A:** Yes.

**Q:** How long have you known the shooter?

**A:** For about a week. He would come by here at Rutland. The forth day I saw him he came by here at Rutland and wanted to sell me a little mutt pit bull puppy. He tried to charge me $80.00 to take his puppy. I told him I don't want his puppy. He said take my cell number down and call me.

**Q:** What cell number did he give you?

---

CDD D 103 (REV. 4-7 B)

C of D-72-ST(4-76)

Q: DID YOU EVER CALL HIS NUMBER?

A: YES. I CALLED HIM AFTER MY UNCLE WAS SHOT SO I COULD GIVE YOU HIS NAME. I WANTED YOU TO KNOW HIS NAME IS JIMMY BUSH. THATS WHAT WAS ON HIS ANSWERING MESSAGE.

Q: I AM GOING TO SHOW YOU A PHOTOGRAPH. DO YOU RECOGNIZE THIS PERSON?

A: YEAH. THAT'S HIM. THATS THE GUY THAT SHOT MY UNCLE.

Q: HOW FAR AWAY WERE YOU FROM THE SHOOTER?

A: ABOUT 10'. I WAS ON THE PORCH. HE WAS BEHIND THE COUCH ON THE LEFT SIDE OF THE DRIVEWAY.

Q: WHAT TIME DID THIS TAKE PLACE?

A: ABOUT 10:45 PM.

Q: HOW WAS THE LIGHTING AT THAT TIME?

A: A STREET LIGHT AND MY FRONT DOOR WAS OPEN WITH THE LIGHTS ON INSIDE.

Q: WAS THE PORCH LIGHT ON?

A: NO. THE LIGHTS INSIDE WERE ENOUGH. HE WAS AT THE HOUSE FOR ABOUT 10 MINUTES.

Q: ARE YOU POSSITIVE THAT THE PERSON IN THE PHOTO IS THE PERSON YOU SAW SHOOT YOUR UNCLE?

A: YES.

X_____